# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS, SPRINGFIELD DIVISION

| | |
|---|---|
| JANET S. HOEFS,<br>   Plaintiff,<br><br>CACV of COLORADO, LLC, et al.,<br>   Defendants. | )<br>)<br>)<br>) CASE NO. 04-30015-KPN<br>)<br>)<br>)<br>) |

### DEFENDANT CACV of Colorado, LLC's REPLY TO HOEFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION

### INTRODUCTION

Defendant CACV of Colorado, LLC ("CACV") replies to *Plaintiff Janet Hoefs' Response to Motion to Compel Arbitration* to present the following points: (1) Hoefs attempts to ignore her contractual obligation to arbitrate her claims that arise from her underlying credit card agreement; (2) Hoefs argues that she never agreed to the arbitration agreement, even though purchases and payments were made on her credit card account after the arbitration agreement was sent to her; therefore, by using the credit card, Hoefs assented to the governing cardmember agreements that contained an arbitration clause; (3) Hoefs argues that the arbitration amendment does not apply to the defendants and implies that she has intentionally not named a party as a defendant in an attempt to avoid enforcement of the arbitration clause; however, MBNA assigned CACV Hoefs' account and as the lawful assignee, CACV is entitled to enforce the arbitration agreement; and (4) Hoefs presents no genuine issue of material fact.

## FACTUAL BACKGROUND

**A.     Hoefs Entered Into Cardmember Agreement With MBNA.**

On October 22, 1997, Hoefs opened a credit card account with MBNA America Bank, N.A.[1] (Deposition of Stephen Fox, Exhibit A, p 8, ln 10). Hoefs agreed that she applied for an MBNA credit card, but could not recall the exact date. (Deposition of Janet Hoefs, Exhibit B, p 7, ln 9). However, she did recall getting a Cardmember Agreement with her credit card, which she reviewed. (Depo of Hoefs, Exhibit B, p 7, ln 13; p 8, ln 5). Specifically, she identified the Cardmember Agreement that she received in the mail at her deposition. (Depo of Hoefs, Exhibit B, p 8, ln 18; Cardmember Agreement, attached as Exhibit C). Once she received the physical credit card, Hoefs called a phone number to activate the card and began making purchases on the credit card account. (Depo of Hoefs, Exhibit B, p 7, ln 20; p 10, ln 3). In addition, her husband at that time, Clinton King, also had authorization to use the MBNA credit card. (Depo of Hoefs, Exhibit B, p 12, ln 13). The Cardmember Agreement expressly stated that "[w]hen you accept or use the account, you agree to the terms in this Agreement." (Exhibit C, p 1, ¶ 2 under "General").

Further, the Cardmember Agreement stated that:

> If you permit any person to have access to your card or account
> number with the authorization to make a charge, you may be liable
> for all charges made by that person including charges for which
> you may not have intended to be liable.

(Exhibit C, p 1, ¶ 3 under "How to Use Your Card"). In addition to this contractual language,

---

[1] At her deposition, Ms. Hoefs testified that when she originally opened the credit card with MBNA, her last name was King since she had taken her ex-husband's last name in marriage. (Depo of Hoefs, Exhibit B, p 15, ln 1-6).

Hoefs testified that by allowing Clinton King to utilize the MBNA credit card, she knew she would be liable for his purchases made on the credit card. (Depo of Hoefs, Exhibit B, p 13, ln 23).

Further, Hoefs recalled reviewing the portion of the Cardmember Agreement that stated it could be amended.[2] (Depo of Hoefs, Exhibit B, p 9, ln 9). Under a heading titled "Amendments," the Cardmember Agreement stated:

> We may amend this Agreement by complying with the applicable notification requirements of federal law and the laws of the State of Delaware. If you fail to accept any amendment to this Agreement in the manner provided in such amendment, we may terminate your rights to receive credit and may ask you to return all credit devices as a condition of your rejection. The amended Agreement (including any higher rate or other higher charges or fees) will apply to the entire unpaid balance, including the balance existing before the amendment became effective. We may replace your credit card with another card at any time.

(Exhibit C, p 6).

