Page 1

```
 1            UNITED STATES DISTRICT COURT
       DISTRICT OF MASSACHUSETTS, SPRINGFIELD DIVISION
 2

 3   JANET S. HOEFS                  :
                                     :
 4        VS.                        :  Case No. 04-30015-KPN
                                     :
 5   CACV of COLORADO, LLC, et al    :

 6
          VIDEO CONFERENCE DEPOSITION OF STEPHEN FOX,
 7        Witness in the above-entitled cause, taken on
          behalf of the Plaintiff, pursuant to notice,
 8        before Jeannette A. Lemoine, CSR, a Notary Public
          in and for the State of Rhode Island and
 9        Providence Plantations, at the offices of Allied
          Court Reporters, 115 Phenix Avenue, Cranston,
10        Rhode Island, on September 1, 2004, at 2:00 p.m.

11
     APPEARANCES:
12   For the Plaintiff:
          LEFEBVRE & SONS LAW OFFICE
13        BY:  CHRISTOPHER LEFEBVRE, ESQUIRE
               Two Dexter Street
14             Pawtucket, RI  02862
               (401) 728-6534
15
     For the Defendant CACV of Colorado, LLC:
16        LAWSON & WEITZEN, LLP
          BY:  KATHRYN E. PIECZARKA, ESQUIRE
17             88 Black Falcon Avenue
               Boston, MA  02210
18             (617) 439-4990

19   For the Witness:
          MBNA AMERICA BANK
20        BY:  DEZZIE COLE, ESQUIRE
               1100 North King Street
21             Wilmington, DE  19884
               (302) 432-0728
22
                  ALLIED COURT REPORTERS
23                  115 PHENIX AVENUE
              CRANSTON, RHODE ISLAND  02920
24                    (401) 946-5500
                www.alliedcourtreporters.com
```

Page 2

```
 1              I N D E X
 2      DEPOSITION OF STEPHEN FOX
 3
                      PAGE
 4
    Direct Examination by Mr. Lefebvre ......    6
 5  Cross-Examination by Ms. Pieczarka ......   30
    Redirect Examination by Mr. Lefebvre .....  42
 6
 7
 8
 9
10              E X H I B I T S
11  PLAINTIFF
    NO.       DESCRIPTION            PAGE
12
    1   Amended Subpoena, 3 pp         3
13  2   Documents Bates stamped MBNA 1-73, 73 pp   3
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1       (DEPOSITION COMMENCED AT 2:28 P.M.)
 2       (PLAINTIFF'S EXHIBITS 1 AND 2 MARKED FOR
 3  IDENTIFICATION)
 4              STEPHEN FOX
 5  Being duly sworn, deposes and testifies as
 6  follows:
 7       THE COURT REPORTER:  Please state your
 8  full name for the record.
 9       THE WITNESS:  Stephen Fox.
10       MR. LEFEBVRE:  Good afternoon, Mr. Fox,
11  Chris Lefebvre here, and I represent the
12  Plaintiff, Janet Hoefs, in the action that is
13  pending against CACV of Colorado and the Cambece
14  Law Offices.  That's a lawsuit pending in the
15  Massachusetts Federal District Court.
16       Before I continue, Dezzie, what I thought I
17  would do is put some stipulations relative to the
18  exhibits on the record.  What I did is as
19  Plaintiff's Exhibit 2, I have the packet that you
20  sent to me yesterday which was 71 pages plus I
21  handed to counsel the document that you faxed to
22  me literally almost moments ago at 1:48.  We're
23  going to call that MBNA 72.  And then finally,
24  the only other document we didn't talk about -- I
```

Page 4

```
 1  assume it's not a problem -- Mr. Fox had actually
 2  signed an affidavit that was presented to him, so
 3  I'm going to call that MBNA 73; okay?
 4       MR. COLE:  That's fine.
 5       MR. LEFEBVRE:  So for purposes of the
 6  deposition, we really only have two exhibits, but
 7  one of them will be a 73 numbered exhibit.
 8       MR. COLE:  Sounds good.  Chris, do you
 9  want to wait until later -- until the conclusion
10  of the deposition before we put on the record the
11  use of the videotape?  You can do it now or you
12  can do it later.  I'm perfectly okay with either.
13       MR. LEFEBVRE:  Why don't we do it at the
14  beginning?  And Kathryn, we had spoken -- Dezzie
15  had called me within the last hour, and it was an
16  oversight relative to the video deposition since
17  we wanted to do -- you wanted to do a deposition
18  of Mrs. Hoefs, and I made arrangements for a
19  video deposition of her.  I assumed it would not
20  be an issue for Mr. Fox.  The notices went out as
21  just regular depositions, and Mr. Cole raised the
22  issue about video depositions.  So what we've
23  agreed to -- which I think is a fair
24  compromise -- is that we're going to conduct the
```

Page 5

```
 1  deposition -- obviously, we have a transcript of
 2  what's transpiring, but what we have agreed to do
 3  is that we will not use the video portion in part
 4  of the case unless we get the agreement of
 5  Mr. Cole and his client or some type of court
 6  approval, although I can't imagine a situation
 7  why we would need it, but I thought that would be
 8  a nice compromise to address Mr. Cole's concern.
 9  I assume that's not a problem with you.
10       MS. PIECZARKA:  Sounds fair, not a
11  problem.
12       MR. LEFEBVRE:  Is that okay?
13       MR. COLE:  We're perfectly okay with that
14  approach.
15       MR. LEFEBVRE:  Okay.  The second thing,
16  the only other exhibit -- Mr. Fox, I'm just going
17  to mark the amended subpoena which was actually
18  served upon you, just so I have that as part of
19  the record, and I'm mainly focusing on the rider
20  that was attached to the subpoena.  I assume
21  you're familiar with the rider.  It was a
22  statement that had five paragraphs requesting
23  that you bring certain documents.
24       THE WITNESS:  I am.
```

Page 6

1   DIRECT EXAMINATION BY MR. LEFEBVRE
2 Q. And you've seen that rider before?
3 A. Yes, I have.
4 Q. And is it fair to say that the 72 documents which
5    were produced to me respond to the rider as
6    requested in the subpoena?
7 A. The 72 documents would demonstrate everything
8    that we were able to get. Some of the items we
9    were unable to get due to records being purged.
10    MR. LEFEBVRE: Okay. So we've now marked
11    the deposition notice as an exhibit.
12 Q. Mr. Fox, you are presently employed by MBNA?
13 A. Yes.
14 Q. And how long have you been so employed there?
15 A. Seven years and two months.
16 Q. Okay. And can you tell me what your present job
17    title is or what you do there now?
18 A. Sure. Currently, I'm a manager of our
19    charge-off sales team for MBNA.
20 Q. And how long have you had held that position?
21 A. Actually, it would be just over a year.
22 Q. Okay. And can you tell me briefly what you do?
23    What does a manager of the charge-off division of
24    MBNA do?

