Page 1

1            UNITED STATES DISTRICT COURT
    DISTRICT OF MASSACHUSETTS, SPRINGFIELD DIVISION
2

3
    JANET S. HOEFS                    :
4                                     :
         VS.                          :   Case No. 04-30015-KPN
5                                     :
    CACV of COLORADO, LLC, et al      :
6

7
         VIDEO CONFERENCE DEPOSITION OF JANET HOEFS,
8    Plaintiff, in the above-entitled cause, taken on
     behalf of the Defendant, CACV of Colorado,
9    pursuant to notice, before Jeannette A. Lemoine,
     CSR, a Notary Public in and for the State of
10   Rhode Island and Providence Plantations, at the
     offices of Allied Court Reporters, 115 Phenix
11   Avenue, Cranston, Rhode Island, on September 1,
     2004, at 3:30 p.m.
12

13
    APPEARANCES:
14
    For the Plaintiff:
15     LEFEBVRE & SONS LAW OFFICE
       BY:  CHRISTOPHER LEFEBVRE, ESQUIRE
16          Two Dexter Street
            Pawtucket, RI  02862
17          (401) 728-6534

18  For the Defendant CACV of Colorado, LLC:
       LAWSON & WEITZEN, LLP
19     BY:  KATHRYN E. PIECZARKA, ESQUIRE
            88 Black Falcon Avenue
20          Boston, MA  02210
            (617) 439-4990
21

22              ALLIED COURT REPORTERS
                 115 PHENIX AVENUE
23         CRANSTON, RHODE ISLAND  02920
                  (401) 946-5500
24           www.alliedcourtreporters.com

Page 6

1  Massachusetts?
2  A. Yes.
3  Q. And what did you do when you lived in
4  Massachusetts?
5  A. I transferred with the Social Security
6  Administration. I continued to work for them.
7  Q. Were you also a paralegal?
8  A. Yes.
9  Q. So your entire time with the Social Security
10 Administration, you were a paralegal?
11 A. No. Actually, in 1989, I started out as a
12 clerk/typist. I was promoted -- I believe it was
13 in '90, I was promoted to a legal assistant; in
14 '93, up to a hearing assistant; and then in 1989,
15 I was promoted to a paralegal.
16 Q. Okay. Now, at some point, you decided to apply
17 for a credit card with MBNA?
18 A. Yes.
19 Q. And do you recall what date you did that?
20 A. I don't recall what date it was. It was when
21 I was with my ex-husband. I'm not exactly sure
22 of the date, maybe '96, '97.
23 Q. Okay. And how did you apply for an MBNA credit
24 card?

Page 7

1  A. I don't remember.
2  Q. Did you call using the telephone or did you
3  physically fill out an application?
4  A. I don't remember that.
5  Q. Okay. Do you remember how you decided to apply
6  for an MBNA credit card?
7  A. I can remember my husband discussing it with
8  me, but I don't remember how we applied.
9  Q. Okay. If I represent to you that it was
10 October 22, 1997, that you applied for a credit
11 card with MBNA, does that seem about right?
12 A. That probably is.
13 Q. Okay. And do you recall getting a card member
14 agreement with your credit card?
15 A. Yes.
16 Q. Okay. Do you remember when you got your credit
17 card in the mail?
18    THE WITNESS: You mean the actual day or
19 do I remember getting it?
20 Q. Do you remember getting the physical card?
21 A. Yes, I do.
22 Q. And what did you have to do to activate your
23 card?
24 A. I believe I had to call a phone number on the

Page 8

1  card before it was activated.
2  Q. Okay. And did you call that number and activate
3  the credit card?
4  A. Yes.
5  Q. Okay. And did you review the credit card
6  agreement that came with the card?
7  A. Yes, I did.
8  Q. Okay. Did you bring some documents with you?
9  A. Yes, I did.
10 Q. If you turn to -- I believe the bottom numbers,
11 they begin with MBNA; do you see that?
12 A. Yes.
13 Q. If you go to MBNA 14?
14 A. Okay.
15 Q. It says Credit Card Agreement on it; is that
16 right?
17 A. Yes.
18 Q. Does this look like the credit card agreement
19 that you would have received in the mail with
20 your credit card?
21 A. Yes, it does.
22 Q. And it goes all the way to Page MBNA 21 which
23 would be Page 8 of the actual agreement?
24 A. Yes.

Page 9

1  Q. Is that right?
2  A. Yes.
3  Q. And you just stated that you remember reviewing
4  this credit card agreement?
5  A. Yes, I do.
6  Q. Okay. If you turn to MBNA Page 19, which is
7  Page 6 of the actual agreement?
8  A. Okay.
9  Q. And there is a section entitled Amendments; do
10 you see that?
11 A. Yes.
12 Q. Can you read that first sentence for me?
13 A. "We may amend this agreement by complying
14 with the" -- you want me to continue?
15    MS. PIECZARKA: You can just finish the
16 sentence.
17 A. "With the applicable notification
18 requirements of federal law and the laws of the
19 State of Delaware."
20 Q. Do you remember reading this paragraph
21 specifically when you got your agreement?
22 A. I remember reading the entire thing.
23 Q. Okay. So it's fair to say you probably read this
24 section on amendments when you read it when you

Page 10

1   got the agreement?
2   A. Yes.
3   Q. Okay. Now, after you received your credit card,
4      did you start making purchases with it?
5   A. Yes.
6   Q. Okay. And do you know when you started doing
7      that?
8   A. Actually, the credit card wasn't -- we didn't
9      apply for the credit card for any specific
10     reason, so I never really -- there was just small
11     purchases that I made with it, and my husband
12     took care of the bills, so I'm not really sure
13     how much that I charged, but I'm sure it wasn't
14     much.
15  Q. Okay. I guess my question is more when you
16     applied for the credit card, you said you called
17     the number and activated the credit card?
18  A. Yes.
19  Q. And my question is did you start using it right
20     away or did you just keep it in your wallet for a
21     time when it could possibly be an emergency?
22  A. Like I said, it wasn't kept for an emergency,
23     but there wasn't nothing but minor things, maybe
24     a grocery store, or something such as that.