After reviewing the Cardmember Agreement, activating the card, and adding her husband, Clinton King, as an authorized user to the credit card account, Hoefs made purchases and payments on the credit card. (Depo of Hoefs, Exhibit B, p 10, ln 3). By using the credit card, Hoefs agreed to the terms of the Cardmember Agreement.

**B.    Hoefs Received Statements From MBNA.**

Once Hoefs began using her credit card for purchases, MBNA sent statements to her at

---

[2] It should be noted that in its *Motion to Compel Arbitration*, CACV incorrectly stated that on July 1, 1999 Hoefs was sent an addition to her Cardmember Agreement that contained a provision allowing the Agreement to be amended. Instead, the original Cardmember Agreement sent to Hoefs, which Hoefs acknowledged was sent to her, contained a provision that it could be amended. There was no addition sent to her since the original agreement could be amended. This was clarified by the deposition testimony of MBNA, who previously owned her account.

3

P.O. Box 337, Bancroft, West Virginia. (Exhibit D). This was Hoefs' valid address and she received MBNA statements at this post office box. (Depo of Hoefs, Exhibit B, p 15, ln 7-16). Hoefs maintained this post office box through access with a key until she moved to Massachusetts in 2000. (Depo of Hoefs, Exhibit B, p 17, ln 3-19). In addition, Hoefs' husband at that time, Clinton King, was legally authorized to use the post office box where the MBNA statements were mailed, since he also had a key.[3] (Depo of Hoefs, Exhibit B, p 20, ln 14; p 24, ln 7).

At some point, Hoefs thought that she had closed her account with MBNA, although she never received any documentation from MBNA that her account had been closed. (Depo of Hoefs, p 22, ln 14). Instead, purchases and payments continued to be made on her account, as detailed on her account statements. (See Exhibit F). Even though the MBNA statements reflected valid addresses for Hoefs, she denied receiving statements from the time period of 1998 until 2000. (Depo of Hoefs, Exhibit B, p 23, ln 2). However, Hoefs admitted that the MBNA statements could be have been sent to her post office box. (Depo of Hoefs, Exhibit B, p 23, ln 22). Further, she admitted that Clinton King may have removed them from the post office box before she could view them, acknowledging that he was legally authorized to use the post office box. (Depo of Hoefs, Exhibit B, p 24, ln 1; p 27, ln 21). This is irrelevant to MBNA, as they continued to send statements to valid addresses for Hoefs' account where regular purchases and payments were being made to it. MBNA never received return mail from the Postal Service on Hoefs' account. (Depo of Fox, Exhibit A, p 21, ln 2).

---

[3] In addition, at some point in July of 1999, Hoefs current husband, Steven Hoefs, was authorized to use the credit card, demonstrating that in 1999 she thought the MBNA card was active. (Depo of Fox, Exhibit A, p 42, ln 16).

**C.    In 1999, MBNA Exercised Its Right To Amend The Cardmember Agreement By Adding An Arbitration Clause.**

In December 1999, MBNA exercised its right to amend the Cardmember Agreement by adding, *inter alia*, an arbitration clause, requiring Hoefs to submit all claims arising out of the Cardmember Agreement to arbitration. (See Amendments, attached as Exhibit E). These amendments were mailed to cardholders in good standing along with their statement. (Depo of Fox, Exhibit A, p 34, ln 3). It was MBNA's normal course of business to send out these amendments that included an arbitration clause. (Depo of Fox, Exhibit A, 34, ln 11). The amendment was sent to Hoefs with her January 2nd billing statement because her account was in good standing. (Depo of Fox, Exhibit A, p 36, 2; p 38, ln 20; see billing statement, attached as Exhibit G). The billing statement was sent to 20 Thorn Hill Estates, Poca, West Virginia. (Depo of Fox, Exhibit A, p 36, ln 14). Further, Hoefs admitted that she lived at this address and that statements would have been mailed to this address, as her address is correct on the statements. (Depo of Hoefs, Exhibit B, p 28, ln 20; p 30, ln 20). However, Hoefs stated that she never received these statements because her ex-husband, Clinton King, took them out of her mailbox before she could read them. (Depo of Hoefs, Exhibit B, p 31, ln 15). It is irrelevant whether it was Hoefs viewing these statements or Clinton King because both individuals were authorized to use the credit card. In any event, charges were made to the card both before and after MBNA sent the arbitration amendment to Hoefs. (Depo of Fox, Exhibit A, p 38, ln 10; p 39, ln 19; Depo of Hoefs, Exhibit B, p 33, ln 3).