Page 7

1 A. Sure. I'm actually responsible for the sales
2    and servicing of distressed assets for MBNA to
3    our contractual partners.
4 Q. Okay. Prior to becoming the manager of this
5    department, what do you do during the other six
6    years that you were employed at MBNA?
7 A. Well, for the three prior years, I was an
8    analyst on the charge-off sales team, a business
9    analyst, and for my first three years at MBNA, I
10    was a collections representative.
11 Q. Okay. Now, how is it that you first became aware
12    of the lawsuit that was filed by Mrs. Hoefs?
13 A. I first became aware when I received the
14    subpoena.
15 Q. Okay. Now, I'm referring to Exhibit 73 which
16    would be the affidavit that you signed. You're
17    familiar with that?
18 A. Yes, I am.
19 Q. Okay. And I'm just -- let me back up. You
20    understand that the purpose of this deposition is
21    really to focus in on the issue of a certain
22    arbitration agreement?
23 A. Yes.
24 Q. Okay. Now, are you familiar with the processes

Page 8

1    in which -- well, strike that. Are you familiar
2    with Mrs. Hoefs' account?
3 A. I have reviewed the documents on her account,
4    so I would consider myself familiar with her
5    account.
6 Q. Okay. Is it fair to say that there was a time --
7    first of all, when did Mrs. Hoefs become an MBNA
8    account holder? When did she first start doing
9    business with MBNA, if you know?
10 A. Her account was opened on October 22, 1997.
11 Q. And was that opened as an individual account?
12 A. Yes, it was.
13 Q. Okay. Were there any changes to that account?
14    I'm referring to whether it became a joint
15    account or authorized user added.
16 A. Based upon my review of notes, there was a
17    Steven Hoefs added to the account as a spousal
18    authorized user, but I don't believe there was
19    any additional applicants added to the account.
20 Q. Now, what is your understanding when someone
21    becomes a spousal authorized user, what type of
22    privileges does that give to the spouse, in this
23    case Mr. Hoefs?
24 A. They receive charging privileges on the

Page 9

1    account, and if they wish, they can receive
2    correspondence in their name as well.
3 Q. Now, I notice looking in the documents that were
4    provided to me that I didn't see the underlying
5    credit application of Mrs. Hoefs. Is it fair for
6    me to assume that at some time an actual credit
7    card application was signed by Mrs. Hoefs
8    regarding this account?
9 A. That would be fair to assume.
10 Q. And in fact -- you know, I want to make sure I'm
11    correct in my assumption, that, in fact, isn't
12    that the general policy or it was the general
13    policy back in 1997, if a card holder wanted an
14    MBNA account, that some credit card application
15    would be signed; is that correct?
16 A. It could either be a signed application or
17    there could be a telemarketing application which
18    would not have a signature.
19 Q. Do you know in this particular case if, in fact,
20    Mrs. Hoefs' account was -- what I'll call the
21    traditional signed application or did it involve
22    the telemarketing application?
23 A. I do not, because the application is no
24    longer available.

Page 10

1  Q. Okay. And why is the application no longer
2     available?
3  A. We only retain the applications on record for
4     a rolling 5-years period, and because her account
5     was opened in 1997, it is past the 5-year period.
6  Q. And I'm not trying to be tricky. I just want to
7     make sure I understand. When you say "a rolling
8     5-years period," does that mean hypothetically if
9     a consumer opens an account on day 1, assuming he
10    or she signed an application, that 5 years later
11    the application is no longer available?
12 A. That is correct.
13 Q. Okay. Now, there's nothing in the computer
14    screens that you provided to me -- I think the
15    first 15 pages of the exhibit -- that would show
16    if this was a telemarketing account?
17 A. No, there is not.
18 Q. Okay. Now, in your affidavit, you
19    mentioned -- and I'm referring to the
20    affidavit -- what we're going to call MBNA 74
21    that you signed on April 22, 2004. You state in
22    the last sentence, that it was your belief that
23    the amendments of terms and conditions of this
24    account was mailed by MBNA in December of 1999 to

Page 11

1     Mrs. Hoefs. Is that still an accurate statement
2     of your understanding regarding Mrs. Hoefs'
3     account?
4  A. Yes, it is.
5  Q. Okay. I assume you are familiar with the
6     processes that were utilized by MBNA to add this
7     arbitration provision to card holders' accounts
8     back in 1999?
9  A. Yes, I am.
10 Q. Okay. Can you tell me in a general sense, do you
11    know why an arbitration rider was added to the
12    account?
13        THE WITNESS: Are you asking do I know
14    why the decision was made to add an arbitration
15    rider?
16 Q. Yes. Do you know why MBNA decided to add an
17    arbitration rider to Mrs. Hoefs' account?
18 A. I don't know why the corporate decision was
19    made, no.
20 Q. Okay. When did the arbitration -- the alleged
21    arbitration agreement first become effective in
22    relation to Mrs. Hoefs' account?
23 A. It first would have become effective as of
24    the day after the opt out date, so that would be

Page 12

1     January 26, 2000.
2  Q. So if I understand you correctly -- let me back
3     up a minute. When we're talking about the
4     arbitration rider to the Hoefs' account, I assume
5     that was part of a general mass mailing to many
6     other account holders?
7  A. Right, to all card holders that were in good
8     standing received a mass mailing of the
9     amendment.
10 Q. And I assume that since the opt out period ended
11    in January of 2000 that this mass mailing
12    occurred sometime in 1999?
13 A. December of 1999.
14 Q. And just so I'm clear, this mailing -- the Hoefs'
15    arbitration agreement that was alleged to have
16    been sent out as part of a mass mailing, do you
17    know how large the mailing was?
18 A. Well, I don't know what the exact number is,
19    but I do know that it went out to our entire
20    customer base that was in good standing on their
21    account.
22 Q. And would it be fair to say that the customer
23    base that was in good standing back in
24    December of 1999 was greater than 250,000 card

Page 13

1     holders?
2  A. That's correct.
3  Q. In fact, was it probably more than a 1 million
4     card holders that received the arbitration -- or
5     the amendment to the agreement similar to the one
6     that is involved in the Hoefs' case?
7  A. Back in 1999, we would have had more than a
8     million customers that were in good standing, so
9     yes, they would have received the amendment.
10 Q. Okay. Now, let me get really to the crux of the
11    issue and the purpose for your deposition. Can
12    you point to me or -- let me back up first. Can
13    you tell me in a general sense how these
14    arbitration agreements were -- you know, the
15    methodology used to send them out, how it was
16    done? If you know.
17 A. Sure. Based upon the research that I did, I
18    was able to come to the understanding that if the
19    account was in good standing with MBNA and had a
20    balance on the account, the arbitration amendment
21    would be included in the December 1999 statement
22    mailing. So all of the customers that were in
23    good standing and had a balance on their account
24    at that time would have received the mailing in

Page 14

1  their statement in '99.
2  Q. Okay. Now, just so I'm clear, when you say "good
3     standing" -- and I don't want to belabor the
4     point, but just so I understand, if someone were
5     like late once in the past 6 months, would that
6     person be considered in good standing for
7     purposes of the mailing of this arbitration
8     rider? Do you understand what I'm getting at?
9  A. Yes. I think I can clarify that for you.
10    Really the accounts that would be excluded would
11    be accounts that were marked as a bankrupt
12    account or an account that was previously settled
13    or an account that we had received deceased
14    notice on. So it would be any active customers.
15 Q. So an active customer could necessarily not be a
16    perfect customer, but still get an arbitration
17    mailing?
18 A. That is correct.
19 Q. Okay. Now, forgive me, because I don't know much
20    about MBNA, but tell me from what -- you said you
21    did some research. Who did you speak to to
22    obtain the information to answer my questions
23    relative to the arbitration issue and to prepare
24    for this deposition?