Page 11

1      There wasn't any major purchases that I used it
2      for.
3   Q. And now, when you applied for the card, you're
4      referencing "we," is that referring to you and
5      your husband -- or your ex-husband?
6   A. Yes.
7   Q. And what is his name?
8   A. Clinton King.
9   Q. Clinton King. Now, when you applied for this
10     MBNA credit card, did you apply with him as a
11     joint account?
12  A. I believe so.
13  Q. Or was it just your name on the account when you
14     applied?
15  A. I believe it was both of our names because he
16     was the one who suggested getting the card.
17  Q. But that doesn't necessarily mean that his name
18     was on the card also? In other words, you could
19     have just put your name on the card and applied
20     for it yourself?
21  A. I know that he had a credit card he kept with
22     him. I'm not sure if his name was actually on
23     the account or if he was an authorized user, but
24     I do know that he had a credit card.

Page 12

1   Q. He had a credit card, but would that be an MBNA
2      credit card?
3   A. Yes.
4   Q. Okay. So you didn't carry it around in your
5      wallet, this MBNA credit card?
6   A. No.
7   Q. But it's fair to say your name was on the
8      application when you applied for it?
9   A. Yes.
10  Q. And you're uncertain as to whether his name was
11     on there as well as yours?
12  A. Correct.
13  Q. Okay. But it's possible that it was an
14     individual account that you opened that he had
15     payment -- or purchase ability on the account?
16  A. Correct. He did have the ability to use the
17     credit card.
18  Q. But you're unsure as to whose name it was
19     actually in, but it was definitely in your name?
20  A. Yes.
21  Q. Okay. If you turn to Page 1 of the credit card
22     agreement which is MBNA 14?
23  A. Okay.
24  Q. It says, "How To Use Your Card"; do you see that

Page 13

1      title?
2   A. Yes.
3   Q. And if you go down to the third paragraph?
4   A. Yes.
5   Q. Can you read that paragraph for me?
6   A. "If you permit any person to have access to
7      your card or account number with the
8      authorization to make a charge, you may be liable
9      for all charges made by that person including
10     charges for which you may not have intended to be
11     liable."
12  Q. Okay. Do you understand what that means?
13  A. Yes.
14  Q. What is your understanding of that paragraph?
15  A. If I authorized someone to -- if I allowed
16     someone to use the credit card, then I may be
17     liable for any charges that they charge on the
18     credit card regardless of if I realized what they
19     were going to be using it for.
20  Q. Okay. So if Clinton King's -- that was your
21     ex-husband's name; correct?
22  A. Yes.
23  Q. Name was also on the account, you would be liable
24     for his activity on there?

Page 14

1   A. Yes.
2   Q. Right?
3   A. Yes.
4   Q. Okay. Now, did you retain a copy of your
5      application when you applied for the credit card
6      with MBNA?
7   A. No, I didn't, no.
8   Q. Did you keep all of your billing statements?
9   A. No, I didn't.
10  Q. Okay. Do you have any billing statements?
11  A. The only thing I have is what Mr. Lefebvre
12     had forwarded to me in this packet.
13  Q. So if you turn to MBNA Page 24?
14  A. Okay.
15  Q. It looks like this is a billing statement; is
16     that correct?
17  A. Yes.
18  Q. Now, have you ever seen this before or something
19     that looks like this, not this particular
20     document?
21  A. Yes.
22  Q. So this is familiar to you as a statement that
23     would come from MBNA?
24  A. Yes.

Page 15

1   Q. And this is your name, Janet S. King; is that
2      correct?
3   A. Yes.
4   Q. And you had taken Clinton King's name when you
5      were married to him?
6   A. Yes.
7   Q. Okay. And that P.O. Box 337, Bancroft, West
8      Virginia, was that your address at the time?
9   A. Yes, it was.
10  Q. And you had stated that earlier as one of the
11     addresses that you had before you moved to
12     Massachusetts?
13  A. Yes.
14  Q. Okay. And you received these statements at that
15     P.O. box; is that correct?
16  A. Yes.
17  Q. And each month would a statement come, and you
18     would go pick it up at the P.O. box?
19  A. Actually, during the time that my ex-husband
20     and I separated and eventually divorced, we had
21     agreed to pay off all of our credit cards prior
22     to the divorce, and in our divorce agreement, we
23     had no credit cards with a balance. That wasn't
24     even discussed in our divorce because everything

Page 16

1      was paid, at least I assumed it was. I wasn't
2      receiving any statements from MBNA, and I assumed
3      since he told me this was paid off that it was,
4      but he had access to the post office box, and I
5      was told later by the post master -- it was a
6      small town -- that he was continuing to pick up
7      some mail at that post office box.
8   Q. So when did you get -- when did you and
9      Clinton King get divorced?
10  A. Our divorce was final in '98. We separated
11     in '97.
12  Q. Okay. Do you know around in '97 when you
13     separated?
14  A. Around July of -- no, wait a minute. It was
15     around the end of '97. He had left a couple
16     times prior to that, but had returned, and it was
17     I would say about the first part of December that
18     he left and didn't return to the house.
19  Q. Okay. So if this account was opened in October
20     of '97, that was only a few months before you
21     separated?
22  A. Right.
23  Q. Okay. And then you got divorced in '98?
24  A. Yes.