As discussed in CACV's *Motion to Compel Arbitration*, the arbitration clause contained a provision that required Hoefs to send written rejection of the arbitration provision to MBNA in

the event she did not want to be subject to arbitration. (Exhibit E, p 2). Hoefs sent no written objection to MBNA. (Depo of Fox, Exhibit A, p 38, ln 3).

**D.     In 2000, Hoefs Made Payments Towards Her Credit Card.**

During sometime in 2000, MBNA contacted Hoefs because she was not making payments on her credit card. At that time, Hoefs lived at 15 Rice Drive, Wilbraham, Massachusetts, which is the address her final statements were being sent to by MBNA. (Depo of Hoefs, Exhibit B, p 35, ln 17). Having been contacted by MBNA, Hoefs made three payments: one in November of 2000, one in December 2000, and one in January 2001. (Depo of Hoefs, Exhibit B, p 40, ln 7). Hoefs made no other payments, although she received about five or six additional statements. (Depo of Hoefs, Exhibit B, p 40, ln 20; p 43, 18).

**E.     MBNA Assigned The Account To CACV.**

On or about April 3, 2002, MBNA assigned the account to CACV because Hoefs' account was "charged off" since she failed to make payments toward her credit card. (Depo of Hoefs, Exhibit B, p 41, ln 12; see Affidavit of Assignment, attached as Exhibit H). Under this assignment, CACV inured to all of MBNA's rights and benefits under the Cardmember Agreement with Hoefs. (Exhibit H). Consequently, CACV attempted to collect the money Hoefs owed by utilizing a third-party service to facilitate collecting the debt, defendant J.A. Cambece Law Offices, P.C.

**ARGUMENT**

**I.     LEGAL STANDARD.**

CACV's *Motion to Compel Arbitration* was filed pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* (FAA). It makes a written arbitration "provision in any...contract

evidencing a transaction involving...an agreement in writing to submit to arbitration an existing controversy arising out of such a contract...valid, irrevocable, and enforceable, save upon such grounds as exist as law or in equity for the revocation of the contract." 9 U.S.C. § 2.  In this way, the FAA ensures that arbitration agreements are enforced pursuant to their terms.  See *Volt Info. Sci., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 498 U.S. 468, 479 (1989).

A district court must promptly compel arbitration once it is satisfied that the parties agreed to arbitrate.  9 U.S.C. § 4.  But, if the district court determines that the making of the arbitration agreement is seriously disputed, "the court shall proceed summarily to the trial thereof."  *Id.*  "The party opposing arbitration must identify a triable issue of fact concerning the existence of the agreement in order to obtain a trial on the merits of the contract."  *Tinder v. Pinkerton Security*, 305 F.3d 728, 735 (7th Cir. 2002), citing, *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191, 1196 (7th Cir. 1987).

A simple review of the facts shows that there is no triable issue of fact concerning the existence of the agreement and Hoefs' assent to that agreement because she continued to make purchases and payments towards her credit card account.[4]  Hoefs' opposition presents no issue of fact that warrants a trial on this issue.

In determining whether to order arbitration, courts must consider the presumption of arbitrability requiring all doubts to be resolved in favor of arbitration.  See, *Green Tree Fin. Corp. v. Bazzle*, 123 S. Ct. 2402, 2407 (2003) ("[I]f there is doubt about [the scope of the arbitrable issues,] we should resolve that doubt in favor of arbitration.") (internal quotes and

---

[4] Contrary to Hoefs' argument, CACV presents sufficient direct evidence to support a ruling in its favor by submitting the attached documents and deposition transcripts.