Page 15

1  A. Okay. I actually spent some time with
2     Dezzie Cole as well as his assistant, Sharise
3     Saunders, to assist me in preparation as well as
4     speaking with our customer fulfillment area which
5     is the area that maintains a matrix that is
6     derived from the mailing, and the matrix includes
7     any customers that were eligible to receive the
8     amendment as well as any customers that replied
9     and opted out of the amendment.
10 Q. Okay. Now, where -- and I'm just trying to get
11    an idea physically, where were these arbitration
12    riders actually sent out? Were they sent out
13    from Delaware back in December of '99?
14 A. I do not know.
15 Q. Now, you talked about -- you just mentioned, and
16    I believe it refers to the last exhibit that
17    Mr. Cole provided to me which is Number 72, you
18    were talking about a matrix or a grid?
19 A. Right. That exhibit actually comes from the
20    matrix database that housed all the account
21    numbers.
22    MR. LEFEBVRE: Okay. And Dezzie, just so
23    we're clear for the record, I gather that this --
24    I'll call it exhibit or grid had a lot of other

Page 16

1  data, and you redacted that in preparation of the
2  deposition. So all I have on Number 72 is
3  information pertaining to Janet Hoefs; is that
4  correct?
5     MR. COLE: That is correct, as well as
6  the legend that runs across the top of the spread
7  sheet.
8  Q. All right. Well, Mr. Fox, why don't you try to
9     help me out, because, obviously, you see what I
10    have? I have a paper that has a little bit of
11    data. Can you tell me a little bit more in a
12    general sense about what this document is? And
13    I'm talking about MBNA 72, the one that I
14    received about an hour ago.
15 A. Sure. That document I actually received
16    yesterday based upon some additional research I
17    was doing on the account, and I received the
18    document from our customer fulfillment area which
19    was the area that maintains the matrix, and
20    basically, what it is is a grid of answers, I
21    guess, to my questions of whether or not the
22    account was included in the mailing, and if it
23    did indeed -- if indeed we did receive an opt out
24    notice.

Page 17

1     If you look at the third column from the
2     right, "Status @ notification," that column
3     states okay. So that is my notification that the
4     account actually did go out in the -- or the
5     amendment did go out in the customer's statement
6     insert, and the second column from the right,
7     "Opt Out," the "N" notifying me that the customer
8     did not submit an opt out letter to us.
9  Q. Okay. So if I understand correctly, MBNA has a
10    grid of all of the account holders that carries
11    this similar information? When I say account
12    holders, those account holders that were part of
13    the December of 1999 amendments to terms mailing.
14 A. That is correct.
15 Q. While you were going over some of these columns,
16    just help me out here, going -- you started on
17    the right. Let me go back to the left. I see
18    date 8/31/2004. What does that date mean?
19 A. That is the date that I had received the
20    answer to my request. So that's just the date
21    they logged it in.
22 Q. All right. Wait a minute. Okay. So you
23    actually -- so I'm clear, you actually had to go
24    to someone to get some information about this

Page 22

1 been that a person manually was in charge of
2 putting the arbitration rider in her account;
3 could have been?
4 A. It could have been, but I believe based on
5 the size of our customer base at that time, that
6 it was probably systematic.
7 Q. Okay. Now, what was the policy -- well, strike
8 that. You told me you're pretty comfortable that
9 probably a million card holders -- at least a
10 million received this arbitration rider. What
11 was the policy of MBNA -- and I'm referring to
12 the mailing, which included the Hoefs' account,
13 what was the policy regarding, you know, returned
14 mail? I mean what would happen if something
15 kicked back, a change in address or something
16 like that? What would MBNA do?
17     THE WITNESS: If we had received return
18 mail from the Postal Service?
19     MR. LEFEBVRE: Right.
20     THE WITNESS: Is that what you're asking?
21     MR. LEFEBVRE: Yes.
22 A. We would have notated the customer's account
23 in the comments, and a mail code status would
24 have been placed on the account of N.

Page 23

1 Q. So in a hypothetical situation, Mary Jones, who
2 let's assume for the moment the
3 arbitration -- his or her -- well, since I used
4 Mary, her December of '99 statement. Assume we
5 don't know if it was computer or we don't know if
6 it was manually, but let's assume that it was
7 manually. The arbitration agreement was put in
8 the envelope. It was sealed. It was mailed out,
9 and Mary Jones moved, and it came back to MBNA.
10 There would be some entry on the -- what I'm
11 going to call the computer statements similar to
12 Documents 1 through 15 that you've provided me in
13 this case?
14 A. Okay. There would have been a comment on the
15 account had we received the statement back.
16     MR. LEFEBVRE: Okay.
17 A. That would have showed that the statement was
18 returned.
19 Q. Now, what was MBNA's policy relative to -- well,
20 strike that. If there was an authorized user on
21 an account, did both the primary card holder and
22 the authorized user get notice of the change to
23 the credit card agreement in relation to the
24 arbitration rider?