Page 17

1   Q. And do you know about what month that occurred?
2   A. In July of '98.
3   Q. Okay. So in October of '97, when you applied for
4      this card, this P.O. Box 337 was the correct
5      address --
6   A. Yes.
7   Q. -- for you, and you had access to this P.O. box;
8      is that correct?
9   A. Yes.
10  Q. And how long did you live in Bancroft,
11     West Virginia?
12  A. Since '92.
13  Q. And when did you leave Bancroft, West Virginia?
14  A. In 2000.
15  Q. 2000, okay. Now, did you have this P.O. box the
16     entire time you were in Bancroft, West Virginia?
17  A. Yes.
18  Q. And you had access to it? You had a key?
19  A. Yes.
20  Q. Okay. I just want to go through a few of these
21     statements. So if in '98 you became divorced --
22     and what did you say, it was about July?
23  A. Yes.
24  Q. When did you actually change your name? Did you

Page 18

1    keep your name until you -- are you remarried or
2    is this --
3    A. Yes.
4  Q. Did you keep your name until you remarried?
5    A. Yes.
6  Q. And when did you remarry?
7    A. In February of '99.
8  Q. Okay. And then you took your current husband's
9    last name which is Hoefs?
10   A. Yes.
11 Q. And when did you actually legally change your
12   name?
13   A. It actually wasn't legally changed until
14   about a year ago.
15 Q. Okay. Well, if we look at these statements --
16   and you said February of '99, you got married?
17   A. Yes.
18 Q. And what's your husband's current name?
19   A. Steve Hoefs.
20 Q. Steve Hoefs. If you look at MBNA Page 36, that
21   says the closing date for the statement; do you
22   see where that is?
23        THE WITNESS: The closing date?
24        MS. PIECZARKA: Yes, it says 1/4/99.

Page 19

1    It's in a little box.
2    A. I see it.
3  Q. It says your name is Janet S. King?
4    A. Yes.
5  Q. And if you turn the page, you're also Janet S.
6    King. If you go to MBNA 39, now MBNA 39 has you
7    on record as Janet S. Hoefs, and that closing
8    date is April 2, 1999; is that correct?
9    A. Yes.
10 Q. Does that seem about the time that you legally
11   changed your name?
12   A. No, as I said, it was just changed legally
13   about a year ago, 2003.
14 Q. So you called MBNA and changed the account name
15   because you were now married?
16        THE WITNESS: Who did?
17 Q. Did you call MBNA and change your account name?
18   A. No, at this time, I thought MBNA was closed.
19 Q. Your MBNA account?
20   A. Yes.
21 Q. Even though this statement says you've made a
22   payment for $44, if you look at this MBNA 39?
23   A. I was not making payments at that time. I
24   thought the account was closed.

Page 20

1  Q. Okay. And when did you think the account closed?
2    A. At the time of our divorce, everything was
3    supposed to be closed out. No credit card
4    accounts were even listed in our divorce
5    agreement. The only thing I had was my house
6    payment and car payment. I had no credit cards.
7    My ex-husband and I had no credit cards with a
8    balance at the time, I thought.
9  Q. Okay. And how did you know that? Did you
10   have -- do you have a written document that says
11   you have no credit cards that are open?
12   A. Nothing but my divorce degree that stated
13   there was no outstanding credit card debt.
14 Q. Okay. And you still had access to this
15   P.O. Box 337 in Bancroft, West Virginia?
16   A. Yes, but as I said, he did also. I didn't
17   realize it at the time, but he had -- his name
18   was also on the box because that's the way we
19   opened the post office box, and he got another
20   key.
21 Q. But you could still go and get mail there;
22   correct?
23   A. Yes.
24 Q. And as you read just a few minutes ago, on Page 1

Page 21

1    of your credit card agreement, it says any person
2    that has access to your account to make charges,
3    that you would be liable for them?
4    A. Yes.
5  Q. Do you still remember that as being part of your
6    credit card agreement?
7    A. I do, but I didn't realize that he had the
8    credit card at the time. Like I said, I thought
9    it was closed out.
10 Q. Okay. Now --
11        MR. LEFEBVRE: Can we go off the record
12   just for one second?
13        (OFF THE RECORD)
14 Q. Now, you stated previously that in your divorce
15   degree, which occurred in February of '99 -- I
16   think that's right?
17   A. No, that's when I was remarried.
18 Q. Oh, right. So when was the divorce, '98?
19   A. Yes.
20 Q. And the month was?
21   A. July, I believe, July '98.
22 Q. Okay. So at that point, you didn't think you had
23   any outstanding or open credit on a credit card?
24   A. Correct.

Page 22

1   Q. Okay. And did you have physical custody over the
2      card at any point in time when this account was
3      open?
4   A. It was kept in our house. I didn't keep it
5      in my purse, but yes, I did have access to it --
6           MS. PIECZARKA: Okay.
7   A. -- until that time, and then I cut up the
8      card after that.
9   Q. Until what time?
10  A. Until -- it was probably -- it was prior to
11     the divorce when everything was supposed to have
12     been paid off, and I cut up all the credit cards.
13     I didn't want any of the old credit cards.
14  Q. Okay. Now, did you ever see any document from
15     MBNA that stated you have closed your account?
16  A. No.
17  Q. So if that occurred in '98 -- do you ever
18     remember seeing literature from MBNA in your P.O.
19     box in West Virginia?
20  A. No.
21  Q. Did you ever receive a statement from MBNA, the
22     ones we had just looked at?
23  A. No.
24  Q. You never looked at any?

Page 23

1   A. No.
2   Q. So it's fair to say that you don't know whether
3      statements came to P.O. Box 337 in Bancroft,
4      West Virginia?
5   A. Exactly. I never saw them.
6   Q. Okay. So it's fair to say that you don't know if
7      any other literature from MBNA came in that P.O.
8      box?
9   A. Nothing that I'm aware of.
10  Q. Did you ever get mail in that P.O. box?
11  A. I got mail in the P.O. box, but apparently,
12     he had gone through the mail and pulled out
13     different items. This wasn't the only credit
14     card he did this with.
15          MS. PIECZARKA: Okay.
16          (OFF THE RECORD)
17  Q. So you never received any statement from MBNA?
18     You never saw one --
19  A. No.
20  Q. -- physically, but it's still possible that the
21     statements were sent to your P.O. box?
22  A. It's possible.
23  Q. And it's just possible that you never actually
24     got them out of your P.O. box?