7

citation omitted); see also, *Green Tree Fin. Corp – Ala. v. Randolph*, 531 U.S. 79, 91 (2000) (recognizing the liberal federal policy favors arbitration agreements); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1982) (same); *Anders v. Hometown Mortgage Servs.*, 346 F.2d 1024, 1029 (11th Cir. 2003) ("The [United States] Supreme Court has interpreted the statutory pronouncement [of the FAA] as a congressional declaration of a liberal federal policy favoring arbitration agreements.") (internal quotes omitted).

Courts routinely have enforced arbitration agreements in disputes relating to credit card agreements. See e.g., *Gipson v. Cross Country Bank*, 294 F.Supp.2d 1251, 1253 (M.D. Ala. 2003) (granting motion to compel arbitration where credit card holder filed an action alleging terms of the credit card agreement violating the Fair Credit Billing Act); see also, *Sarver v. TransUnion, LLC*, 264 F.Supp.2d 691, 693 (N.D. Ill. 2003) (enforcing the credit card agreement's arbitration clause which was added by an amendment when the plaintiff claimed that the credit card issuer violated the Fair Credit Reporting Act in connection with the credit card account); *Bank One, N.A. v. Coates*, 125 F.Supp.2d 819, 821 (S.D. Miss. 2001) (ordering the credit card holder to arbitrate all the claims relating to the cardmember agreement in accordance with the arbitration provision which was subsequently added to the original agreement).

As discussed below, Hoefs agreement to arbitrate is enforceable and valid because MBNA mailed the amendment to Hoefs at her valid address in its usual course of business and payments and purchases continued to be made to her account. There are no triable issues of fact in this case and CACV's *Motion to Compel Arbitration* should be granted.

**II.    HOEFS IS BOUND BY THE ARBITRATION PROVISION BECAUSE SHE USED THE CARD AFTER THE ARBITRATION TERMS WERE MAILED TO HER AND SHE MADE NO WRITTEN OBJECTION TO THE TERMS.**

Hoefs is bound by the arbitration provision because she used her credit card and benefitted from her agreement, thereby accepting the arbitration provision. Further, she did not send a written objection to the arbitration provision when it was mailed to her. As noted above, courts have found valid arbitration clauses where the dispute originated from credit card agreements. For example, in *Taylor v. Citibank USA, N.A.,* the court ordered the parties to arbitrate the plaintiff's claim that the credit card issuer violated the Fair Credit Billing Act, 15 U.S.C. § 1666(c) (FCBA), in connection with the plaintiff's credit card account. *Taylor v. Citibank USA, N.A.*, 292 F.Supp.2d 1333, 1335 (M.D. Ala.2003). The parties entered into a credit card agreement which specifically stated that the agreement may be changed at any time by the credit card issuer. *Id.* at 1336. The plaintiff made charges on his account and the defendant sent monthly billing statements in the months when he had an account balance. *Id.* Several years later, the defendant sent plaintiff a notice of amendment, which added an arbitration provision to the original agreement, with the billing statement. *Id.* The plaintiff argued that he did not assent to the amendment and that the defendant violated the FCBA. In rejecting the plaintiff's argument, the court found that "[s]ince Taylor received the notice of change in terms, which included the arbitration provision, and did not reject the changes as allowed, but continued to use the account by maintaining an account balance, he assented to the arbitration provision and is bound by it." *Id.* at 1338. The unambiguous language of the arbitration clause dictated the forum for the resolution of the dispute.

Like the plaintiff in *Taylor*, Hoefs is bound by the clear language of the arbitration

provision in her Cardmember Agreement. The present situation is factually similar to *Taylor*. Hoefs and MBNA entered into a credit card agreement. On October 22, 1997, Hoefs opened a credit card account with MBNA. (Deposition of Stephen Fox, Exhibit A, p 8, ln 10). Hoefs recalled getting a Cardmember Agreement with her credit card, which she reviewed. (Depo of Hoefs, Exhibit B, p 7, ln 13; p 8, ln 5). Once she received the physical credit card, Hoefs called a phone number to activate the card and began making purchases on the credit card account. (Depo of Hoefs, Exhibit B, p 7, ln 20; p 10, ln 3). Then, she added her husband at that time as an authorized user to the account. (Depo of Hoefs, Exhibit B, p 12, ln 13). Hoefs made purchases and payments on the credit card. (Depo of Hoefs, Exhibit B, p 10, ln 3). By using the credit card, Hoefs agreed to the terms of the Cardmember Agreement, which stated that it could be amended.