Page 24

1     THE WITNESS: Are you asking if there
2 would have been separate mailings to both of the
3 card holders or if there would have been only one
4 mailing address to both customers?
5 Q. Well, I guess -- let me get -- well, assume there
6 is an authorized user. Mrs. Hoefs was the
7 original card holder; correct?
8 A. That's correct.
9 Q. You told me earlier per your notes -- and I
10 noticed it myself -- that at one time while she
11 was a card holder, that Mr. Hoefs became an
12 authorized user; correct?
13 A. That's correct.
14 Q. So let's use the Hoefs' example, and I was
15 looking at -- and forgive my editorializing, when
16 I was looking at some of the statements that were
17 provided to me, I noticed that all the statements
18 at the time of this mailing and before appear to
19 be in the name of Mrs. Hoefs. I didn't see
20 anything addressed to Mr. Hoefs. So my question
21 is if Mr. Hoefs was an authorized user, would he
22 have received some separate notice that, in fact,
23 the terms and conditions of this account had been
24 modified, more particularly in relation to the

Page 25

1 arbitration rider?
2 A. In this case, he would not have been notified
3 separately. There would have only been one
4 mailing to Janet.
5 Q. Okay. Now, you would agree with me that the --
6 at the time of the mailing of -- the alleged
7 mailing of this arbitration rider pertaining to
8 Janet Hoefs, that the address on the account was
9 to a post office box; is that correct?
10 A. That is correct.
11 Q. Okay. Did MBNA have, if you know, when they
12 decided -- when whoever made the decision to add
13 the arbitration rider and to modify the
14 agreement, do you know if there were any concerns
15 or memorandums or issues or discussions about,
16 you know, sending notices to a P.O. box rather
17 than to a residence? Was that ever an issue that
18 you were aware of?
19 A. That was not an issue that I was aware of.
20 Q. Okay. So you would agree with me that if Mrs. --
21 well, strike that. If a card holder calls up
22 MBNA, and says I want to have my husband put on
23 as an authorized user -- I'm assuming this card
24 holder was someone in good standing back in

Page 18

1  rider and the mailing of it, and that person sent
2  you back this -- we'll call it mini chart, this
3  information; is that how that happened?
4  A. That is correct.
5  Q. So next I see -- the next column says "Current
6  account," 53, and then it ends in 09. I assume
7  that's Mrs. Hoefs' account?
8  A. That is correct.
9  Q. Okay. Then I see above, it says "Converted
10 account," and then I see at the bottom, that's
11 left blank. What does that mean "Converted
12 account"?
13 A. Had the account been converted from another
14 bank rather than originated at MBNA, there would
15 have been a conversion account number in there.
16 Q. Then I see, up top, "Lost/Stolen account." Then
17 I see "LS/Date." Then at the bottom, I can't
18 tell which one is matched up, but I see the same
19 account number. Then I see the words charge off.
20 Can you help me put into perspective what that
21 charge off means?
22 A. Sure. And actually, it would be a different
23 account number because you see the three 9's in
24 the middle of the account number? For our

Page 19

1  internal purposes, accounts that have three 9's
2  in the middle, that is the new account number
3  that is given to the account when it does charge
4  off.
5  Q. So is it fair to say that Mrs. Hoefs' account
6  sometime became a charged off account, and the
7  number referenced above the words "Charge off" --
8  and I must confess, I'm having a hard time
9  reading it. It looks like 5329011999226251 -- is
10 the new charged off number assigned by MBNA to
11 this account?
12 A. That is correct.
13 Q. I guess my vision is better than I thought. Can
14 you tell me, when did this account, the Hoefs'
15 account, become charged off?
16 A. It charged off in the month of August 2001.
17 Q. Okay. And then after this, I see some initials.
18 It says up top, "Group," and then "Group Name,"
19 and at the bottom, I see some initials. It looks
20 like "RABU," and I think it says, "Ringling Bros.
21 Barnum & Bailey." What does -- can you tell me
22 what that is?
23 A. Sure. When the account was opened, it was a
24 member of an affinity group of MBNA's that is --

Page 20

1  internally, our abbreviation for that group is
2  RABU, and the group's actual name is the Ringling
3  Bros. Barnum & Bailey. So there would have
4  been -- the original card would be a Ringling
5  Bros. Barnum & Bailey card.
6  Q. Is there any document in this packet that you can
7  direct my attention to -- or maybe there's a
8  document that you've become aware of -- that can
9  verify that, in fact, an arbitration rider was
10 actually put into the monthly statement of
11 Mrs. Hoefs in December of 1999, and actually
12 received by her? Is there any type of indication
13 or document available to answer my inquiry on
14 that issue?
15 A. Well, the last document that we just went
16 over, the grid, is the only document that
17 actually verifies both that the customer met our
18 status at notification time, and that the mailing
19 was sent out. You can also look to the comments
20 that were given to you that are actually part of
21 that first 15 pages that you had spoken about.
22     MR. LEFEBVRE: Yes.
23 A. And you can see that we were mailing at that
24 time her statements to a post office box, and

Page 21

1  during the time before and after the mailing of
2  the arbitration amendment, we did not receive any
3  return mail from the Postal Service. So we
4  can -- to the best of my ability, I believe that
5  the customer did, in fact, receive the
6  arbitration amendment based upon the research I
7  have done.
8  Q. But you would agree with me, there's no -- you're
9  assuming that, in fact, the arbitration rider was
10 actually stuffed in the envelope, and you're
11 assuming that there was no problem with the mail
12 in coming to that conclusion; is that correct?
13 A. We're assuming there was no problem with the
14 mail.
15 Q. Okay. Let me go back. Do you know how it was --
16 and I'm not trying to be difficult. I'm just
17 trying to understand. How was the arbitration
18 agreement actually put into the billing
19 statement? Was it done manually or was it done
20 by some computerized sorting mechanism?
21 A. In 1999, I do not know the answer to that
22 question.
23 Q. Okay. So you don't know how -- regarding
24 Mrs. Hoefs' account, MBNA account, it could have

www.AlliedCourtReporters.com                                401-946-5500 / Toll Free 888-443-3767

Page 22

1  been that a person manually was in charge of
2  putting the arbitration rider in her account;
3  could have been?
4  A. It could have been, but I believe based on
5  the size of our customer base at that time, that
6  it was probably systematic.
7  Q. Okay. Now, what was the policy -- well, strike
8  that. You told me you're pretty comfortable that
9  probably a million card holders -- at least a
10 million received this arbitration rider. What
11 was the policy of MBNA -- and I'm referring to
12 the mailing, which included the Hoefs' account,
13 what was the policy regarding, you know, returned
14 mail? I mean what would happen if something
15 kicked back, a change in address or something
16 like that? What would MBNA do?
17     THE WITNESS: If we had received return
18 mail from the Postal Service?
19     MR. LEFEBVRE: Right.
20     THE WITNESS: Is that what you're asking?
21     MR. LEFEBVRE: Yes.
22 A. We would have notated the customer's account
23 in the comments, and a mail code status would
24 have been placed on the account of N.

Page 23

1  Q. So in a hypothetical situation, Mary Jones, who
2  let's assume for the moment the
3  arbitration -- his or her -- well, since I used
4  Mary, her December of '99 statement. Assume we
5  don't know if it was computer or we don't know if
6  it was manually, but let's assume that it was
7  manually. The arbitration agreement was put in
8  the envelope. It was sealed. It was mailed out,
9  and Mary Jones moved, and it came back to MBNA.
10 There would be some entry on the -- what I'm
11 going to call the computer statements similar to
12 Documents 1 through 15 that you've provided me in
13 this case?
14 A. Okay. There would have been a comment on the
15 account had we received the statement back.
16     MR. LEFEBVRE: Okay.
17 A. That would have showed that the statement was
18 returned.
19 Q. Now, what was MBNA's policy relative to -- well,
20 strike that. If there was an authorized user on
21 an account, did both the primary card holder and
22 the authorized user get notice of the change to
23 the credit card agreement in relation to the
24 arbitration rider?