Page 24

1   A. I got all the mail that was there for me to
2      pick up, but apparently, I found out later from
3      the postmaster that he would come and go through
4      the mail.
5   Q. And that's Clinton King?
6   A. Yes.
7   Q. Was he legally authorized to use the P.O. box as
8      well?
9   A. Yes, he was. The postmaster told me that
10     when we opened up the box, it had both of our
11     names on it, and I hadn't changed that, and I
12     didn't think to change that, so --
13  Q. Did he have a key?
14  A. He had given me his key, but then he
15     requested another key, I found out later.
16  Q. Did you have your own key as well?
17  A. Yes, I had my key.
18  Q. Okay. Do you know whether your credit card
19     agreement was amended at all?
20  A. Not that I'm aware of.
21  Q. If I represent to you that in December of '99,
22     MBNA sent an amendment to your credit card
23     agreement along with one of your statements,
24     would you know whether or not that was sent to

Page 25

1      your P.O. box?
2   A. I know that I did not receive that.
3   Q. Okay. But it's possible that it was sent to your
4      P.O. box?
5   A. It's possible.
6   Q. Okay. And it's possible that Clinton King
7      removed it from the P.O. box?
8   A. Correct.
9   Q. And it's possible that you just never saw it, but
10     it did go to the P.O. box?
11  A. That's possible.
12  Q. If you look at MBNA document 22?
13  A. Okay.
14  Q. It's entitled Important Amendments To Your Credit
15     Card Agreement; do you see that?
16  A. Yes.
17  Q. Do you see how there is a boldfaced word that
18     says "Arbitration" towards the last large
19     paragraph?
20  A. Yes.
21  Q. Can you read the first sentence for me?
22  A. "Any claim or dispute ('Claim') by either you
23     or us against the other or against the employees,
24     agents or assigns of the other, arising from or

Page 26

1   relating in any way to this Agreement or any
2   prior Agreement" -- I believe that's "Or your
3   account (whether under a statute, in contract,
4   tort, or otherwise and whether for money damages,
5   penalties" -- I'm sorry, I can't read that part.
6  Q. I think it says "Or" --
7  A. "Or" -- it's blurred. I can't see it.
8      MS. PIECZARKA: Okay.
9  A. "Or equitable relief) including Claims
10  regarding the applicability of this Arbitration
11  Section or the validity of the entire Agreement
12  or any prior agreement shall be resolved by
13  binding arbitration."
14 Q. Now, do you understand what that means?
15 A. It means that rather than go to court, it
16  will go to -- that I would agree it would go to
17  arbitration.
18 Q. And do you recall seeing this in your P.O. box
19  that came with the statement?
20 A. No.
21 Q. Okay. But it's fair to say that MBNA was still
22  sending these statements to your P.O. box with
23  your name on them, and that MBNA was considering
24  this account open?

Page 27

1  A. Apparently -- from looking at these
2   documents, apparently, they were, but I didn't
3   know that.
4  Q. Okay. Now, if you turn to MBNA 23, it's just the
5   second page to that amendment?
6  A. Okay.
7  Q. If you look at the last paragraph, it's in
8   italics?
9  A. Yes.
10 Q. It says, "If you do not wish your account to be
11  subject to this Arbitration Section, you must
12  write to us at MBNA," et cetera. Do you recall
13  seeing this in your P.O. Box?
14 A. No.
15 Q. But you agree that your account was open at this
16  time, and you might not have known it was open,
17  but it was open?
18 A. It appears that it was, but like I said, I
19  did not know that, and I know I did not receive
20  this in the mail.
21 Q. But it's possible that it was sent to your P.O.
22  box, and Clinton King removed it?
23 A. Yes, that's possible.
24 Q. And you didn't write to MBNA and wish to not be

Page 28

1   subject to the arbitration section; is that
2   correct?
3  A. That's correct, because I was not aware of
4   this.
5  Q. Okay. Now, if you turn to MBNA Page 50?
6  A. Okay.
7  Q. I'm going to represent to you that this was the
8   statement that contained that amendment we just
9   read about, the arbitration provision?
10     MR. LEFEBVRE: Or alleged statement. We
11  still --
12     MS. PIECZARKA: Alleged statement.
13     MR. LEFEBVRE: For purposes of the
14  record.
15     MS. PIECZARKA: Fair enough.
16 Q. And this says it was sent to Janet S. Hoefs at
17  20 Thorn Hill Estates in Poca, West Virginia; is
18  that what that says?
19 A. Yes.
20 Q. Did you live at that address?
21 A. That was my physical address, but I did not
22  use that. Anything that came into that box was
23  junk mail, and I used the post office box.
24 Q. Okay. But you lived -- this was where you

Page 29

1   physically resided, at 20 Thorn Hill Estates?
2  A. Yes.
3  Q. And you got mail there?
4  A. Like I said, I got fliers and stuff. I
5   didn't ever use this as a mailing address.
6  Q. Okay. Did you ever open the mail?
7      THE WITNESS: The mail that came into
8   this box?
9      MS. PIECZARKA: To 20 Thorn Hill Estates.
10 A. Yes, like I said, it was junk mail. I opened
11  up fliers and stuff like that, but there was
12  never any bills that were sent to this address.
13  What happened was there was no mail service to
14  the area, and when they began mail service, I
15  automatically got this address. So I got just
16  fliers and stuff, but I never used it.
17 Q. What do you mean there was no mail service to the
18  area?
19 A. There was no mail service. We could not get
20  mail. We had to use a post office box, and
21  eventually they came around, and said we could
22  get mail delivery to our homes, and that's when
23  this address came about.
24 Q. Okay. So when they said you could get mail at

Page 30

1  your house, you got this address, 20 Thorn Hill
2  Estates?
3  A. Yes.
4  Q. And then you started getting fliers?
5  A. Yes.
6  Q. Okay. And at some point, this address was
7     changed with MBNA to be 20 Thorn Hill Estates?
8  A. Yes.
9  Q. Did you call MBNA and change that address?
10 A. No.
11 Q. Do you know how MBNA was contacted to change that
12    address?
13 A. I have no idea.
14 Q. But it's fair to say that MBNA was contacted, and
15    the address was changed on their system as that
16    being your address?
17 A. I'm assuming so since this is on the
18    statement, but I never received anything at that
19    address from them.
20 Q. Okay. And if this was your address on the
21    statement, it's fair to say it would have been
22    mailed to that address; is that correct?
23 A. Yes.
24 Q. But you stated that you never received any of