     At some point, Hoefs believed that her credit card account was closed, although she never received any documentation that it was closed. (Depo of Hoefs, Exhibit B, p 22, ln 14). Instead, purchases and payments continued to be made on her account, as detailed on her account statements. (See Exhibit F). These statements were all sent to valid addresses that she identified in her deposition.

     In December 1999, MBNA exercised its right to amend the Cardmember Agreement by adding, *inter alia*, an arbitration clause, requiring Hoefs and MBNA to submit all claims arising out of the Cardmember Agreement to arbitration. (See Amendments, attached as Exhibit E). These amendments were mailed to cardholders in good standing along with their statement. (Depo of Fox, Exhibit A, p 34, ln 3). It was MBNA's normal course of business to send out these amendments that included an arbitration clause. (Depo of Fox, Exhibit A, 34, ln 11).

Evidence of business custom is admissible to show that an act was performed in conformity with the custom. *Commonwealth v. Carroll*, 360 Mass. 580, 587 (1971); see also, Fed. R. Evid. 406. Further, the amendment was sent to Hoefs with her January 2nd billing statement because her account was in good standing. (Depo of Fox, Exhibit A, p 36, 2; p 38, ln 20; see billing statement, attached as Exhibit G). The billing statement was sent to 20 Thorn Hill Estates, Poca, West Virginia. (Depo of Fox, Exhibit A, p 36, ln 14). Hoefs admitted that she lived at this address and that statements would have been mailed to this address, as her address is correct on the statements. (Depo of Hoefs, Exhibit B, p 28, ln 20; p 30, ln 20). Charges were made to the card both before and after MBNA sent the arbitration amendment to Hoefs. (Depo of Fox, Exhibit A, p 38, ln 10; p 39, ln 19; Depo of Hoefs, Exhibit B, p 33, ln 3). By making these charges, whether made by herself or her authorized users, and benefitting from the credit card agreement, Hoefs agreed to the arbitration amendment. Finally, Hoefs sent no written objection to MBNA. (Depo of Fox, Exhibit A, p 38, ln 3). Therefore, she accepted the arbitration amendment.

     There is no evidence presented by Hoefs that she did not receive the arbitration amendment. Further, Hoefs claims that her ex husband, Clinton King, was making charges to the credit card account both before and after the arbitration amendment was mailed with the account statement. However, she recognized that he is an authorized user and that she is liable for his account activity. In fact, Hoefs knew that she was responsible for her credit card account because she made three payments: one in November of 2000, one in December 2000, and one in January 2001. (Depo of Hoefs, Exhibit B, p 40, ln 7). Hoefs also admitted the Clinton King may have received the statement with the arbitration provision. MBNA never received return mail

11

from the Postal Service on Hoefs' account.  (Depo of Fox, Exhibit A, p 21, ln 2).  In fact, MBNA followed its normal course of business and mailed Hoefs the arbitration amendment with her December 1999 account statement.  Charges were made to the account both before and after the arbitration amendment was mailed to Hoefs; therefore, she accepted the amendment and there is no triable issue of material fact.

**III.   CACV IS ENTITLED TO ENFORCE THE ARBITRATION PROVISION BECAUSE IT WAS ASSIGNED THE ACCOUNT BY MBNA.**

In her opposition, Hoefs now attempts to argue that the arbitration provision does not apply to CACV.  In asserting this position, Hoefs misreads the definitions in the arbitration agreement and improperly asserts that only MBNA can benefit from the arbitration terms.  Hoefs argues that she has not named MBNA as a co-defendant and therefore the arbitration agreement does not apply.  Not only does Hoefs misinterpret the language of the arbitration agreement, but she attempts to evade enforcement of her agreement to arbitrate by only naming certain defendants and not others.  Further, Hoefs attempts to argue that CACV is a "debt collector," which is irrelevant after a careful review of the definitions in the arbitration agreement.