Page 24

1       THE WITNESS: Are you asking if there
2  would have been separate mailings to both of the
3  card holders or if there would have been only one
4  mailing address to both customers?
5  Q. Well, I guess -- let me get -- well, assume there
6  is an authorized user. Mrs. Hoefs was the
7  original card holder; correct?
8  A. That's correct.
9  Q. You told me earlier per your notes -- and I
10 noticed it myself -- that at one time while she
11 was a card holder, that Mr. Hoefs became an
12 authorized user; correct?
13 A. That's correct.
14 Q. So let's use the Hoefs' example, and I was
15 looking at -- and forgive my editorializing, when
16 I was looking at some of the statements that were
17 provided to me, I noticed that all the statements
18 at the time of this mailing and before appear to
19 be in the name of Mrs. Hoefs. I didn't see
20 anything addressed to Mr. Hoefs. So my question
21 is if Mr. Hoefs was an authorized user, would he
22 have received some separate notice that, in fact,
23 the terms and conditions of this account had been
24 modified, more particularly in relation to the

Page 25

1  arbitration rider?
2  A. In this case, he would not have been notified
3  separately. There would have only been one
4  mailing to Janet.
5  Q. Okay. Now, you would agree with me that the --
6  at the time of the mailing of -- the alleged
7  mailing of this arbitration rider pertaining to
8  Janet Hoefs, that the address on the account was
9  to a post office box; is that correct?
10 A. That is correct.
11 Q. Okay. Did MBNA have, if you know, when they
12 decided -- when whoever made the decision to add
13 the arbitration rider and to modify the
14 agreement, do you know if there were any concerns
15 or memorandums or issues or discussions about,
16 you know, sending notices to a P.O. box rather
17 than to a residence? Was that ever an issue that
18 you were aware of?
19 A. That was not an issue that I was aware of.
20 Q. Okay. So you would agree with me that if Mrs. --
21 well, strike that. If a card holder calls up
22 MBNA, and says I want to have my husband put on
23 as an authorized user -- I'm assuming this card
24 holder was someone in good standing back in

Page 26

1  December of 1999, and assume that the card holder
2  called up in January of '99 and said put my
3  husband on. MBNA puts the husband on. The
4  authorized user would not get independent notice
5  of this modification?
6  A. That's correct, only a co-applicant would
7  have received their name on the correspondence.
8  Q. And in fact, you would agree with me that in a
9  situation with a husband and wife -- in that
10 situation that I just used, husband and wife, if
11 the husband actually was the one that went to the
12 mailbox and got the mail, it could be a situation
13 where the wife would never know about this
14 arbitration rider? You would agree that that
15 could happen?
16 A. I don't know.
17 Q. Okay. Are you familiar -- how many people
18 actually, if you know, opted out and actually
19 sent something back during this '99 mailing
20 opting out of the arbitration, if you know?
21 A. I don't know.
22 Q. Would you -- to the best of your knowledge, was
23 it a small number that opted out or was it a
24 common practice of people opting out, if you

Page 27

1  know?
2  A. I do not know.
3  Q. Okay. Now, this account was ultimately sold; is
4  that correct?
5  A. Yes, it was.
6  Q. Okay. And it was sold to Collect America?
7  A. Yes, it was.
8  Q. And when the account was sold to Collect America,
9  just -- I want to understand. What documents
10 would have been forwarded to Collect America as
11 part of the sale of this account?
12 A. No particular documents would have been
13 forwarded to Collect America unless they were
14 requested. The only information forwarded to
15 Collect America would be demographic information,
16 account numbers, and customer's name.
17 Q. So in this particular case -- okay. In this
18 particular case, Collect America would have never
19 received the application? I'm talking about the
20 underlying credit card application, because at
21 the time of the sale, the account was more than
22 five years old; am I correctly --
23 A. At the time of the sale, the account was only
24 four years old. Had they requested the

Page 28

1  application over the next year after the sale,
2  they would have received the application.
3      MR. LEFEBVRE: Okay.
4  A. I don't believe that they requested any
5  application or anything like that from us during
6  that time.
7  Q. And is that general standard practice? I know in
8  this case it was sold to Collect America, but
9  assume -- you know, I'm just trying to understand
10 general practices in the sale of accounts. From
11 MBNA's perspective, when an account is sold,
12 let's assume it is to ABC Company, that generally
13 copies of the card agreement are not transferred
14 unless asked for; is that how it generally works?
15     THE WITNESS: Are you asking about the
16 card agreement or are you asking about the
17 application?
18     MR. LEFEBVRE: Okay. I'm talking
19 about -- good point. I probably used those words
20 too loosely. I'm talking about the application
21 where Mary Smith actually signed on the dotted
22 line promising to pay MBNA per the terms of the
23 agreement.
24 A. We do not forward applications unless asked.

Page 29

1  Q. Okay. But in all circumstances, after five
2  years, they're gone?
3  A. That is correct.
4  Q. No way of getting them back under any
5  circumstance?
6  A. There is not.
7  Q. Are they physically destroyed after five years?
8  A. I do not know if they're physically
9  destroyed. The only thing I know is we're not
10 able to recover anything after five years for any
11 reason.
12 Q. And do you know if that policy or capability
13 about not being able to get the actual
14 application, the signed agreement, after five
15 years is something that's common to the credit
16 card industry or is it just something unique to
17 MBNA, if you know?
18 A. Actually, I don't know exactly what the
19 standard is. I believe we are only required to
20 maintain the applications or statements for one
21 or two years, but we actually retain them for
22 five years. So we do more than the industry
23 standard.
24 Q. So is it your belief and testimony that the

Page 30

1  industry standard is less than five years from
2  what you understand?
3  A. Yes, that's correct.
4      MR. LEFEBVRE: Okay. I have no further
5  questions at this time. Do you have any
6  questions?
7      MS. PIECZARKA: Okay. Hi, Stephen, my
8  name is Kathryn Pieczarka. I'm from Lawson &
9  Weitzen. We represent one of the Defendants,
10 CACV of Colorado in this action.
11     CROSS-EXAMINATION BY MS. PIECZARKA
12 Q. Now, you stated that the applications are
13 discarded after five years; right?
14 A. That's correct.
15 Q. Okay. So if Mrs. Hoefs opened an application on
16 October 22, 1997, her application would be
17 discarded on October 22, 2002; is that right?
18 A. That's correct.
19 Q. Now, when she applied for this application --
20 and you testified that you don't know whether it
21 was through a telemarketing application or a
22 signed application; is that correct?
23 A. Right. That's correct.
24 Q. When she applied for this credit card, she was

Page 31

1  then sent a card member agreement; is that right?
2  A. Yes, she was.
3  Q. Now, in the documents that you have provided that
4  were responsive to the rider in your subpoena, it
5  looked like MBNA Number 14 begins with a credit
6  card agreement?
7  A. That's correct.
8  Q. And it looks like that continues to MBNA
9  Number 21 making it 8 pages; is that correct?
10 A. That is correct.
11 Q. Do you know when this was drafted, this credit
12 card agreement?
13 A. I believe if you look at MBNA 21, you will
14 see that it was actually drafted in January of
15 1997. You'll see a code at the bottom, AGMT90
16 and 1/97. That's when this agreement was
17 drafted, and this would have been the exact
18 agreement that would have been received by
19 Mrs. Hoefs with her card.
20 Q. And is it fair to say that anyone who opens an
21 account in '97 received this agreement?
22 A. Yes.
23 Q. And if you turn Page 6 of the agreement which
24 would be MBNA 19?