Page 31

1     these statements at this address?
2  A. That's correct. I never used this box
3     because I knew -- at this time, I knew there was
4     problems with my ex-husband trying to get my
5     mail, and I had taken his name off the post
6     office box, so that couldn't happen, and
7     apparently, it was coming to the box at my home,
8     and I didn't realize it.
9  Q. So it's possible that you did receive these
10    statements in the mail and thought they were
11    junk, and maybe threw them away?
12 A. No, absolutely not.
13 Q. Did you open all of the junk mail?
14 A. Yes, I did.
15 Q. Okay. But it's fair to say that these statements
16    did get mailed to your house at 20 Thorn Hill
17    Estates?
18 A. Yes, and not until after I moved to
19    Massachusetts did a neighbor tell me that she had
20    saw my ex-husband getting the mail out of my
21    mailbox in front of my home.
22 Q. Okay. So that's Clinton King?
23 A. Yes.
24 Q. And so it's your testimony that he was going into

Page 32

1     your mailbox at 20 Thorn Hill Estates?
2  A. Yes.
3  Q. And removing your mail?
4  A. Yes.
5  Q. Okay. Now, it says here on the same page,
6     MBNA 50, it says that there's an over credit line
7     fee and a late charge for payment due; is that
8     correct?
9  A. Yes.
10 Q. Now, if you go back to MBNA Page 48?
11 A. Yes.
12 Q. It still says Janet S. Hoefs, 20 Thorn Hill
13    Estates, Poca, West Virginia; is that correct?
14 A. Yes.
15 Q. And it looks like there's a series of charges on
16    there?
17 A. Yes.
18 Q. It says, for instance, Adirondack Technologies
19    $19.95; do you see that? It's the fourth line
20    down.
21 A. Yes.
22 Q. Do you recall making that charge to the account?
23 A. No, I have no idea what that is.
24 Q. So it's possible that Clinton King made that

Page 33

1     charge to the account?
2  A. It's very likely.
3  Q. And so the next one, Drug Emporium #2 for $39.11,
4     you don't recognize that?
5  A. No.
6  Q. So it's possible Clinton King made that charge?
7  A. Yes, that's also very likely.
8  Q. Okay. So if we turn to MBNA 52?
9  A. Yes.
10 Q. And this was a statement with a closing date of
11    February 2, 2000; do you see that in that box?
12 A. Yes.
13 Q. It says there was an express payment made of
14    $325?
15 A. It looks like $125.
16    MR. LEFEBVRE: It looks likes $125 to me.
17    MS. PIECZARKA: Okay. $125.
18 A. Yes.
19 Q. Did you make that payment?
20 A. No.
21 Q. Do you know who did make that payment?
22 A. No, I don't know.
23 Q. But it's fair to say that MBNA assumes that you
24    made this payment?

Page 34

1  MR. LEFEBVRE: I'm going to object. I
2  don't know how she could have any foundation to
3  know what MBNA would assume. You can answer if
4  you want to. Do you understand what she's asking
5  you, Janet?
6  THE WITNESS: I guess she's asking me
7  would I assume what MBNA would think when they
8  received the payment?
9  MS. PIECZARKA: All right. I withdraw
10  the question.
11  Q. Did you ever fail to make a payment on your
12  credit card?
13  A. No.
14  Q. Okay. And as far as you're concerned, you always
15  made payments on the card when they were supposed
16  to be made; is that correct?
17  A. Yes.
18  Q. And that at some point, the account was closed?
19  A. Yes.
20  Q. Okay. When is the first time that you learned
21  that this account was open after you had thought
22  that it had been closed?
23  A. After I moved to Massachusetts.
24  Q. And what year was that?

Page 35

1  A. In 2000.
2  Q. Okay. In 2000. And how did you come to that
3  realization?
4  A. I got a phone call from MBNA concerning the
5  account.
6  Q. And the phone call -- you received the phone call
7  in Massachusetts?
8  A. Yes.
9  Q. Did you receive a statement in Massachusetts?
10  A. I did after I received the phone call. I had
11  asked for a statement showing what this was
12  about. I was clueless, and I never received
13  anything such as what I'm looking at now showing
14  what charges were on the account.
15  Q. If you turn to the Page MBNA 60?
16  A. Yes.
17  Q. It says Janet S. Hoefs, 15 Rice Drive, Wilbraham,
18  Mass. Was that your address in Massachusetts?
19  A. Yes, it was.
20  Q. Did you receive this statement there at that
21  address?
22  A. I believe so.
23  Q. Was this the statement you requested after you
24  spoke with someone at MBNA?

Page 36

1  A. This is not what I had requested. I had
2  requested a statement showing what the charges
3  were, you know, how this happened. Like I said,
4  I thought it was closed out, and then they're
5  telling me that I'm past due, and I have a big
6  balance on the account, and I really didn't know
7  what was going on.
8  Q. Have you ever seen a document that looks like
9  this page, MBNA 60?
10  THE WITNESS: Like a statement like this?
11  MS. PIECZARKA: Correct, sent to 15 Rice
12  Drive in Wilbraham, Massachusetts.
13  A. Yes, I did get a statement.
14  Q. Okay. Did you get regular statements or just
15  one?
16  A. I got a couple, and every time I got one, I
17  would call them and tell them -- retell them the
18  situation, that I had no idea what this was
19  about. I didn't know what these charges stemmed
20  from. I hadn't received anything from them since
21  the account was closed, and every time I just got
22  a runaround. I never got any answers to what
23  these charges stem from. They just told me that
24  I was going to collections, and that I needed to