Specifically, the definitions in the arbitration amendment state:

> For the purposes of this Arbitration Section, "we" and "us" means MBNA America Bank, N.A., its parent, subsidiaries, affiliates, licensees, predecessors, successors, ***assigns, and any purchaser of your account***, and all of the officers, directors, employees, agents and assigns or any and all of them.

(Exhibit E, p 2) (emphasis added).  CACV was assigned the account and purchased the account from MBNA.  (See Exhibit H).  Therefore, CACV fits within the definition of "we" and "us" and can enforce the arbitration amendment.

The definitions further define "we" and "us" to mean:

> any third party providing benefits, services, or products in connection with the account (including but not limited to credit bureaus, merchants that accept any credit device issued under the account, rewards or enrollment services, credit insurance companies, debt collectors and all of their officers, directors, employees and agents) if, and only if, such a third party is named by you as a co-defendant in any Claim you assert against us.

(Exhibit E, p 2). By misreading this second sentence and ignoring the first sentence, Hoefs argues that CACV is a "debt collector" and should have been named as a co-defendant with MBNA, which has not occurred, and therefore CACV cannot benefit from the arbitration agreement. This is a gross misinterpretation of the second sentence of the definitions. First, CACV bought Hoefs' account from MBNA and can enforce the arbitration agreement in accordance with the first sentence of the definitions. Second, the second sentence states ***"any third party providing benefits, services, or products in connection with the account,"*** which is not applicable to CACV. CACV is not providing a benefit, service or product to MBNA in connection with Hoefs' account. To the contrary, CACV owns Hoefs' account and can secure its own third parties to provide benefits, services or products to it for the account. This is precisely what CACV has done by enlisting the services of defendant Cambece, who is named as a co-defendant. Therefore, CACV is entitled to enforce the arbitration agreement.

In her opposition, Hoefs confidently directs the Court to *Dannewitz v. EquiCredit*, 333 Ill.App.3d 370, 371 (1st Dist. 2002), stating that it is "directly [o]n point." (See *Hoefs' Opposition*, p 8). This could not be more inaccurate. While the case involves similar definitions of an arbitration agreement, a mere reading of the language at issue in *Dannewitz* reveals that the "second" sentence of the definitions includes additional language that is not present in the

13

arbitration language at issue in this case. In *Dannewitz*, the "second" sentence of the definitions reads:

> In addition... "us" mean[s] any third party providing any product or service in connection with the Credit Transaction (including but not limited to investors or potential investors, real estate brokers, mortgage brokers, credit bureaus, appraisers, mortgage life insurance companies, private mortgage insurance companies, closing agents, escrow agents, title insurance companies, loan originators, rating agencies and loan services) ***or any assignee of the Credit Transaction*** if, and only if, such third party is named as a codefendant with us in a Claim asserted by you.

*Id.* at 371. (Emphasis added). As identified in bold italics, this additional language presents a contradiction between the first sentence and the second sentence, resulting in the holding in *Dannewitz* where the arbitration clause was not enforced. This contradictory language is not present in this case. Therefore, *Dannewitz* is not relevant to the decision of this case.

## CONCLUSION

For the reasons stated above, CACV requests that the Court grant its *Motion to Compel Arbitration* and order this case to be arbitrated.

> Respectfully submitted,
> CACV of Colorado, LLC,
> By its attorneys,
>
>   /s/ **Kathryn E. Pieczarka**
> Evan T. Lawson (BBO# 289280)
> Kathryn E. Pieczarka (BBO# 658785)
> LAWSON & WEITZEN, LLP
> 88 Black Falcon Avenue, Suite 345
> Boston, MA 02210
> (617) 439-4990

**CERTIFICATE OF SERVICE**

I, Kathryn E. Pieczarka, certify that on October 15, 2004 a copy of the foregoing DEFENDANT CACV OF COLORADO, LLC'S REPLY TO HOEFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION was filed electronically and served by certified mail to counsel of record as a courtesy in the event that counsel is not registered with the electronic filing system.

  /s/ **Kathryn E. Pieczarka**
Kathryn E. Pieczarka

14