Page 32

1  A. Okay.
2  Q. It says -- there's a section entitled Amendments?
3  A. Yes.
4  Q. You see that. And that section -- it's fair to
5  say that everyone who opened a credit card in
6  1997 got this application, and this section was
7  in there?
8  A. Yes.
9  Q. Right?
10 A. Yes.
11 Q. Okay. And is it fair to state that it's MBNA's
12 normal practice to send out this credit
13 application when someone opens an account?
14 A. We will send out the terms and agreements,
15 yes.
16 Q. Okay. And when MBNA decides to amend the
17 agreement, the process they go by is they draft
18 an amendment; is that correct?
19 A. That is correct.
20 Q. Okay. And you provided documents, one being MBNA
21 22, which states that it's important amendments
22 to your credit card agreement; is that correct?
23 A. Yes.
24 Q. And do you know when this document was drafted?

Page 33

1  A. This document was drafted in 1999. I don't
2  know what month, but this was the document that
3  was included with the customers' statements in
4  December of 1999. This is the amendment.
5  Q. So this amendment was sent to Mrs. Hoefs?
6  A. That's correct.
7  Q. And you testified that these amendments are sent
8  along with her statement; is that right?
9  A. Yes.
10 Q. Okay. And at the time that this amendment was
11 sent out, what is the fulfillment process that
12 occurs in order to send this amendment out to the
13 credit card holders; do you know?
14     THE WITNESS: What do you mean by
15 "fulfillment process"?
16 Q. I mean someone drafts this amendment, and someone
17 prints the amendment, and then at some point,
18 it's collated with a statement for all the card
19 holders. Do you have knowledge as to how that
20 process works?
21 A. I don't have knowledge of the statement
22 processing.
23 Q. Okay. But you testified that everyone who was in
24 good standing in December of '97 got a copy of

Page 34

1  this amendment?
2  A. Yes, that's correct.
3  Q. And it was mailed to them with their statement;
4     correct?
5  A. Yes.
6      MR. LEFEBVRE: I don't mean to interrupt.
7  You said December '97. I think you meant
8  December of '99.
9      MS. PIECZARKA: Oh, December of '99, I'm
10 sorry. You're right.
11 Q. So is it fair to say it was MBNA's normal course
12    of business that in December of '99 it sent out
13    an amendment to all credit card agreements that
14    were in good standing?
15 A. To all customers that were in good standing,
16    yes.
17 Q. Now, you provided documents -- I believe
18    beginning at MBNA 24, there is a series of
19    statements?
20 A. Yes.
21 Q. Have you reviewed these statements?
22 A. Yes, I have.
23 Q. Okay. Now, is this first statement when
24    Mrs. Hoefs -- is this the first statement

Page 35

1  Mrs. Hoefs received on MBNA 24?
2  A. I don't believe this would be the first
3     statement that she received. Again, we can only
4     get statements that are 5 years old. We didn't
5     get anything more than 5 years old. Now, we do
6     have some from '98 that were still housed in our
7     system, but the ones that go all the way back to
8     the beginning of '97 we weren't able to get those
9     statements.
10     MS. PIECZARKA: Okay.
11 A. But it does look like it's an original charge
12    of $359.34, and that's what the balance is. So
13    this is possible this is her first statement she
14    received if she never used the card before that.
15 Q. But it's fair to say at some point, she started
16    using the credit card after she applied?
17 A. Yes.
18 Q. And she made payments on the account; is that
19    correct?
20 A. Yes.
21 Q. Could you find on here the billing statement that
22    was the amendment -- the arbitration amendment
23    was sent out with?
24 A. Sure.

Page 36

1      (PAUSE)
2  A. It would have been MBNA 50.
3  Q. Okay. And how do you know that?
4  A. I know that based upon the due date on the
5     account which is the 2nd of January that this is
6     her billing statement for December.
7  Q. Okay. And it looks like it says there's a
8     closing date of December 2, '99?
9  A. Correct.
10 Q. Okay. So this statement would have been sent out
11    shortly after?
12 A. Right. Actually, it probably would have been
13    sent out on the 3rd.
14 Q. Okay. And it looks like her address at that time
15    was 20 Thorn Hill Estates?
16 A. Correct.
17 Q. Poca, West Virginia; is that correct?
18 A. That is correct.
19 Q. Okay. And it's fair to say that MBNA would have
20    sent the amendment to her agreement to that
21    address?
22 A. We would have, that's correct.
23 Q. Now, you stated that the arbitration provision
24    became effective on January 26, 2000; is that

Page 37

1  right?
2  A. Yes.
3  Q. And how do you know that?
4  A. I know that because based upon the language
5     in the amendment that was sent out, if you look
6     at the last paragraph on MBNA 23, we stated that
7     we needed to receive the letter to opt out by
8     January 25, 2000, and after that it says, "Or
9     your rejection of the arbitration section will
10    not be effective."
11 Q. Okay. And when MBNA receives a written rejection
12    from any card holder, what do they do with that?
13    How do they manage that rejection?
14 A. Any rejection that we would have received
15    from a customer for a change in terms would be
16    notated on the account notes.
17 Q. Okay. Is that the matrix that you were
18    explaining earlier?
19 A. It would be notated as well in the matrix --
20    it would be maintained in the matrix database,
21    but it would be commented on the notes which
22    would be MBNA 2 through MBNA 13. Those are the
23    system notes.
24 Q. Okay. And have you looked through these with

Page 38

1  respect to Mrs. Hoefs' account?
2  A. Yes, I have.
3  Q. And there's no notation that she submitted a
4     written objection?
5  A. There is no notation that she submitted a
6     written objection.
7  Q. Okay. So it's fair to say she didn't submit a
8     written objection?
9  A. It is fair to say that.
10 Q. Okay. Now, after Mrs. Hoefs was sent the
11    amendment to her credit card containing the
12    arbitration clause, can you tell whether she
13    continued to use her credit card?
14 A. I can tell that she did continue to use her
15    credit card. There's actually a charge on the
16    account on MBNA 53. It's the charge closest to
17    the arbitration amendment date, and it's a charge
18    for $345 dollars from Cafe Anzio in North Oxford,
19    Massachusetts.
20 Q. Now, when Mrs. Hoefs was sent the arbitration
21    amendment in December of '99, can you tell me
22    based on these statements whether she was in good
23    standing as it's defined by MBNA?
24 A. I can tell you from the statements that she