Page 37

1  make a substantial payment, and at one point, I
2  even tried to set up a payment plan with them,
3  and I just was unable to do so because I wasn't
4  in a situation to pay this bill at that time.
5  Q. Did you call MBNA and change your address to
6  15 Rice Drive on this account?
7  A. No, I didn't.
8  Q. Did you ever contact Clinton King when you
9  suspected that he was intercepting your
10  statements or using a credit card in your name
11  without your authorization?
12  A. Not until I received this phone call from
13  MBNA in 2000.
14  Q. And then --
15  A. I had no clue until that time that anything
16  was going on.
17  Q. Did you contact Clinton King after you received
18  this phone call?
19  A. Yes, I did.
20  Q. And what did you say to him?
21  A. I asked him if he was responsible for charges
22  on a credit card that he was supposed to have
23  closed out, that I thought that we had closed out
24  all credit card accounts, and I'm getting a phone

Page 38

1    call stating there's a large balance on one of
2    the owed accounts that I wasn't aware of, and he
3    refused to discuss it with me.
4  Q. Did he deny that he had been using the credit
5    card?
6  A. No.
7  Q. Did he say he had been using the credit card?
8  A. He didn't say that either.
9      MS. PIECZARKA: All right.
10 A. He just actually stated -- I remember the
11   comment, "You got what you deserve," and he hung
12   up on me.
13     MS. PIECZARKA: That's nice.
14     THE WITNESS: Yes.
15 Q. What happened after you were receiving these
16   statements from MBNA, did -- they wanted to set
17   up a payment plan with you?
18 A. Yes.
19 Q. Or did you want to set up a payment plan with
20   them?
21 A. I asked them what I could do about this. I
22   explained the situation, told them I was very
23   concerned about this, what could I do. This
24   shouldn't be my responsibility. I didn't make

Page 39

1    these charges, and I just really got the
2    runaround telling me I had to pay it. It was in
3    my name. It was my responsibility, and that I
4    needed to actually make the payment in full, and
5    after continuous phone calls from them telling me
6    this was in collections, and I had to do
7    something about it, I told them I would try to
8    make monthly payments, but it was impossible at
9    the time for me to do so.
10 Q. Did you ever make a monthly payment on the
11   account?
12 A. I believe I made a couple of payments on it.
13 Q. And what year or date was that?
14 A. That would have been in 2000, after they
15   contacted me.
16 Q. In 2000. Now, these statements beginning MBNA 60
17   are during 2000. That one looks likes it's from
18   November 2000. Could you identify on these
19   statements that are from 2000 where there is a
20   payment that you actually made? It looks like
21   MBNA Page 60 is the first statement directed at
22   15 Rice Drive, Wilbraham, Mass., the first time
23   it was mailed there.
24 A. Okay. It looks likes the November payment --

Page 40

1    actually, it's --
2  Q. On MBNA 61?
3  A. On 60.
4      MS. PIECZARKA: Okay.
5  A. The $145 payment.
6      MS. PIECZARKA: Yes.
7  A. I believe that's when I started trying to
8    make the payments. They told me if I would send
9    $145, and then $85 dollars a month, and I made
10   those two $85 payments, and I was unable to
11   continue.
12 Q. So you made the $145 payment on Page MBNA 60?
13 A. Yes.
14 Q. And you made the $85 payment on MBNA Page 61?
15 A. Yes.
16 Q. Okay. Did you make the payment on MBNA Page 62,
17   the $85 payment?
18 A. Yes.
19 Q. And then you stopped making payments?
20 A. Yes, I was unable to continue. At that time,
21   I was diagnosed with rheumatoid arthritis and had
22   a lot of medical bills coming in, and I had to
23   set my priorities as to what was being paid, and
24   this was not something that I had charged. I

Page 41

1    didn't feel I was responsible for it.
2  Q. But you stated that you had made payments to the
3    account?
4  A. I did because I valued my credit, and they
5    kept telling me this was going to reflect poorly
6    on my credit.
7  Q. And you were taking responsibility for the
8    account?
9  A. No, I was not taking responsibility. I was
10   trying to protect my credit.
11 Q. By making a payment, you weren't taking
12   responsibility for the account?
13 A. I was misled over the telephone when they
14   called me. They kept telling me this was my
15   total responsibility; that even though I didn't
16   make the charges, that it was still my
17   responsibility. This was going against my
18   credit. This would prevent me from ever buying
19   another house. They scared me.
20 Q. And this is your name on the account, Janet S.
21   Hoefs?
22 A. Yes.
23 Q. And you do remember at some point opening an MBNA
24   credit card with your ex-husband, Clinton King?

Page 42

1   A. Yes.
2   Q. So you knew at that point that the account had
3      never been closed, and there had been -- and
4      Clinton King had been using the credit card?
5   A. I assumed that's what had happened.
6   Q. And you knew that the credit card was also your
7      responsibility?
8   A. No, I didn't feel it was my responsibility at
9      that point. I thought the card was closed.
10          (OFF THE RECORD)
11  A. I did not make these charges.
12  Q. But you had just stated that in MBNA Page 60, you
13     had made that $145 payment. At that point, you
14     knew that this account was still open and had
15     been used?
16  A. That's what they told me.
17  Q. What happened after you made the second $85
18     payment?
19  A. I was unable to continue making these
20     payments. As I said, I had a lot of medical
21     bills. I informed them of this because I
22     continued to receive phone calls almost on a
23     daily basis, and I told them I was not
24     responsible for this, that I gave them my

Page 43

1   ex-husband's name, phone number, address, and
2   told them they need to direct all correspondence
3   to him.
4   Q. Did they acknowledge that he was an authorized
5      user on the account?
6   A. They really wouldn't give me any information.
7      They just told me that this is my responsibility.
8      They were very -- they harassed me very much on
9      the telephone.
10  Q. Did they continue sending you statements to
11     15 Rice Drive in Wilbraham?
12  A. Yes.
13  Q. Did you make any other payments after that second
14     $85 payment?
15  A. No.
16  Q. So how many statements did you receive after that
17     second $85 payment?
18  A. I don't know, maybe 5 or 6.
19  Q. If you turn to the final page in that packet,
20     MBNA 71.
21  A. Okay.
22  Q. And you notice the first line of the body of the
23     document states, "Charge-off Adjustment"?
24  A. Yes.