Page 39

1     was in good standing.
2  Q. Okay. How can you tell me that?
3  A. Well, based on the previous definition I had
4     given you of being in good standing. The
5     customer was still receiving statements from us
6     and did have a balance; was not a part of a
7     bankruptcy proceeding; we had not received a
8     deceased notification on the customer; and we had
9     not settled with the customer. The customer was
10    still an active customer of MBNA.
11 Q. Okay. And can you find the last payment she made
12    on the account before she was sent the
13    arbitration amendment in December of '99?
14          (PAUSE)
15 A. The last payment she had made was August 26
16    for $50, and that was August 26, 1999.
17 Q. Okay. And what Bates number is that MBNA number?
18 A. 44.
19 Q. Okay. And can you find the next payment she made
20    after she received the arbitration agreement?
21 A. Sure. She made a payment to us over the
22    phone on February 2nd of 2000.
23 Q. What page are you looking in the MBNA's numbers?
24 A. I'm sorry, MBNA 52.

Page 40

1  Q. So Mrs. Hoefs continued to make payments and
2     purchases on her credit card after she was sent
3     the notice of amendment regarding the arbitration
4     clause?
5  A. Yes, she did.
6  Q. Now, when did -- you stated that the Hoefs'
7     account was charged off?
8  A. Yes.
9  Q. What do you mean by that? How is that defined?
10 A. Any account that we do not receive
11    contractual payments for for over 180 days, the
12    account is charged off or written off as a loss
13    by MBNA.
14 Q. And is that when it gets the new account number
15    based upon the matrix which is MBNA 72?
16 A. Yes.
17 Q. And do you know the date when that happened on
18    Mrs. Hoefs' account?
19 A. It was August of 2001, but I don't know what
20    the exact day was.
21 Q. Okay. And you provided us with statements up
22    until -- what's the last date on that statement
23    of MBNA Page 71?
24 A. The closing date was 9/4.

Page 41

1        MS. PIECZARKA: Okay.
2  A. And this is actually -- the only thing on
3     that statement is actually just the charge-off
4     adjustment showing the customer that they were
5     charged off.
6  Q. Okay. Now, when an account gets charged off, you
7     assignment debt to a separate company; is that
8     correct?
9  A. It's not 100 percent of the time do we do
10    that, but yes, we do sell some of our charged off
11    debt.
12 Q. Now, the MBNA document 73 which is the Affidavit
13    of Assignment that you had signed, it says that
14    the account has been assigned, transferred and
15    sent over to the CACV of Colorado; is that
16    correct?
17 A. That's correct.
18 Q. Okay. Previously, you had stated it was
19    Collect America?
20 A. To the best of my knowledge, they are one and
21    the same company.
22        MS. PIECZARKA: Okay.
23 A. Our system comment calls them Collect America
24    because's how they're known internally, but CACV

Page 42

1  of Colorado is the entity that purchases the
2  accounts.
3  Q. And this Affidavit of Assignment was signed by
4     you on April 22, 2004; is that correct?
5  A. That's correct. I don't have it in front of
6     me, but I believe that's correct.
7            (OFF THE RECORD)
8        MS. PIECZARKA: Okay. No further
9     questions.
10       MR. LEFEBVRE: I have a few follow-up.
11       REDIRECT EXAMINATION BY MR. LEFEBVRE
12 Q. Mr. Fox, could you turn to MBNA Number 3? I'm
13    hoping you might be able to -- let's start with
14    Number 2. Now, if I understand correctly, the
15    account was originally opened by Mrs. Hoefs, and
16    I see based on looking at MBNA 02 and 03, there
17    are some notes where the husband was added on
18    sometime in '99, July of '99?
19 A. That's correct.
20 Q. Just something I didn't understand. I'm looking
21    at the last line of Number 2. It says -- it
22    looks likes the date of July 27, '99. It's got a
23    time, "0701," some initials, "CRLWAL, Status code
24    changed for decision from blank to H," and I see

Page 43

1  that's also repeated at the top on 03. Can you
2  tell me what that entry means?
3  A. The account status code was changed to not
4     having a status to having a status of an H
5     internally.
6  Q. What does that mean in English? I have no idea
7     what that means.
8  A. Basically, an H status code means that since
9     we were adding Mr. Hoefs as a user, the decision
10    was made to put an H status code on the account
11    to hold the account at the current credit line.
12       MR. LEFEBVRE: Okay.
13 A. For a period of time.
14 Q. So it's fair to say that after July of '99,
15    Mr. Hoefs was an authorized user, and he had
16    privileges to charge on that account per the
17    terms and conditions of the account, the credit
18    limit?
19 A. Yes, he did.
20 Q. Okay. So when counsel was asking you moments
21    ago, and you went through some statements, and
22    you were talking about payment -- charges after
23    the arbitration rider was allegedly mailed out to
24    you, with all fairness, you have no idea if

Page 44

1  Mrs. Hoefs used the account? For all you know,
2  all the charges post alleged mailing of the
3  arbitration agreement were made by Mr. Hoefs;
4  correct? You don't know if she made any
5  payments?
6  A. I do not know if she was the one using the
7     card or if Mr. Hoefs was the one using the card.
8  Q. And you don't know if she made the payments or
9     Mr. Hoefs made the payments or their mother,
10    sister, father, or some benevolent person made
11    the payments? You would have no idea looking at
12    your records who made the payments on this
13    account post alleged mailing of the arbitration
14    agreement?
15       MR. COLE: I'm going to object. I think
16    the witness answered to the best of his ability.
17 Q. Well, you are going to answer the question;
18    right? You have no idea?
19 A. I have no idea.
20 Q. Okay. Now, I just wanted to go back to
21    something. When you talked about the
22    agreement -- I'm not talking about the
23    application. I'm talking about the agreement
24    that you were just questioned on. I'm talking

Page 45

1  about the credit card agreement. Just bear with
2  me. I believe that's MBNA 14 through 21.
3  You told us that you were -- that it was standard
4  practice that once a card -- when the card was
5  opened, that the consumer, in this case, Mrs.
6  Hoefs, would get this agreement? You were pretty
7  sure of that?
8  A. It is mailed with the card.
9  Q. Okay. And in fact, isn't it -- strike that.
10    Wasn't it the policy of MBNA back in '97 when
11    Mrs. Hoefs got the card, that when a consumer
12    would get the card in the mail, they would have
13    to dial some number to activate the card; is that
14    correct?
15 A. Right. The card needs to be activated by
16    calling.
17 Q. And that was an important -- that was a concern
18    of MBNA? That is, that MBNA when they would send
19    out a new card and a credit card agreement, they
20    wanted to make sure that the card holder got the
21    card, got the agreement, and somehow it wasn't
22    lost or got into the hands of some other person;
23    isn't that a fair statement?
24 A. That is a fair statement.