Page 44

1   Q. Do you remember receiving this document?
2   A. No, I don't.
3   Q. Do you see how it says Janet S. Hoefs?
4   A. Yes.
5   Q. And underneath that, it says P.O. Box -- what is
6      that 18026?
7   A. That's what it looks like.
8   Q. And then in Wilmington, Delaware; is that
9      correct?
10  A. That's what it says.
11  Q. And did you ever open that P.O. Box?
12  A. No, I have never lived there.
13          MR. LEFEBVRE: I think that's an MBNA
14     address.
15          MS. PIECZARKA: I think you might be
16     right.
17  Q. So do you recall seeing the MBNA Page 70
18     document?
19  A. I remember seeing one similar to it, but I
20     can't be positive it was this one.
21  Q. So after you received this, did you receive any
22     other statements?
23  A. No.
24  Q. What is the next contact you received from MBNA?

Page 45

1   A. I didn't receive any contact from MBNA. The
2      next contact I received was from -- I thought at
3      the time it was an attorney's office stating they
4      were handling the collection of this account.
5   Q. Okay. And did you know what they were trying to
6      collect?
7   A. I assumed it had -- well, they had put --
8      referenced this MBNA account, and the total
9      amount due, so yes.
10  Q. And you were familiar with that because you had
11     been getting these statements?
12  A. Yes.
13          MS. PIECZARKA: Okay.
14  A. At the time I had received that, I thought
15     that -- when I quit receiving statements, I
16     assumed that somehow they had straightened this
17     out with my ex-husband or whatever because I quit
18     receiving statements.
19          MS. PIECZARKA: Okay. I don't have any
20     other further questions.
21          MR. LEFEBVRE: I have a couple.
22          EXAMINATION BY MR. LEFEBVRE
23  Q. Janet, I just want to get some time frames clear
24     so we have a nice record. You mentioned

Page 46

1  repeatedly during the deposition that as part of
2  the divorce, you believed that there were no
3  credit cards; correct? That they had all been
4  paid off?
5  A. Yes.
6  Q. Now, just educate me. I assume you and your
7  ex-husband had had some discussions about credit
8  card debt and paying them off which formed the
9  basis for your belief that they were going to be
10 paid; correct?
11 A. Yes.
12 Q. When you went to court -- was it West Virginia
13 you got divorced in?
14 A. Yes.
15 Q. Did your husband show up in court?
16 A. Yes.
17 Q. Okay. Now, you talked about the divorce. There
18 was a -- educate me a little bit. You went into
19 the court date -- when did you actually go before
20 the judge to get the divorce, what month
21 approximately, give or take?
22 A. Maybe March or April of '98.
23 Q. And then did you have to wait a few months before
24 you got a final decree of divorce?

Page 47

1  A. Yes.
2  Q. Okay. Now, prior to March of '98, when you went
3  before the judge for your divorce, were you and
4  your husband living together at that time?
5       THE WITNESS: When we went before the
6  judge?
7       MR. LEFEBVRE: Yes.
8  A. No.
9  Q. In fact, you had been separated; is that correct?
10 A. Yes.
11 Q. When did you separate from your husband? When
12 were you living in separate places?
13 A. We lived in separate places several different
14 times, but the last time was toward the end of
15 '97.
16 Q. And that was the last separation before the
17 divorce?
18 A. Yes.
19 Q. So is it fair to say that sometime in '97 up
20 until March of 1998, when you went before the
21 judge to get your divorce, you were living in one
22 household, and your husband was living in
23 another?
24 A. Yes.

Page 48

1  Q. And at that time, you still had that P.O. box,
2  the one in Bancroft?
3  A. Yes.
4  Q. Okay. Now, from the time you separated in '97 up
5  until the day you went to see the divorce judge
6  in March of '98, who was getting the MBNA
7  statement at that time, if you remember?
8  A. Actually, I believed this was paid off prior
9  to us seeing the judge.
10 Q. And what had you -- go ahead. I'm sorry.
11 A. We had discussed this at the time we were
12 separating. There was no way that either of us
13 could handle having credit card debt and living
14 separately, so we agreed to take money that we
15 had in the bank at the time and pay off all
16 credit card debt, and that left me with the house
17 payment and my car payment, and left him with no
18 debt at the time.
19 Q. Okay. So is it fair to say that after you went
20 before the judge in March of '98 that you never
21 made a single charge or purchase to this MBNA
22 account?
23 A. That's correct.
24 Q. And is it fair to say that after March of '98,

Page 49

1  until you received that phone call from MBNA
2  sometime in 2000, that you were unaware of this
3  account? You had thought that it was history?
4  A. That's correct.
5  Q. So if looking at statement -- let's go through
6  the statements. Look at Number 26.
7  A. Okay.
8  Q. There's a charge -- I'm looking at the -- there's
9  a charge it looks like from North Carolina,
10 Adam Hayl, and then a charge at Big Lots. You
11 didn't make those charges?
12 A. No.
13 Q. Let's go to the next one, 27. Look at all the
14 charges on this statement and the payment. Did
15 you make the payment or any of these charges?
16 A. No, I didn't.
17 Q. How about 28 -- let's forget 28. There's no
18 charges there. Did you make the $1,000 payment
19 referenced on MBNA 29?
20 A. No.
21 Q. How about 30, the Truckee River Lodge, there was
22 a purchase for $384; do you know what the Truckee
23 River Lodge is in Reno?
24 A. I have no idea.

Page 50

1  Q. Ever been to Reno?
2  A. No.
3  Q. Okay. How about 31, Myrtle Beach, did you go
4     down to the beach in October of '98 and spend
5     $736?
6  A. No, I didn't.
7  Q. Did you make any of these charges referenced on
8     MBNA 31?
9  A. No.
10 Q. So I just want to back up, just flipping through
11    34, 35 -- I'm looking at MBNA 34, 35, 36, 37,
12    MBNA 38, MBNA 39, up until the time you were in
13    Massachusetts in 2000, you didn't make any of
14    these charges as referenced on these exhibits?
15 A. No, I didn't.
16 Q. Now, I want to just go back. We took the
17    deposition of the MBNA rep., and you heard
18    counsel mention that this account was opened I
19    think -- what was it, October of --
20       MS. PIECZARKA: '97.
21 Q. '97. That kind of coincides -- you don't dispute
22    that it was October of '97 if MBNA's records say
23    so?
24 A. No, I don't.