Page 46

1  Q. And would you agree with me that changes to the
2     credit card agreement are important to MBNA?
3     When MBNA makes a change to its credit card
4     agreement, as referenced in the addendum that was
5     supposedly made out, that those changes are
6     important to MBNA?
7  A. I would agree that corporately they are
8     important.
9  Q. And do you think that changes to an account are
10    also important to the consumer?
11 A. Yes.
12 Q. But on the changes to the card, when you change
13    the agreement, MBNA doesn't require the consumer
14    to dial back in to make sure they got the
15    amendments to the card? They didn't do that back
16    in '99?
17       MR. COLE: I'm going to object to form,
18    Counsel.
19 Q. Do you understand my question?
20 A. I understand your question. You're asking me
21    if they -- if we require the customer to call us
22    back when we send them out an amendment?
23 Q. Right. And the answer is you don't?
24 A. And the answer is we do not require them to

Page 47

1     call us back.
2  Q. And you didn't require that back in December of
3     '99?
4  A. We did not require them to call us back in
5     December of 1999.
6        MR. LEFEBVRE: Okay. Just give me one
7     minute, and I think I'll be done.
8        (PAUSE)
9  Q. Have you -- you said you work in the charge off
10    or the -- is it fair to say you told me you were
11    the charge-off manager; correct?
12 A. I told you I was the manager of the sales
13    team for MBNA charge off.
14 Q. Okay. Has MBNA ever had a card holder call and
15    complain that, "Gee, I never got my statement
16    last month"? Does that ever happen? Does MBNA
17    ever receive such a call? I'm not talking about
18    Mrs. Hoefs. Does that happen on occasion with
19    card holders that they don't get their statement?
20 A. I'm sure the bank would receive calls stating
21    that the customer has not received their
22    statement.
23 Q. And you would agree with me that sometimes things
24    are misaddressed or they get lost in the mail?

Page 48

1     Has that ever happened to a customer?
2        MR. COLE: Objection to the form. You
3     can answer.
4        (NO ANSWER)
5  Q. Has a customer ever called and complained that
6     "Gee, I never got my January statement. It must
7     have gotten lost in the mail"?
8  A. I think I answered that before that, yes,
9     customers have called and complained that they
10    did not receive their statements.
11 Q. Could it be that Mrs. Hoefs' statement and the
12    amendment that was allegedly mailed was lost in
13    the mail? Could that have possibly happened, yes
14    or no?
15       MR. COLE: Objection to the form.
16 A. I don't know.
17 Q. So you don't know, as you sit here today, whether
18    Mrs. Hoefs received that arbitration rider; is
19    that a fair statement?
20 A. I don't know whether or not she received the
21    statement, but based upon the research that I
22    did, I do not see any reason why she would not
23    have received the statement or the amendment.
24 Q. Okay. Well, just following up on that, you told

Page 49

1     me you weren't sure about the actual -- what I'm
2     going to call the assembly line, and forgive me,
3     I don't mean to be derogatory about where the
4     December statement was being put together, and
5     then the addendum was being put together. First
6     of all, do you know if the addendum was in
7     booklet form or was it just a regular 8 1/2 x 11
8     paper?
9        MR. COLE: I believe that's been asked
10    and answered, Counsel, earlier on in the
11    deposition.
12       MR. LEFEBVRE: Forgive me. I forgot what
13    the answer was. Could you refresh my memory?
14       MR. COLE: I believe a while back you
15    asked that question, and he said that he was not
16    intimately familiar with that process, I think
17    was his response.
18 Q. So you don't know if the rider regarding
19    Mrs. Hoefs' account was manually inserted or if
20    it was done somehow -- I want to call it by
21    machine? You don't know that. You already told
22    me that; correct?
23 A. I already told you that.
24 Q. If it was manually done -- assume that it was

Page 50

```
1    manually done.  You don't know if the person who
2    hypothetically was stuffing the envelope, he or
3    she could have made a mistake and not put one in
4    her envelope?  That could have happened; right?
5    You don't know what happened?
6        A.  I was not there.  I do not know.
7            MR. LEFEBVRE:  Thank you.  That's all I
8    have.
9            MS. PIECZARKA:  I have nothing further.
10           MR. LEFEBVRE:  Would you like to read and
11   sign, Dezzie, when this gets back or just --
12   whatever your pleasure?
13           MR. COLE:  Yes, we will waive.
14           MR. LEFEBVRE:  Okay.  We're all set.  It
15   was a pleasure meeting you, and thank you,
16   Mr. Fox, for your testimony.
17           MS. PIECZARKA:  Thank you.
18           MR. COLE:  Thank you.
19           THE REPORTER:  Would you like a copy?
20           MS. PIECZARKA:  Yes.
21           (DEPOSITION CLOSED AT 3:30 P.M.)
22
23
24
```

Page 51

```
1         CERTIFICATE
2
        I, Jeannette A. Lemoine, a Notary Public in and
3    for the State of Rhode Island, duly commissioned and
     qualified to administer oaths, do hereby certify that
4    the foregoing video conference deposition of
     Stephen Fox, witness in the above-entitled cause, was
5    taken by me at the offices of Allied Court Reporters,
     115 Phenix Avenue, Cranston, Rhode Island, commencing
6    at 2:00 p.m. on September 1, 2004; that previous to
     the testimony of said witness, who was of lawful age,
7    the witness was sworn by me; whereupon the witness was
     first duly cautioned and sworn to testify the truth,
8    the whole truth, and nothing but the truth, and that
     the witness thereupon testified as in the
9    foregoing-annexed transcript.
10      I further certify that the foregoing deposition
     was taken down by me in stenotype and was later
11   reduced to typewriting and that the foregoing is a
     true and accurate record of the testimony of said
12   witness.
13      Pursuant to Rule 30 (e), the witness, with
     agreement of the parties, hereby waives the right to
14   read and sign the transcript.
15      Pursuant to Rule 5 (d) and 30 (f) (1) of the
     Federal Rules of Civil Procedure, original transcripts
16   shall not be filed in court.  Therefore, original is
     delivered and retained by Plaintiff's attorney.
17
        IN WITNESS WHEREOF, I have hereupon set my hand
18   this      day of September, 2004.
19
20
21      JEANNETTE A. LEMOINE, CSR, NOTARY PUBLIC
        My Commission Expires July 17, 2005
22
23   In Re: Janet Hoefs v. CACV of Colorado, LLC
     Deposition: Stephen Fox
24   Date: September 1, 2004
```