Page 51

1  Q. At the time in '97, you don't remember how you
2     got the card, if it was via the phone, some
3     telephone solicitation, or you filled out an
4     application? You don't remember how you did it?
5  A. I really don't.
6  Q. Do you know if your husband was involved? Did
7     you talk to him, and did he want to be --
8  A. I remember it was his suggestion.
9       MR. LEFEBVRE: Okay.
10 A. At the time, we were trying to patch things
11    up, and I was very cooperative.
12 Q. Okay. And ultimately you got the card?
13 A. Yes.
14 Q. Now, when you got the card, was it your
15    understanding in October of '97 that your husband
16    was permitted to use the card at that time?
17 A. Yes.
18 Q. So did you ever call MBNA at any time and have a
19    discussion with them asking them to put your
20    husband's name on as an authorized user?
21 A. Not that I recall.
22 Q. So if MBNA -- take a look with me at -- just bear
23    with me one second.
24       (PAUSE)

Page 52

1  Q. Take a look at MBNA 02.
2  A. Okay.
3  Q. Now, you see here the dates, I'm looking at --
4     halfway through, it looks like a 7/26/99 at 1514,
5     there is some operator, BTASLS, it says, "Add
6     CH's Husband" -- I assume card holder's
7     husband -- "as authorized user." Do you recall
8     having a conversation in July of '99?
9  A. No, and I can assure you that my current
10    husband has never had a card on this account.
11 Q. Because I must confess, and I'm a bit
12    embarrassed, during the prior deposition, I kept
13    using Steven Hoefs, assuming that Steven was your
14    ex-husband until I just learned that he was not.
15    Steven Hoefs is your present husband?
16 A. Yes, he is.
17 Q. Does Steven Hoefs have an MBNA credit card?
18 A. No, he never has.
19 Q. You're sure of that?
20 A. I'm quite positive of that.
21 Q. And in fact, in this marriage with Steven, you
22    take care of all of the finances; is that
23    correct?
24 A. Yes, I do.

Page 53

1  Q. You open all of the bills, and you pay them; is
2     that right?
3  A. Yes.
4  Q. Okay. So to the best of your knowledge, Steven
5     doesn't have an MBNA account?
6  A. No.
7  Q. Do you know why Steven would be referenced on
8     your account back in July of '99? Were you two
9     dating at that time? Were you married by them?
10 A. We were married at that time.
11 Q. Okay. How about during your prior marriage,
12    whose responsibility was it to pay the bills?
13 A. My ex-husband handled all the bills.
14 Q. So you learned, and in this marriage, you're
15    paying the bills?
16 A. I learned.
17 Q. Okay. And you understand that you're under oath,
18    and you understand the importance of testifying
19    truthfully; you understand that?
20 A. Yes, I do.
21 Q. Is there any doubt in your mind -- relative to
22    receiving the arbitration rider which has been
23    talked about at length, and it's referenced in
24    MBNA 22 and 23, did you ever see that document,

Page 54

1    open an envelope that contained that document?
2    That's my question. Have you ever --
3    A. No.
4 Q. So is it fair to say other than just yesterday,
5    when I scanned this document to you or as part of
6    this lawsuit, it was the first time that you ever
7    had seen this -- we'll call it arbitration
8    addendum, Exhibit Numbered 22 and 23?
9    A. Yes, that's correct.
10 Q. And you said that when you first found out that
11    there was a problem sometime in June of 2000, you
12    were living in Massachusetts?
13    A. Yes.
14        MR. LEFEBVRE: Okay. That's all I have.
15        MS. PIECZARKA: Nothing further.
16        MR. LEFEBVRE: We would like to read and
17    sign, so we don't want to waive that privilege.
18        THE REPORTER: Would you like a copy?
19        MR. LEFEBVRE: Yes.
20    (DEPOSITION CLOSED AT 4:51 P.M.)
21
22
23
24

Page 55

1        CERTIFICATE
2
       I, Jeannette A. Lemoine, a Notary Public in and
3  for the State of Rhode Island, duly commissioned and
   qualified to administer oaths, do hereby certify that
4  the foregoing deposition of Janet Hoefs, Plaintiff in
   the above-entitled cause, was taken by me at the
5  offices of Allied Court Reporters, 115 Phenix Avenue,
   Cranston, Rhode Island, commencing at 3:30 p.m. on
6  September 1, 2004; that previous to the testimony of
   said witness, who was of lawful age, the witness was
7  sworn by me; whereupon the witness was first duly
   cautioned and sworn to testify the truth, the whole
8  truth, and nothing but the truth, and that the witness
   thereupon testified as in the foregoing-annexed
9  transcript.
10     I further certify that the foregoing deposition
   was taken down by me in stenotype and was later
11 reduced to typewriting and that the foregoing is a
   true and accurate record of the testimony of said
12 witness.
13     Pursuant to Rule 30 (e), the witness, with
   agreement of the parties, hereby requests to read and
14 sign the transcript.
15     Pursuant to Rule 5 (d) and 30 (f) (1) of the
   Federal Rules of Civil Procedure, original transcripts
16 shall not be filed in court. Therefore, original is
   delivered and retained by Defendant's attorney.
17
       IN WITNESS WHEREOF, I have hereupon set my hand
18 this       day of September, 2004.
19
20
21     JEANNETTE A. LEMOINE, CSR, NOTARY PUBLIC
       My Commission Expires July 17, 2005
22
23 In Re: Janet Hoefs v. CACV of Colorado, LLC, et al
   Deposition: Janet Hoefs
24 Date: September 1, 2004

