UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS
SPRINGFIELD DIVISION

| | |
|---|---|
| JANET S. HOEFS,<br>          Plaintiff<br><br>v.<br><br>CACV OF COLORADO, LLC, J.A.<br>CAMBECE LAW OFFICE, P.C., and J.<br>ANTHONY CAMBECE,<br>          Defendants | CIVIL ACTION NO. 04-CV-30015-MAP |

## REPLY MEMORANDUM OF DEFENDANTS J.A. CAMBECE LAW OFFICE, P.C. AND J. ANTHONY CAMBECE IN SUPPORT OF MOTION TO COMPEL ARBITRATION

Represented by successor counsel, Defendants J.A. Cambece Law Office, P.C. and J. Anthony Cambece (collectively "Cambece") submit the following reply to plaintiff Janet S. Hoefs' Response to Cambece's Motion to Compel Arbitration. For the most part, Cambece relies on and incorporates the arguments set forth in defendant CACV of Colorado, LLC's reply memorandum, rather than repeating them here. This reply is addressed to two issues: (1) the application of the Federal Mailbox Rule, and (2) the impact of Cambece's status as a third-party "debt collector."

### INTRODUCTION

Plaintiff Janet S. Hoefs' ("Hoefs") Response to the Cambece Defendants' Motion to Compel Arbitration devotes considerable space to complaining about Cambece's failure to submit any affidavits, deposition testimony or similar material in support of its motion to compel arbitration. Hoefs knows full well, however, that the obligation to submit such material arises only *after* the opposing party takes the position that the parties never agreed to arbitrate. *See*

*Snow v. B E & K Const. Co.*, 126 F. Supp. 2d 5, 7 (D. Me. 2001). Hoefs is also aware that discovery concerning the arbitration issue was not even completed until the depositions of herself and Stephen Fox were conducted on September 1, 2004. Discovery on the issue of arbitration having now been completed, Cambece is now in a position to address Hoefs' claim that there was no arbitration agreement on the basis of a complete factual record as contemplated in the *Snow* case.

Hoefs' opposition is also premised on a false construction of the arbitration amendment that, even if accepted, has no bearing on her obligation to arbitrate her claim against Cambece. Hoefs' legal argument is particularly troubling because she falsely accuses Cambece of "disingenuously quot[ing] the [arbitration] provision with … critical language deleted, without indicating the deletion through ellipses or other accepted methods." (Plaintiffs' Response to Motion to Compel Arbitration, p. 9). In fact, the "critical language" referred to by Hoefs (and quoted at p. 8 of her Response) is recited in its entirety on the eighth page of Cambece's Motion to Compel Arbitration and to Dismiss Plaintiffs' Punitive Class Action Amended Complaint in its Entirety. As shown below, that same "critical language" mandates arbitration as to Cambece.

The deposition testimony of Stephen Fox of MBNA, the original issuer of Hoefs' credit cardmember agreement, makes it clear that the amendment to the arbitration agreement was placed in an envelope with Hoefs' account statement and mailed to Hoefs in December of 1999. In her own deposition testimony, Hoefs confirmed that she received MBNA account statements at the address to which her December 1999 statement was mailed. The "critical language" of the arbitration agreement plainly states that it applies to claims against "debt collectors" as long as they are named in a claim together with MBNA or, *inter alia*, its assignee. The amended complaint alleges that Cambece acted as a "debt collector" on behalf of defendant CACV of

2

Colorado, LLC ("CACV"), to which MBNA assigned its rights under its cardmember agreement with Hoefs. On both the facts and the law, therefore, Cambece's Motion to Compel Arbitration should be allowed.

## FACTS

The parties took the deposition of Stephen Fox on September 1, 2004. Mr. Fox is employed by MBNA. He is knowledgeable about Hoefs' MBNA credit card account. A complete copy of the transcript of his deposition testimony is attached hereto as **Exhibit A**. He confirmed that MBNA's rights under its card member agreement with Hoefs were assigned to CACV. (Affidavit of Assignment executed by Stephen Fox, attached hereto as **Exhibit B**, included as Document MBNA 000073 of Exhibit 2 marked during the September 1, 2004 deposition of Mr. Fox). Based on Mr. Fox's review of Hoefs' MBNA account information, he testified that it was his "belief that the amendments of terms and conditions of this account was [sic] mailed by MBNA in December 1999 to Mrs. Hoefs." (**Exhibit A**, p. 5). More particularly, he agreed that it was MBNA's "normal course of business" in December of 1999 to send the amendment to all credit card holders whose accounts were in good standing. (*Id.*, p. 14). Mr. Fox confirmed that based on his review of Hoefs' statements, "she was in good standing" at that time. (*Id.*, p. 16). Mr. Fox also confirmed that Hoefs' December 2, 1999 statement, which included the arbitration amendment, was mailed to Hoefs' address at 20 Thorn Hill Estates, Poca, West Virginia. (*Id.*, p. 15).

For her part, Hoefs was also deposed on September 1, 2004. A complete copy of the transcript of her deposition is attached hereto as **Exhibit C**. During her deposition, Hoefs was shown a copy of her December 1999 MBNA credit card statement, which was addressed to 20 Thorn Hill Estates, Poca, West Virginia. (A copy of the statement is attached hereto as **Exhibit D**, included as Document MBNA 000050 of Exhibit 2 marked during the September 1, 2004

3

deposition of Mr. Fox). She agreed that she received mail delivery at the address on the

statement, 20 Thorn Hill Estates, Poca, West Virginia. (**Exhibit C**, p. 12). Although Hoefs

denied ever receiving a copy of the arbitration amendment, she indicated that it would be "fair to

say" that the December 1999 statement was mailed to her address at 20 Thorn Hill Estates, Poca,

West Virginia. (*Id.* p. 13).[1] Mr. Fox also confirmed that MBNA did not receive any returned

mail on Hoefs' account (**Exhibit A**, p. 21).

The arbitration provision, as amended in 1999, provided that the cardholder could reject

the amended arbitration provision:

> You must give notice in writing; it is not sufficient to telephone us.
> Send this notice only to the address in this paragraph; do not send
> it with a payment. **We must receive your letter at the above
> address by January 25, 2000 or your rejection of the
> arbitration section will not be effective.**

(See **Exhibit E**, p. 4, included as Document MBNA 000022-23 of Exhibit 2 marked during the

September 1, 2004 deposition of Mr. Fox (emphasis in original)). There is no evidence that

Hoefs' rejected the arbitration provision in this (or any other) manner. In fact, Hoefs

acknowledged during her deposition that charges continued to be made on the credit card

account after January 25, 2000. (**Exhibit C**, pp. 14-22).[2]

---

[1] Hoefs claims that a neighbor told her that the neighbor saw Hoefs'ex-husband removing mail from the mailbox in front of 20 Thorn Hill Estates after Hoefs had moved to Massachusetts. This testimony is premised on inadmissible hearsay.

[2] In Cambece's Motion to Compel Arbitration, predecessor counsel purported to quote a provision from the cardmember agreement concerning the means by which an amendment could be rejected. It is not clear what the source of that language is. Now represented by successor counsel, Cambece relies on the above-quoted provision from the 1999 arbitration amendment itself. Clearly, the plain language of the amendment itself, as quoted above, takes precedence over any other language to which Hoefs might point. The arbitration amendment itself is clear on the mechanism by which Hoefs could have, but failed to, reject it.

## ARGUMENT

I.    **HOEFS IS PRESUMED TO HAVE RECEIVED THE ARBITRATION AMENDMENT BECAUSE IT IS UNDISPUTED THAT MBNA MAILED IT TO AN ADDRESS AT WHICH SHE RECEIVED MAIL, INCLUDING MBNA ACCOUNT STATEMENTS.**

"The mailbox rule provides that the proper and timely mailing of a document raises a rebuttable presumption that the document has been received by the addressee in the usual time. It is a settled feature of the federal common law." *Schikore v. BankAmerica Supplement Retirement*, 269 F. 3d 956, 961 (9th Cir. 2001), *citing Hagner v. United States*, 285 U.S. 427, 430, 52 S. Ct. 417, 76 L. Ed. 861 1932 (additional citations omitted).

> If the sender shows enough evidence to raise the presumption, then the other party bears the burden of showing that the document never arrived. *Id* at 963. Merely stating that the document isn't in the addressee's files or records – which is all that the [plaintiff] has done in this case – is insufficient to defeat the presumption of receipt.

*Huizar v. Carey*, 273 F. 3d 1220, 1224, n. 3 (9th Cir. 2001), *quoting Schikore, supra*, at 963.

Here, it is undisputed that both the testimony of Mr. Fox and Hoefs combine to establish that the arbitration amendment was mailed to Hoefs at 20 Thorn Hill Estates, Poca, West Virginia, an address at which she agrees she received MBNA account statements. There is no evidence that the Postal Service returned the mailing to MBNA as undeliverable. Under these circumstances, the presumption of receipt provided for by the mailbox rule has been established. Hoefs' bare contention that she never received the amendment is insufficient to overcome the presumption. *See Huizar, supra.* To the extent that Hoefs claims that the evidence of receipt is inconclusive, she proves Cambece's point. Courts have adopted the mailbox rule in response to cases involving inconclusive evidence of receipt. *Schikore, supra* at 963. The objective of the rule is "precisely to avoid the type of swearing contest in which the parties are presently involved." *Id.* In fact, Hoefs and Cambece, or even CACV, for that matter, are not actually

involved in any "swearing contest" at all. Hoefs finds herself at odds with the testimony of Stephen Fox of MBNA, a party with no stake in this matter.

Hoefs' unadorned claim that she never received the arbitration amendment is insufficient to defeat it. Cambece is entitled to rely on the common law mailbox rule, and its application demonstrates that there is no genuine material dispute as to whether Hoefs received the amendment. As a matter of fact and law, she did.

## II.   HOEFS' LEGAL CONSTRUCTION OF THE ARBITRATION AMENDMENT MISREPRESENTS THE CONTENT OF CAMBECE'S MOTION AND FAILS TO EXPLAIN WHY THE AMENDMENT IS NOT EFFECTIVE AS TO CAMBECE.

As mentioned at the outset of this Memorandum, Hoefs falsely accuses Cambece of omitting critical language from the arbitration amendment without the use of ellipses or other accepted methods. This accusation is misplaced. The language is quoted in full at the eighth page of Cambece's Motion to Compel Arbitration. It can also be found in the second sentence of the eleventh paragraph on the second page of the amendment. **(Exhibit E).** The language itself provides that third-parties, including debt collectors, who provide services in connection with the debt are subject to the arbitration agreement as long as any claim asserted against them is also asserted against MBNA or, among others, its assigns. The amended complaint alleges that the Cambece defendants are "debt collectors" within meaning of the Federal Fair Debt Collection Practices Act. (Amended Complaint ¶¶ 7, 8). MBNA assigned its rights under its cardmember agreement with Hoefs to CACV. The arbitration provision, in language appearing in the first sentence of the same eleventh paragraph on the second page of the amendment, provides that for purposes of the arbitration section "we" and "us" refers not only to MBNA America Bank, NA, but also to its "assigns," among others. The arbitration provision goes on to state, as indicated above, that it applies to third party "debt collectors" as long as any claim against such debt

collectors also names "us" as defined in the arbitration provision (i.e., MBNA and, *inter alia*, its assigns, including CACV).

There is no question that MBNA assigned its rights under the cardmember agreement to CACV. There is also no question that the Cambece defendants are alleged to have acted as "debt collectors" when they attempted to assist CACV in its efforts to collect a debt under the cardmember agreement with Hoefs. Finally, there is likewise no question that both the Cambece defendants and CACV have been named by Hoefs as co-defendants in this case. As a consequence, the arbitration agreement applies to Cambece regardless of whether it also applies to CACV. For that reason, Cambece's Motion to Compel Arbitration should be allowed.

> Respectfully submitted,
> J. Anthony Cambece and
> J.A. Cambece Law Office, P.C.
> By their attorneys,
>
>
> ____/s/ Richard L. Nahigian_____
> Richard L. Nahigian
> BBO # 549096
> Peabody & Arnold LLP
> 30 Rowes Wharf
> Boston, MA 02110
> 617.951.2100

599409_1

# Exhibit A

090104 Stephen Fox (ASCII).txt

0001

1                  UNITED STATES DISTRICT COURT
       DISTRICT OF MASSACHUSETTS, SPRINGFIELD DIVISION

2

3    JANET S. HOEFS                :
                                   :
4        VS.                       :  Case No. 04-30015-KPN
                                   :
5    CACV of COLORADO, LLC, et al  :

6

7          VIDEO CONFERENCE DEPOSITION OF STEPHEN FOX,
           Witness in the above-entitled cause, taken on
           behalf of the Plaintiff, pursuant to notice,
8          before Jeannette A. Lemoine, CSR, a Notary Public
           in and for the State of Rhode Island and
9          Providence Plantations, at the offices of Allied
           Court Reporters, 115 Phenix Avenue, Cranston,
10         Rhode Island, on September 1, 2004, at 2:00 p.m.

11

     APPEARANCES:
12   For the Plaintiff:
          LEFEBVRE & SONS LAW OFFICE
13        BY:  CHRISTOPHER LEFEBVRE, ESQUIRE
               Two Dexter Street
14             Pawtucket, RI  02862
               (401) 728-6534

15

     For the Defendant CACV of Colorado, LLC:
16        LAWSON & WEITZEN, LLP
          BY:  KATHRYN E. PIECZARKA, ESQUIRE
17             88 Black Falcon Avenue
               Boston, MA  02210
18             (617) 439-4990

19   For the Witness:
          MBNA AMERICA BANK
20        BY:  DEZZIE COLE, ESQUIRE
               1100 North King Street
21             Wilmington, DE  19884
               (302) 432-0728

22

                  ALLIED COURT REPORTERS
23                  115 PHENIX AVENUE
              CRANSTON, RHODE ISLAND  02920
24                  (401) 946-5500
              www.alliedcourtreporters.com

0002

1                    I N D E X
2              DEPOSITION OF STEPHEN FOX
3
                                               PAGE
4

     Direct Examination by Mr. Lefebvre . . . . . .    6
5    Cross-Examination by Ms. Pieczarka . . . . . .   30
     Redirect Examination by Mr. Lefebvre . . . . .   42
6
7
8
9
10                   E X H I B I T S
11   PLAINTIFF
     NO.            DESCRIPTION                  PAGE
12
     1    Amended Subpoena, 3 pp                     3

```
                     090104 Stephen Fox (ASCII).txt
13   2    Documents Bates stamped MBNA 1-73, 73 pp        3
14
15
16
17
18
19
20
21
22
23
24
0003
 1              (DEPOSITION COMMENCED AT 2:28 P.M.)
 2           (PLAINTIFF'S EXHIBITS 1 AND 2 MARKED FOR
 3    IDENTIFICATION)
 4                   STEPHEN FOX
 5    Being duly sworn, deposes and testifies as
 6    follows:
 7              THE COURT REPORTER:  Please state your
 8    full name for the record.
 9              THE WITNESS:  Stephen Fox.
10              MR. LEFEBVRE:  Good afternoon, Mr. Fox,
11    Chris Lefebvre here, and I represent the
12    Plaintiff, Janet Hoefs, in the action that is
13    pending against CACV of Colorado and the Cambece
14    Law Offices.  That's a lawsuit pending in the
15    Massachusetts Federal District Court.
16         Before I continue, Dezzie, what I thought I
17    would do is put some stipulations relative to the
18    exhibits on the record.  What I did is as
19    Plaintiff's Exhibit 2, I have the packet that you
20    sent to me yesterday which was 71 pages plus I
21    handed to counsel the document that you faxed to
22    me literally almost moments ago at 1:48.  We're
23    going to call that MBNA 72.  And then finally,
24    the only other document we didn't talk about -- I
0004
 1    assume it's not a problem -- Mr. Fox had actually
 2    signed an affidavit that was presented to him, so
 3    I'm going to call that MBNA 73; okay?
 4              MR. COLE:  That's fine.
 5              MR. LEFEBVRE:  So for purposes of the
 6    deposition, we really only have two exhibits, but
 7    one of them will be a 73 numbered exhibit.
 8              MR. COLE:  Sounds good.  Chris, do you
 9    want to wait until later -- until the conclusion
10    of the deposition before we put on the record the
11    use of the videotape?  You can do it now or you
12    can do it later.  I'm perfectly okay with either.
13              MR. LEFEBVRE:  Why don't we do it at the
14    beginning?  And Kathryn, we had spoken -- Dezzie
15    had called me within the last hour, and it was an
16    oversight relative to the video deposition since
17    we wanted to do -- you wanted to do a deposition
18    of Mrs. Hoefs, and I made arrangements for a
19    video deposition of her.  I assumed it would not
20    be an issue for Mr. Fox.  The notices went out as
21    just regular depositions, and Mr. Cole raised the
22    issue about video depositions.  So what we've
23    agreed to -- which I think is a fair
24    compromise -- is that we're going to conduct the
0005
```

090104 Stephen Fox (ASCII).txt
```
 1   deposition -- obviously, we have a transcript of
 2   what's transpiring, but what we have agreed to do
 3   is that we will not use the video portion in part
 4   of the case unless we get the agreement of
 5   Mr. Cole and his client or some type of court
 6   approval, although I can't imagine a situation
 7   why we would need it, but I thought that would be
 8   a nice compromise to address Mr. Cole's concern.
 9   I assume that's not a problem with you.
10            MS. PIECZARKA:  Sounds fair, not a
11   problem.
12            MR. LEFEBVRE:  Is that okay?
13            MR. COLE:  We're perfectly okay with that
14   approach.
15            MR. LEFEBVRE:  Okay.  The second thing,
16   the only other exhibit -- Mr. Fox, I'm just going
17   to mark the amended subpoena which was actually
18   served upon you, just so I have that as part of
19   the record, and I'm mainly focusing on the rider
20   that was attached to the subpoena.  I assume
21   you're familiar with the rider.  It was a
22   statement that had five paragraphs requesting
23   that you bring certain documents.
24            THE WITNESS:  I am.
0006
 1            DIRECT EXAMINATION BY MR. LEFEBVRE
 2   Q.  And you've seen that rider before?
 3   A.  Yes, I have.
 4   Q.  And is it fair to say that the 72 documents which
 5   were produced to me respond to the rider as
 6   requested in the subpoena?
 7   A.  The 72 documents would demonstrate everything
 8   that we were able to get.  Some of the items we
 9   were unable to get due to records being purged.
10            MR. LEFEBVRE:  Okay.  So we've now marked
11   the deposition notice as an exhibit.
12   Q.  Mr. Fox, you are presently employed by MBNA?
13   A.  Yes.
14   Q.  And how long have you been so employed there?
15   A.  Seven years and two months.
16   Q.  Okay.  And can you tell me what your present job
17   title is or what you do there now?
18   A.  Sure.  Currently, I'm a manager of our
19   charge-off sales team for MBNA.
20   Q.  And how long have you had held that position?
21   A.  Actually, it would be just over a year.
22   Q.  Okay.  And can you tell me briefly what you do?
23   What does a manager of the charge-off division of
24   MBNA do?
0007
 1   A.  Sure.  I'm actually responsible for the sales
 2   and servicing of distressed assets for MBNA to
 3   our contractual partners.
 4   Q.  Okay.  Prior to becoming the manager of this
 5   department, what do you do during the other six
 6   years that you were employed at MBNA?
 7   A.  Well, for the three prior years, I was an
 8   analyst on the charge-off sales team, a business
 9   analyst, and for my first three years at MBNA, I
10   was a collections representative.
11   Q.  Okay.  Now, how is it that you first became aware
12   of the lawsuit that was filed by Mrs. Hoefs?
13   A.  I first became aware when I received the
                                    Page 3
```

090104 Stephen Fox (ASCII).txt

```
14        subpoena.
15  Q.    Okay.  Now, I'm referring to Exhibit 73 which
16        would be the affidavit that you signed.  You're
17        familiar with that?
18  A.    Yes, I am.
19  Q.    Okay.  And I'm just -- let me back up.  You
20        understand that the purpose of this deposition is
21        really to focus in on the issue of a certain
22        arbitration agreement?
23  A.    Yes.
24  Q.    Okay.  Now, are you familiar with the processes
0008
 1        in which -- well, strike that.  Are you familiar
 2        with Mrs. Hoefs' account?
 3  A.    I have reviewed the documents on her account,
 4        so I would consider myself familiar with her
 5        account.
 6  Q.    Okay.  Is it fair to say that there was a time --
 7        first of all, when did Mrs. Hoefs become an MBNA
 8        account holder?  When did she first start doing
 9        business with MBNA, if you know?
10  A.    Her account was opened on October 22, 1997.
11  Q.    And was that opened as an individual account?
12  A.    Yes, it was.
13  Q.    Okay.  Were there any changes to that account?
14        I'm referring to whether it became a joint
15        account or authorized user added.
16  A.    Based upon my review of notes, there was a
17        Steven Hoefs added to the account as a spousal
18        authorized user, but I don't believe there was
19        any additional applicants added to the account.
20  Q.    Now, what is your understanding when someone
21        becomes a spousal authorized user, what type of
22        privileges does that give to the spouse, in this
23        case Mr. Hoefs?
24  A.    They receive charging privileges on the
0009
 1        account, and if they wish, they can receive
 2        correspondence in their name as well.
 3  Q.    Now, I notice looking in the documents that were
 4        provided to me that I didn't see the underlying
 5        credit application of Mrs. Hoefs.  Is it fair for
 6        me to assume that at some time an actual credit
 7        card application was signed by Mrs. Hoefs
 8        regarding this account?
 9  A.    That would be fair to assume.
10  Q.    And in fact -- you know, I want to make sure I'm
11        correct in my assumption, that, in fact, isn't
12        that the general policy or it was the general
13        policy back in 1997, if a card holder wanted an
14        MBNA account, that some credit card application
15        would be signed; is that correct?
16  A.    It could either be a signed application or
17        there could be a telemarketing application which
18        would not have a signature.
19  Q.    Do you know in this particular case if, in fact,
20        Mrs. Hoefs' account was -- what I'll call the
21        traditional signed application or did it involve
22        the telemarketing application?
23  A.    I do not, because the application is no
24        longer available.
0010
 1  Q.    Okay.  And why is the application no longer
```

Page 4

090104 Stephen Fox (ASCII).txt
```
 2          available?
 3          A.   We only retain the applications on record for
 4          a rolling 5-years period, and because her account
 5          was opened in 1997, it is past the 5-year period.
 6     Q.   And I'm not trying to be tricky.  I just want to
 7          make sure I understand.  When you say "a rolling
 8          5-years period," does that mean hypothetically if
 9          a consumer opens an account on day 1, assuming he
10          or she signed an application, that 5 years later
11          the application is no longer available?
12          A.   That is correct.
13     Q.   Okay.  Now, there's nothing in the computer
14          screens that you provided to me -- I think the
15          first 15 pages of the exhibit -- that would show
16          if this was a telemarketing account?
17          A.   No, there is not.
18     Q.   Okay.  Now, in your affidavit, you
19          mentioned -- and I'm referring to the
20          affidavit -- what we're going to call MBNA 74
21          that you signed on April 22, 2004.  You state in
22          the last sentence, that it was your belief that
23          the amendments of terms and conditions of this
24          account was mailed by MBNA in December of 1999 to
0011
 1          Mrs. Hoefs.  Is that still an accurate statement
 2          of your understanding regarding Mrs. Hoefs'
 3          account?
 4          A.   Yes, it is.
 5     Q.   Okay.  I assume you are familiar with the
 6          processes that were utilized by MBNA to add this
 7          arbitration provision to card holders' accounts
 8          back in 1999?
 9          A.   Yes, I am.
10     Q.   Okay.  Can you tell me in a general sense, do you
11          know why an arbitration rider was added to the
12          account?
13               THE WITNESS:  Are you asking do I know
14          why the decision was made to add an arbitration
15          rider?
16     Q.   Yes.  Do you know why MBNA decided to add an
17          arbitration rider to Mrs. Hoefs' account?
18          A.   I don't know why the corporate decision was
19          made, no.
20     Q.   Okay.  When did the arbitration -- the alleged
21          arbitration agreement first become effective in
22          relation to Mrs. Hoefs' account?
23          A.   It first would have become effective as of
24          the day after the opt out date, so that would be
0012
 1          January 26, 2000.
 2     Q.   So if I understand you correctly -- let me back
 3          up a minute.  When we're talking about the
 4          arbitration rider to the Hoefs' account, I assume
 5          that was part of a general mass mailing to many
 6          other account holders?
 7          A.   Right, to all card holders that were in good
 8          standing received a mass mailing of the
 9          amendment.
10     Q.   And I assume that since the opt out period ended
11          in January of 2000 that this mass mailing
12          occurred sometime in 1999?
13          A.   December of 1999.
14     Q.   And just so I'm clear, this mailing -- the Hoefs'
```

090104 Stephen Fox (ASCII).txt

15 arbitration agreement that was alleged to have
16 been sent out as part of a mass mailing, do you
17 know how large the mailing was?
18 A.  Well, I don't know what the exact number is,
19 but I do know that it went out to our entire
20 customer base that was in good standing on their
21 account.
22 Q. And would it be fair to say that the customer
23 base that was in good standing back in
24 December of 1999 was greater than 250,000 card

0013
1 holders?
2 A.  That's correct.
3 Q. In fact, was it probably more than a 1 million
4 card holders that received the arbitration -- is
5 the amendment to the agreement similar to the one
6 that is involved in the Hoefs' case?
7 A.  Back in 1999, we would have had more than a
8 million customers that were in good standing, so
9 yes, they would have received the amendment.
10 Q. Okay.  Now, let me get really to the crux of the
11 issue and the purpose for your deposition.  Can
12 you point to me or -- let me back up first.  Can
13 you tell me in a general sense how these
14 arbitration agreements were -- you know, the
15 methodology used to send them out, how it was
16 done?  If you know.
17 A.  Sure.  Based upon the research that I did, I
18 was able to come to the understanding that if the
19 account was in good standing with MBNA and had a
20 balance on the account, the arbitration amendment
21 would be included in the December 1999 statement
22 mailing.  So all of the customers that were in
23 good standing and had a balance on their account
24 at that time would have received the mailing in

0014
1 their statement in '99.
2 Q. Okay.  Now, just so I'm clear, when you say "good
3 standing" -- and I don't want to belabor the
4 point, but just so I understand, if someone were
5 like late once in the past 6 months, would that
6 person be considered in good standing for
7 purposes of the mailing of this arbitration
8 rider?  Do you understand what I'm getting at?
9 A.  Yes.  I think I can clarify that for you.
10 Really the accounts that would be excluded would
11 be accounts that were marked as a bankrupt
12 account or an account that was previously settled
13 or an account that we had received deceased
14 notice on.  So it would be any active customers.
15 Q. So an active customer could necessarily not be a
16 perfect customer, but still get an arbitration
17 mailing?
18 A.  That is correct.
19 Q. Okay.  Now, forgive me, because I don't know much
20 about MBNA, but tell me from what -- you said you
21 did some research.  Who did you speak to to
22 obtain the information to answer my questions
23 relative to the arbitration issue and to prepare
24 for this deposition?

0015
1 A.  Okay.  I actually spent some time with
2 Dezzie Cole as well as his assistant, Sharise

```
                        090104 Stephen Fox (ASCII).txt
 3          Saunders, to assist me in preparation as well as
 4          speaking with our customer fulfillment area which
 5          is the area that maintains a matrix that is
 6          derived from the mailing, and the matrix includes
 7          any customers that were eligible to receive the
 8          amendment as well as any customers that replied
 9          and opted out of the amendment.
10    Q.    Okay.  Now, where -- and I'm just trying to get
11          an idea physically, where were these arbitration
12          riders actually sent out?  Were they sent out
13          from Delaware back in December of '99?
14    A.    I do not know.
15    Q.    Now, you talked about -- you just mentioned, and
16          I believe it refers to the last exhibit that
17          Mr. Cole provided to me which is Number 72, you
18          were talking about a matrix or a grid?
19    A.    Right.  That exhibit actually comes from the
20          matrix database that housed all the account
21          numbers.
22                MR. LEFEBVRE:  Okay.  And Dezzie, just so
23          we're clear for the record, I gather that this --
24          I'll call it exhibit or grid had a lot of other
0016
 1          data, and you redacted that in preparation of the
 2          deposition.  So all I have on Number 72 is
 3          information pertaining to Janet Hoefs; is that
 4          correct?
 5                MR. COLE:  That is correct, as well as
 6          the legend that runs across the top of the spread
 7          sheet.
 8    Q.    All right.  Well, Mr. Fox, why don't you try to
 9          help me out, because, obviously, you see what I
10          have?  I have a paper that has a little bit of
11          data.  Can you tell me a little bit more in a
12          general sense about what this document is?  And
13          I'm talking about MBNA 72, the one that I
14          received about an hour ago.
15    A.    Sure.  That document I actually received
16          yesterday based upon some additional research I
17          was doing on the account, and I received the
18          document from our customer fulfillment area which
19          was the area that maintains the matrix, and
20          basically, what it is is a grid of answers, I
21          guess, to my questions of whether or not the
22          account was included in the mailing, and if it
23          did indeed -- if indeed we did receive an opt out
24          notice.
0017
 1                If you look at the third column from the
 2          right, "Status @ notification," that column
 3          states okay.  So that is my notification that the
 4          account actually did go out in the -- or the
 5          amendment did go out in the customer's statement
 6          insert, and the second column from the right,
 7          "Opt Out," the "N" notifying me that the customer
 8          did not submit an opt out letter to us.
 9    Q.    Okay.  So if I understand correctly, MBNA has a
10          grid of all of the account holders that carries
11          this similar information?  When I say account
12          holders, those account holders that were part of
13          the December of 1999 amendments to terms mailing.
14    A.    That is correct.
15    Q.    While you were going over some of these columns,
                                    Page 7
```

090104 Stephen Fox (ASCII).txt

16    just help me out here, going -- you started on
17    the right.  Let me go back to the left.  I see
18    date 8/31/2004.  What does that date mean?
19    A.  That is the date that I had received the
20    answer to my request.  So that's just the date
21    they logged it in.
22  Q.  All right.  Wait a minute.  Okay.  So you
23    actually -- so I'm clear, you actually had to go
24    to someone to get some information about this
0018
1    rider and the mailing of it, and that person sent
2    you back this -- we'll call it mini chart, this
3    information; is that how that happened?
4    A.  That is correct.
5  Q.  So next I see -- the next column says "Current
6    account," 53, and then it ends in 09.  I assume
7    that's Mrs. Hoefs' account?
8    A.  That is correct.
9  Q.  Okay.  Then I see above, it says "Converted
10    account," and then I see at the bottom, that's
11    left blank.  What does that mean "Converted
12    account"?
13    A.  Had the account been converted from another
14    bank rather than originated at MBNA, there would
15    have been a conversion account number in there.
16  Q.  Then I see, up top, "Lost/Stolen account."  Then
17    I see "LS/Date."  Then at the bottom, I can't
18    tell which one is matched up, but I see the same
19    account number.  Then I see the words charge off.
20    Can you help me put into perspective what that
21    charge off means?
22    A.  Sure.  And actually, it would be a different
23    account number because you see the three 9's in
24    the middle of the account number?  For our
0019
1    internal purposes, accounts that have three 9's
2    in the middle, that is the new account number
3    that is given to the account when it does charge
4    off.
5  Q.  So is it fair to say that Mrs. Hoefs' account
6    sometime became a charged off account, and the
7    number referenced above the words "Charge off" --
8    and I must confess, I'm having a hard time
9    reading it.  It looks like 5329011999226251 -- is
10    the new charged off number assigned by MBNA to
11    this account?
12    A.  That is correct.
13  Q.  I guess my vision is better than I thought.  Can
14    you tell me, when did this account, the Hoefs'
15    account, become charged off?
16    A.  It charged off in the month of August 2001.
17  Q.  Okay.  And then after this, I see some initials.
18    It says up top, "Group," and then "Group Name,"
19    and at the bottom, I see some initials.  It looks
20    like "RABU," and I think it says, "Ringling Bros.
21    Barnum & Bailey."  What does -- can you tell me
22    what that is?
23    A.  Sure.  When the account was opened, it was a
24    member of an affinity group of MBNA's that is --
0020
1    internally, our abbreviation for that group is
2    RABU, and the group's actual name is the Ringling
3    Bros. Barnum & Bailey.  So there would have
                              Page 8

```
                        090104 Stephen Fox (ASCII).txt
 4          been -- the original card would be a Ringling
 5          Bros. Barnum & Bailey card.
 6     Q.   Is there any document in this packet that you can
 7          direct my attention to -- or maybe there's a
 8          document that you've become aware of -- that can
 9          verify that, in fact, an arbitration rider was
10          actually put into the monthly statement of
11          Mrs. Hoefs in December of 1999, and actually
12          received by her?  Is there any type of indication
13          or document available to answer my inquiry on
14          that issue?
15     A.   Well, the last document that we just went
16          over, the grid, is the only document that
17          actually verifies both that the customer met our
18          status at notification time, and that the mailing
19          was sent out.  You can also look to the comments
20          that were given to you that are actually part of
21          that first 15 pages that you had spoken about.
22                    MR. LEFEBVRE:  Yes.
23     A.   And you can see that we were mailing at that
24          time her statements to a post office box, and
0021
 1          during the time before and after the mailing of
 2          the arbitration amendment, we did not receive any
 3          return mail from the Postal Service.  So we
 4          can -- to the best of my ability, I believe that
 5          the customer did, in fact, receive the
 6         .arbitration amendment based upon the research I
 7          have done.
 8     Q.   But you would agree with me, there's no -- you're
 9          assuming that, in fact, the arbitration rider was
10          actually stuffed in the envelope, and you're
11          assuming that there was no problem with the mail
12          in coming to that conclusion; is that correct?
13     A.   We're assuming there was no problem with the
14          mail.
15     Q.   Okay.  Let me go back.  Do you know how it was --
16          and I'm not trying to be difficult.  I'm just
17          trying to understand.  How was the arbitration
18          agreement actually put into the billing
19          statement?  Was it done manually or was it done
20          by some computerized sorting mechanism?
21     A.   In 1999, I do not know the answer to that
22          question.
23     Q.   Okay.  So you don't know how -- regarding
24          Mrs. Hoefs' account, MBNA account, it could have
0022
 1          been that a person manually was in charge of
 2          putting the arbitration rider in her account;
 3          could have been?
 4     A.   It could have been, but I believe based on
 5          the size of our customer base at that time, that
 6          it was probably systematic.
 7     Q.   Okay.  Now, what was the policy -- well, strike
 8          that.  You told me you're pretty comfortable that
 9          probably a million card holders -- at least a
10          million received this arbitration rider.  What
11          was the policy of MBNA -- and I'm referring to
12          the mailing, which included the Hoefs' account,
13          what was the policy regarding, you know, returned
14          mail?  I mean what would happen if something
15          kicked back, a change in address or something
16          like that?  What would MBNA do?
                                    Page 9
```

090104 Stephen Fox (ASCII).txt
```
17              THE WITNESS:  If we had received return
18    mail from the Postal Service?
19              MR. LEFEBVRE:  Right.
20              THE WITNESS:  Is that what you're asking?
21              MR. LEFEBVRE:  Yes.
22    A.  We would have notated the customer's account
23    in the comments, and a mail code status would
24    have been placed on the account of N.
0023
 1  Q.  So in a hypothetical situation, Mary Jones, who
 2      let's assume for the moment the
 3      arbitration -- his or her -- well, since I used
 4      Mary, her December of '99 statement.  Assume we
 5      don't know if it was computer or we don't know if
 6      it was manually, but let's assume that it was
 7      manually.  The arbitration agreement was put in
 8      the envelope.  It was sealed.  It was mailed out,
 9      and Mary Jones moved, and it came back to MBNA.
10      There would be some entry on the -- what I'm
11      going to call the computer statements similar to
12      Documents 1 through 15 that you've provided me in
13      this case?
14  A.  Okay.  There would have been a comment on the
15      account had we received the statement back.
16              MR. LEFEBVRE:  Okay.
17  A.  That would have showed that the statement was
18      returned.
19  Q.  Now, what was MBNA's policy relative to -- well,
20      strike that.  If there was an authorized user on
21      an account, did both the primary card holder and
22      the authorized user get notice of the credit card
23      the credit card agreement in relation to the
24      arbitration rider?
0024
 1              THE WITNESS:  Are you asking if there
 2      would have been separate mailings to both of the
 3      card holders or if there would have been only one
 4      mailing address to both customers?
 5  Q.  Well, I guess -- let me get -- well, assume there
 6      is an authorized user.  Mrs. Hoefs was the
 7      original card holder; correct?
 8  A.  That's correct.
 9  Q.  You told me earlier per your notes -- and I
10      noticed it myself -- that at one time while she
11      was a card holder, that Mr. Hoefs became an
12      authorized user; correct?
13  A.  That's correct.
14  Q.  So let's use the Hoefs' example, and I was
15      looking at -- and forgive my editorializing, when
16      I was looking at some of the statements that were
17      provided to me, I noticed that all the statements
18      at the time of this mailing and before appear to
19      be in the name of Mrs. Hoefs.  I didn't see
20      anything addressed to Mr. Hoefs.  So my question
21      is if Mr. Hoefs was an authorized user, would he
22      have received some separate notice that, in fact,
23      the terms and conditions of this account had been
24      modified, more particularly in relation to the
0025
 1      arbitration rider?
 2  A.  In this case, he would not have been notified
 3      separately.  There would have only been one
 4      mailing to Janet.
```
                              Page 10

090104 Stephen Fox (ASCII).txt
```
 5   Q.   Okay.  Now, you would agree with me that the --
 6        at the time of the mailing of -- the alleged
 7        mailing of this arbitration rider pertaining to
 8        Janet Hoefs, that the address on the account was
 9        to a post office box; is that correct?
10   A.   That is correct.
11   Q.   Okay.  Did MBNA have, if you know, when they
12        decided -- when whoever made the decision to add
13        the arbitration rider and to modify the
14        agreement, do you know if there were any concerns
15        or memorandums or issues or discussions about,
16        you know, sending notices to a P.O. box rather
17        than to a residence?  Was that ever an issue that
18        you were aware of?
19   A.   That was not an issue that I was aware of.
20   Q.   Okay.  So you would agree with me that if Mrs. --
21        well, strike that.  If a card holder calls up
22        MBNA, and says I want to have my husband put on
23        as an authorized user -- I'm assuming this card
24        holder was someone in good standing back in
0026
 1        December of 1999, and assume that the card holder
 2        called up in January of '99 and said put my
 3        husband on.  MBNA puts the husband on.  The
 4        authorized user would not get independent notice
 5        of this modification?
 6   A.   That's correct, only a co-applicant would
 7        have received their name on the correspondence.
 8   Q.   And in fact, you would agree with me that in a
 9        situation with a husband and wife -- in that
10        situation that I just used, husband and wife, if
11        the husband actually was the one that went to the
12        mailbox and got the mail, it could be a situation
13        where the wife would never know about this
14        arbitration rider?  You would agree that that
15        could happen?
16   A.   I don't know.
17   Q.   Okay.  Are you familiar -- how many people
18        actually, if you know, opted out and actually
19        sent something back during this '99 mailing
20        opting out of the arbitration, if you know?
21   A.   I don't know.
22   Q.   Would you -- to the best of your knowledge, was
23        it a small number that opted out or was it a
24        common practice of people opting out, if you
0027
 1        know?
 2   A.   I do not know.
 3   Q.   Okay.  Now, this account was ultimately sold; is
 4        that correct?
 5   A.   Yes, it was.
 6   Q.   Okay.  And it was sold to Collect America?
 7   A.   Yes, it was.
 8   Q.   And when the account was sold to Collect America,
 9        just -- I want to understand.  What documents
10        would have been forwarded to Collect America as
11        part of the sale of this account?
12   A.   No particular documents would have been
13        forwarded to Collect America unless they were
14        requested.  The only information forwarded to
15        Collect America would be demographic information,
16        account numbers, and customer's name.
17   Q.   So in this particular case -- okay.  In this
```
                                    Page 11

090104 Stephen Fox (ASCII).txt
```
18      particular case, Collect America would have never
19      received the application?  I'm talking about the
20      underlying credit card application, because at
21      the time of the sale, the account was more than
22      five years old; am I correctly --
23      A.  At the time of the sale, the account was only
24      four years old.  Had they requested the
0028
1       application over the next year after the sale,
2       they would have received the application.
3               MR. LEFEBVRE:  Okay.
4       A.  I don't believe that they requested any
5       application or anything like that from us during
6       that time.
7    Q. And is that general standard practice?  I know in
8       this case it was sold to Collect America, but
9       assume -- you know, I'm just trying to understand
10      general practices in the sale of accounts.  From
11      MBNA's perspective, when an account is sold,
12      let's assume it is to ABC Company, that generally
13      copies of the card agreement are not transferred
14      unless asked for; is that how it generally works?
15              THE WITNESS:  Are you asking about the
16      card agreement or are you asking about the
17      application?
18              MR. LEFEBVRE:  Okay.  I'm talking
19      about -- good point.  I probably used those words
20      too loosely.  I'm talking about the application
21      where Mary Smith actually signed on the dotted
22      line promising to pay MBNA per the terms of the
23      agreement.
24      A.  We do not forward applications unless asked.
0029
1    Q. Okay.  But in all circumstances, after five
2       years, they're gone?
3       A.  That is correct.
4    Q. No way of getting them back under any
5       circumstance?
6       A.  There is not.
7    Q. Are they physically destroyed after five years?
8       A.  I do not know if they're physically
9       destroyed.  The only thing I know is we're not
10      able to recover anything after five years for any
11      reason.
12   Q. And do you know if that policy or capability
13      about not being able to get the actual
14      application, the signed agreement, after five
15      years is something that's common to the credit
16      card industry or is it just something unique to
17      MBNA, if you know?
18      A.  Actually, I don't know exactly what the
19      standard is.  I believe we are only required to
20      maintain the applications or statements for one
21      or two years, but we actually retain them for
22      five years.  So we do more than the industry
23      standard.
24   Q. So is it your belief and testimony that the
0030
1       industry standard is less than five years from
2       what you understand?
3       A.  Yes, that's correct.
4               MR. LEFEBVRE:  Okay.  I have no further
5       questions at this time.  Do you have any
```
Page 12

090104 Stephen Fox (ASCII).txt

```
 6      questions?
 7              MS. PIECZARKA:  Okay.  Hi, Stephen, my
 8      name is Kathryn Pieczarka.  I'm from Lawson &
 9      Weitzen.  We represent one of the Defendants,
10      CACV of Colorado in this action.
11              CROSS-EXAMINATION BY MS. PIECZARKA
12  Q.  Now, you stated that the applications are
13      discarded after five years; right?
14  A.  That's correct.
15  Q.  Okay.  So if Mrs. Hoefs opened an application on
16      October 22, 1997, her application would be
17      discarded on October 22, 2002; is that right?
18  A.  That's correct.
19  Q.  Now, when she applied for this application --
20      and you testified that you don't know whether it
21      was through a telemarketing application or a
22      signed application; is that correct?
23  A.  Right.  That's correct.
24  Q.  When she applied for this credit card, she was
0031
 1      then sent a card member agreement; is that right?
 2  A.  Yes, she was.
 3  Q.  Now, in the documents that you have provided that
 4      were responsive to the rider in your subpoena, it
 5      looked like MBNA Number 14 begins with a credit
 6      card agreement?
 7  A.  That's correct.
 8  Q.  And it looks like that continues to MBNA
 9      Number 21 making it 8 pages; is that correct?
10  A.  That is correct.
11  Q.  Do you know when this was drafted, this credit
12      card agreement?
13  A.  I believe if you look at MBNA 21, you will
14      see that it was actually drafted in January of
15      1997.  You'll see a code at the bottom, AGMT90
16      and 1/97.  That's when this agreement was
17      drafted, and this would have been the exact
18      agreement that would have been received by
19      Mrs. Hoefs with her card.
20  Q.  And is it fair to say that anyone who opens an
21      account in '97 received this agreement?
22  A.  Yes.
23  Q.  And if you turn Page 6 of the agreement which
24      would be MBNA 19?
0032
 1  A.  Okay.
 2  Q.  It says -- there's a section entitled Amendments?
 3  A.  Yes.
 4  Q.  You see that.  And that section -- it's fair to
 5      say that everyone who opened a credit card in
 6      1997 got this application, and this section was
 7      in there?
 8  A.  Yes.
 9  Q.  Right?
10  A.  Yes.
11  Q.  Okay.  And is it fair to state that it's MBNA's
12      normal practice to send out this credit
13      application when someone opens an account?
14  A.  We will send out the terms and agreements,
15      yes.
16  Q.  Okay.  And when MBNA decides to amend the
17      agreement, the process they go by is they draft
18      an amendment; is that correct?
```

Page 13

090104 Stephen Fox (ASCII).txt
```
19        A.  That is correct.
20   Q.   Okay.  And you provided documents, one being MBNA
21        22, which states that it's important amendments
22        to your credit card agreement; is that correct?
23        A.  Yes.
24   Q.   And do you know when this document was drafted?
0033
 1        A.  This document was drafted in 1999.  I don't
 2        know what month, but this was the document that
 3        was included with the customers' statements in
 4        December of 1999.  This is the amendment.
 5   Q.   So this amendment was sent to Mrs. Hoefs?
 6        A.  That's correct.
 7   Q.   And you testified that these amendments are sent
 8        along with her statement; is that right?
 9        A.  Yes.
10   Q.   Okay.  And at the time that this amendment was
11        sent out, what is the fulfillment process that
12        occurs in order to send this amendment out to the
13        credit card holders; do you know?
14             THE WITNESS:  What do you mean by
15        "fulfillment process"?
16   Q.   I mean someone drafts this amendment, and someone
17        prints the amendment, and then at some point,
18        it's collated with a statement for all the card
19        holders.  Do you have knowledge as to how that
20        process works?
21        A.  I don't have knowledge of the statement
22        processing.
23   Q.   Okay.  But you testified that everyone who was in
24        good standing in December of '97 got a copy of
0034
 1        this amendment?
 2        A.  Yes, that's correct.
 3   Q.   And it was mailed to them with their statement;
 4        correct?
 5        A.  Yes.
 6             MR. LEFEBVRE:  I don't mean to interrupt.
 7        You said December '97.  I think you meant
 8        December of '99.
 9             MS. PIECZARKA:  Oh, December of '99, I'm
10        sorry.  You're right.
11   Q.   So is it fair to say it was MBNA's normal course
12        of business that in December of '99 it sent out
13        an amendment to all credit card agreements that
14        were in good standing?
15        A.  To all customers that were in good standing,
16        yes.
17   Q.   Now, you provided documents -- I believe
18        beginning at MBNA 24, there is a series of
19        statements?
20        A.  Yes.
21   Q.   Have you reviewed these statements?
22        A.  Yes, I have.
23   Q.   Okay.  Now, is this first statement when
24        Mrs. Hoefs -- is this the first statement
0035
 1        Mrs. Hoefs received on MBNA 24?
 2        A.  I don't believe this would be the first
 3        statement that she received.  Again, we can only
 4        get statements that are 5 years old.  We didn't
 5        get anything more than 5 years old.  Now, we do
 6        have some from '98 that were still housed in our
```
Page 14

090104 Stephen Fox (ASCII).txt

```
 7      system, but the ones that go all the way back to
 8      the beginning of '97 we weren't able to get those
 9      statements.
10           MS. PIECZARKA:  Okay.
11      A.  But it does look like it's an original charge
12      of $359.34, and that's what the balance is.  So
13      this is possible this is her first statement she
14      received if she never used the card before that.
15   Q. But it's fair to say at some point, she started
16      using the credit card after she applied?
17      A.  Yes.
18   Q. And she made payments on the account; is that
19      correct?
20      A.  Yes.
21   Q. Could you find on here the billing statement that
22      was the amendment -- the arbitration amendment
23      was sent out with?
24      A.  Sure.
0036
 1                  (PAUSE)
 2      A.  It would have been MBNA 50.
 3   Q. Okay.  And how do you know that?
 4      A.  I know that based upon the due date on the
 5      account which is the 2nd of January that this is
 6      her billing statement for December.
 7   Q. Okay.  And it looks like it says there's a
 8      closing date of December 2, '99?
 9      A.  Correct.
10   Q. Okay.  So this statement would have been sent out
11      shortly after?
12      A.  Right.  Actually, it probably would have been
13      sent out on the 3rd.
14   Q. Okay.  And it looks like her address at that time
15      was 20 Thorn Hill Estates?
16      A.  Correct.
17   Q. Poca, West Virginia; is that correct?
18      A.  That is correct.
19   Q. Okay.  And it's fair to say that MBNA would have
20      sent the amendment to her agreement to that
21      address?
22      A.  We would have, that's correct.
23   Q. Now, you stated that the arbitration provision
24      became effective on January 26, 2000; is that
0037
 1      right?
 2      A.  Yes.
 3   Q. And how do you know that?
 4      A.  I know that because based upon the language
 5      in the amendment that was sent out, if you look
 6      at the last paragraph on MBNA 23, we stated that
 7      we needed to receive the letter to opt out by
 8      January 25, 2000, and after that it says, "Or
 9      your rejection of the arbitration section will
10      not be effective."
11   Q. Okay.  And when MBNA receives a written rejection
12      from any card holder, what do they do with that?
13      How do they manage that rejection?
14      A.  Any rejection that we would have received
15      from a customer for a change in terms would be
16      notated on the account notes.
17   Q. Okay.  Is that the matrix that you were
18      explaining earlier?
19      A.  It would be notated as well in the matrix --
```

Page 15

```
                          090104 Stephen Fox (ASCII).txt
20        it would be maintained in the matrix database,
21        but it would be commented on the notes which
22        would be MBNA 2 through MBNA 13.  Those are the
23        system notes.
24   Q.   Okay.  And have you looked through these with
0038
1         respect to Mrs. Hoefs' account?
2         A.   Yes, I have.
3    Q.   And there's no notation that she submitted a
4         written objection?
5         A.   There is no notation that she submitted a
6         written objection.
7    Q.   Okay.  So it's fair to say she didn't submit a
8         written objection?
9         A.   It is fair to say that.
10   Q.   Okay.  Now, after Mrs. Hoefs was sent the
11        amendment to her credit card containing the
12        arbitration clause, can you tell whether she
13        continued to use her credit card?
14        A.   I can tell that she did continue to use her
15        credit card.  There's actually a charge on the
16        account on MBNA 53.  It's the charge closest to
17        the arbitration amendment date, and it's a charge
18        for $345 dollars from Cafe Anzio in North Oxford,
19        Massachusetts.
20   Q.   Now, when Mrs. Hoefs was sent the arbitration
21        amendment in December of '99, can you tell me
22        based on these statements whether she was in good
23        standing as it's defined by MBNA?
24        A.   I can tell you from the statements that she
0039
1         was in good standing.
2    Q.   Okay.  How can you tell me that?
3         A.   Well, based on the previous definition I had
4         given you of being in good standing.  The
5         customer was still receiving statements from us
6         and did have a balance; was not a part of a
7         bankruptcy proceeding; we had not received a
8         deceased notification on the customer; and we had
9         not settled with the customer.  The customer was
10        still an active customer of MBNA.
11   Q.   Okay.  And can you find the last payment she made
12        on the account before she was sent the
13        arbitration amendment in December of '99?
14                      (PAUSE)
15        A.   The last payment she had made was August 26
16        for $50, and that was August 26, 1999.
17   Q.   Okay.  And what Bates number is that MBNA number?
18        A.   44.
19   Q.   Okay.  And can you find the next payment she made
20        after she received the arbitration agreement?
21        A.   Sure.  She made a payment to us over the
22        phone on February 2nd of 2000.
23   Q.   What page are you looking in the MBNA's numbers?
24        A.   I'm sorry, MBNA 52.
0040
1    Q.   So Mrs. Hoefs continued to make payments and
2         purchases on her credit card after she was sent
3         the notice of amendment regarding the arbitration
4         clause?
5         A.   Yes, she did.
6    Q.   Now, when did -- you stated that the Hoefs'
7         account was charged off?
                                        Page 16
```

090104 Stephen Fox (ASCII).txt
```
 8        A.  Yes.
 9   Q.   What do you mean by that?  How is that defined?
10        A.  Any account that we do not receive
11        contractual payments for for over 180 days, the
12        account is charged off or written off as a loss
13        by MBNA.
14   Q.   And is that when it gets the new account number
15        based upon the matrix which is MBNA 72?
16        A.  Yes.
17   Q.   And do you know the date when that happened on
18        Mrs. Hoefs' account?
19        A.  It was August of 2001, but I don't know what
20        the exact day was.
21   Q.   Okay.  And you provided us with statements up
22        until -- what's the last date on that statement
23        of MBNA Page 71?
24        A.  The closing date was 9/4.
0041
 1              MS. PIECZARKA:  Okay.
 2        A.  And this is actually -- the only thing on
 3        that statement is actually just the charge-off
 4        adjustment showing the customer that they were
 5        charged off.
 6   Q.   Okay.  Now, when an account gets charged off, you
 7        assignment debt to a separate company; is that
 8        correct?
 9        A.  It's not 100 percent of the time do we do
10        that, but yes, we do sell some of our charged off
11        debt.
12   Q.   Now, the MBNA document 73 which is the Affidavit
13        of Assignment that you had signed, it says that
14        the account has been assigned, transferred and
15        sent over to the CACV of Colorado; is that
16        correct?
17        A.  That's correct.
18   Q.   Okay.  Previously, you had stated it was
19        Collect America?
20        A.  To the best of my knowledge, they are one and
21        the same company.
22              MS. PIECZARKA:  Okay.
23        A.  Our system comment calls them Collect America
24        because's how they're known internally, but CACV
0042
 1        of Colorado is the entity that purchases the
 2        accounts.
 3   Q.   And this Affidavit of Assignment was signed by
 4        you on April 22, 2004; is that correct?
 5        A.  That's correct.  I don't have it in front of
 6        me, but I believe that's correct.
 7              (OFF THE RECORD)
 8              MS. PIECZARKA:  Okay.  No further
 9        questions.
10              MR. LEFEBVRE:  I have a few follow-up.
11              REDIRECT EXAMINATION BY MR. LEFEBVRE
12   Q.   Mr. Fox, could you turn to MBNA Number 3?  I'm
13        hoping you might be able to -- let's start with
14        Number 2.  Now, if I understand correctly, the
15        account was originally opened by Mrs. Hoefs, and
16        I see based on looking at MBNA 02 and 03, there
17        are some notes where the husband was added on
18        sometime in '99, July of '99?
19        A.  That's correct.
20   Q.   Just something I didn't understand.  I'm looking
                          Page 17
```

090104 Stephen Fox (ASCII).txt
```
21        at the last line of Number 2.  It says -- it
22        looks likes the date of July 27, '99.  It's got a
23        time, "0701," some initials, "CRLWAL, Status code
24        changed for decision from blank to H," and I see
0043
 1        that's also repeated at the top on 03.  Can you
 2        tell me what that entry means?
 3        A.   The account status code was changed to not
 4        having a status to having a status of an H
 5        internally.
 6   Q.   What does that mean in English?  I have no idea
 7        what that means.
 8        A.   Basically, an H status code means that since
 9        we were adding Mr. Hoefs as a user, the decision
10        was made to put an H status code on the account
11        to hold the account at the current credit line.
12                 MR. LEFEBVRE:  Okay.
13        A.   For a period of time.
14   Q.   So it's fair to say that after July of '99,
15        Mr. Hoefs was an authorized user, and he had
16        privileges to charge on that account per the
17        terms and conditions of the account, the credit
18        limit?
19        A.   Yes, he did.
20   Q.   Okay.  So when counsel was asking you moments
21        ago, and you went through some statements, and
22        you were talking about payment -- charges after
23        the arbitration rider was allegedly mailed out to
24        you, with all fairness, you have no idea if
0044
 1        Mrs. Hoefs used the account?  For all you know,
 2        all the charges post alleged mailing of the
 3        arbitration agreement were made by Mr. Hoefs;
 4        correct?  You don't know if she made any
 5        payments?
 6        A.   I do not know if she was the one using the
 7        card or if Mr. Hoefs was the one using the card.
 8   Q.   And you don't know if she made the payments or
 9        Mr. Hoefs made the payments or their mother,
10        sister, father, or some benevolent person made
11        the payments?  You would have no idea looking at
12        your records who made the payments on this
13        account post alleged mailing of the arbitration
14        agreement?
15                 MR. COLE:  I'm going to object.  I think
16        the witness answered to the best of his ability.
17   Q.   Well, you are going to answer the question;
18        right?  You have no idea?
19        A.   I have no idea.
20   Q.   Okay.  Now, I just wanted to go back to
21        something.  When you talked about the
22        agreement -- I'm not talking about the
23        application.  I'm talking about the agreement
24        that you were just questioned on.  I'm talking
0045
 1        about the credit card agreement.  Just bear with
 2        me.  I believe that that's MBNA 14 through 21.
 3        You told us that you were -- that it was standard
 4        practice that once a card -- when the card was
 5        opened, that the consumer, in this case, Mrs.
 6        Hoefs, would get this agreement?  You were pretty
 7        sure of that?
 8        A.   It is mailed with the card.
                              Page 18
```

```
                    090104 Stephen Fox (ASCII).txt
 9   Q.   Okay.  And in fact, isn't it -- strike that.
10.       Wasn't it the policy of MBNA back in '97 when
11        Mrs. Hoefs got the card, that when a consumer
12        would get the card in the mail, they would have
13        to dial some number to activate the card; is that
14        correct?
15        A.  Right.  The card needs to be activated by
16        calling.
17   Q.   And that was an important -- that was a concern
18        of MBNA?  That is, that MBNA when they would send
19        out a new card and a credit card agreement, they
20        wanted to make sure that the card holder got the
21        card, got the agreement, and somehow it wasn't
22        lost or got into the hands of some other person;
23        isn't that a fair statement?
24        A.  That is a fair statement.
0046
 1   Q.   And would you agree with me that changes to the
 2        credit card agreement are important to MBNA?
 3        When MBNA makes a change to its credit card
 4        agreement, as referenced in the addendum that was
 5        supposedly made out, that those changes are
 6        important to MBNA?
 7        A.  I would agree that corporately they are
 8        important.
 9   Q.   And do you think that changes to an account are
10        also important to the consumer?
11        A.  Yes.
12   Q.   But on the changes to the card, when you change
13        the agreement, MBNA doesn't require the consumer
14        to dial back in to make sure they got the
15        amendments to the card?  They didn't do that back
16        in '99?
17             MR. COLE:  I'm going to object to form,
18        Counsel.
19   Q.   Do you understand my question?
20        A.  I understand your question.  You're asking me
21        if they -- if we require the customer to call us
22        back when we send them out an amendment?
23   Q.   Right.  And the answer is you don't?
24        A.  And the answer is we do not require them to
0047
 1        call us back.
 2   Q.   And you didn't require that back in December of
 3        '99?
 4        A.  We did not require them to call us back in
 5        December of 1999.
 6             MR. LEFEBVRE:  Okay.  Just give me one
 7        minute, and I think I'll be done.
 8                  (PAUSE)
 9   Q.   Have you -- you said you work in the charge off
10        or the -- is it fair to say you told me you were
11        the charge-off manager; correct?
12        A.  I told you I was the manager of the sales
13        team for MBNA charge off.
14   Q.   Okay.  Has MBNA ever had a card holder call and
15        complain that, "Gee, I never got my statement
16        last month"?  Does that ever happen?  Does MBNA
17        ever receive such a call?  I'm not talking about
18        Mrs. Hoefs.  Does that happen on occasion with
19        card holders that they don't get their statement?
20        A.  I'm sure the bank would receive calls stating
21        that the customer has not received their
                                        Page 19
```

090104 Stephen Fox (ASCII).txt
```
22        statement.
23   Q.   And you would agree with me that sometimes things
24        are misaddressed or they get lost in the mail?
0048
1         Has that ever happened to a customer?
2                   MR. COLE:  Objection to the form.  You
3         can answer.
4                   (NO ANSWER)
5    Q.   Has a customer ever called and complained that
6         "Gee, I never got my January statement.  It must
7         have gotten lost in the mail"?
8    A.   I think I answered that before that, yes,
9         customers have called and complained that they
10        did not receive their statements.
11   Q.   Could it be that Mrs. Hoefs' statement and the
12        amendment that was allegedly mailed was lost in
13        the mail?  Could that have possibly happened, yes
14        or no?
15                  MR. COLE:  Objection to the form.
16   A.   I don't know.
17   Q.   So you don't know, as you sit here today, whether
18        Mrs. Hoefs received that arbitration rider; is
19        that a fair statement?
20   A.   I don't know whether or not she received the
21        statement, but based upon the research that I
22        did, I do not see any reason why she would not
23        have received the statement or the amendment.
24   Q.   Okay.  Well, just following up on that, you told
0049
1         me you weren't sure about the actual -- what I'm
2         going to call the assembly line, and forgive me,
3         I don't mean to be derogatory about where the
4         December statement was being put together, and
5         then the addendum was being put together.  First
6         of all, do you know if the addendum was in
7         booklet form or was it just a regular 8 1/2 x 11
8         paper?
9                   MR. COLE:  I believe that's been asked
10        and answered, Counsel, earlier on in the
11        deposition.
12                  MR. LEFEBVRE:  Forgive me.  I forgot what
13        the answer was.  Could you refresh my memory?
14                  MR. COLE:  I believe a while back you
15        asked that question, and he said that he was not
16        intimately familiar with that process, I think
17        was his response.
18   Q.   So you don't know if the rider regarding
19        Mrs. Hoefs' account was manually inserted or if
20        it was done somehow -- I want to call it by
21        machine?  You don't know that.  You already told
22        me that; correct?
23   A.   I already told you that.
24   Q.   If it was manually done -- assume that it was
0050
1         manually done.  You don't know if the person who
2         hypothetically was stuffing the envelope, he or
3         she could have made a mistake and not put one in
4         her envelope?  That could have happened; right?
5         You don't know what happened?
6    A.   I was not there.  I do not know.
7                   MR. LEFEBVRE:  Thank you.  That's all I
8         have.
9                   MS. PIECZARKA:  I have nothing further.
                              Page 20
```

```
                         090104 Stephen Fox (ASCII).txt
10            MR. LEFEBVRE:  Would you like to read and
11       sign, Dezzie, when this gets back or just --
12       whatever your pleasure?
13            MR. COLE:  Yes, we will waive.
14            MR. LEFEBVRE:  Okay.  We're all set.  It
15       was a pleasure meeting you, and thank you,
16       Mr. Fox, for your testimony.
17            MS. PIECZARKA:  Thank you.
18            MR. COLE:  Thank you.
19            THE REPORTER:  Would you like a copy?
20            MS. PIECZARKA:  Yes.
21             (DEPOSITION CLOSED AT 3:30 P.M.)
22
23
24
0051
1                C E R T I F I C A T E
2
        I, Jeannette A. Lemoine, a Notary Public in and
3    for the State of Rhode Island, duly commissioned and
     qualified to administer oaths, do hereby certify that
4    the foregoing video conference deposition of
     Stephen Fox, witness in the above-entitled cause, was
5    taken by me at the offices of Allied Court Reporters,
     115 Phenix Avenue, Cranston, Rhode Island, commencing
6    at 2:00 p.m. on September 1, 2004; that previous to
     the testimony of said witness, who was of lawful age,
7    the witness was sworn by me; whereupon the witness was
     first duly cautioned and sworn to testify the truth,
8    the whole truth, and nothing but the truth, and that
     the witness thereupon testified as in the
9    foregoing-annexed transcript.
10       I further certify that the foregoing deposition
     was taken down by me in stenotype and was later
11   reduced to typewriting and that the foregoing is a
     true and accurate record of the testimony of said
12   witness.
13       Pursuant to Rule 30 (e), the witness, with
     agreement of the parties, hereby waives the right to
14   read and sign the transcript.
15       Pursuant to Rule 5 (d) and 30 (f) (1) of the
     Federal Rules of Civil Procedure, original transcripts
16   shall not be filed in court.  Therefore, original is
     delivered and retained by Plaintiff's attorney.
17
        IN WITNESS WHEREOF, I have hereupon set my hand
18   this        day of September, 2004.
19
20
21        JEANNETTE A. LEMOINE, CSR, NOTARY PUBLIC
            My Commission Expires July 17, 2005
22
23   In Re:  Janet Hoefs v. CACV of Colorado, LLC
     Deposition:  Stephen Fox
24   Date:  September 1, 2004
```

Page 21

# Exhibit B

STATE OF DELAWARE)
County of New Castle)          ss.          AFFIDAVIT OF ASSIGNMENT

    Affiant, a Personal Banking Officer of MBNA America Bank, N.A., duly deposes that he is authorized to make the statements and representations herein. As reflected in the books and records of MBNA America Bank, N.A., there is the amount of $....  ...  due and payable from.                 account number ·        ·  ?  . ·. as of the 3rd day of April, 2002.

    This account has been assigned, transferred and set over unto CACV of Colorado, LLC. by MBNA America Bank, N.A. on April 3, 2002.

    Further, the affiant states that to the affiant's knowledge, information and belief there are no uncredited payments, just counterclaims or offsets against the said debt. MBNA America Bank N.A. has no further interest in said debt for any purpose. Additionally, the affiant states that to the affiant's knowledge, information and belief the amendment of terms and conditions for this account was mailed by MBNA in December, 1999.

                DATED April 22, 2004.

                By: _____
                Stephen Fox, Personal Banking Officer

Subscribed and sworn to before me, April 22, 2004

                _____
                Notary Public

           DAWN M. PEUGH
        Notary Public · State of Delaware
       My Commission Expires 12/12/06

MBNA 000073

# Exhibit C

090104 Hoefs (ASCII).txt

0001
1                    UNITED STATES DISTRICT COURT
         DISTRICT OF MASSACHUSETTS, SPRINGFIELD DIVISION
2
3

    JANET S. HOEFS                    :
4                                     :
         VS.                          :    Case No. 04-30015-KPN
5                                     :
    CACV of COLORADO, LLC, et al :
6
7
         VIDEO CONFERENCE DEPOSITION OF JANET HOEFS,
8        Plaintiff, in the above-entitled cause, taken on
         behalf of the Defendant, CACV of Colorado,
9        pursuant to notice, before Jeannette A. Lemoine,
         CSR, a Notary Public in and for the State of
10       Rhode Island and Providence Plantations, at the
         offices of Allied Court Reporters, 115 Phenix
11       Avenue, Cranston, Rhode Island, on September 1,
         2004, at 3:30 p.m.
12
13

    APPEARANCES:
14
    For the Plaintiff:
15       LEFEBVRE & SONS LAW OFFICE
         BY:  CHRISTOPHER LEFEBVRE, ESQUIRE
16            Two Dexter Street
              Pawtucket, RI  02862
17            (401) 728-6534
18  For the Defendant CACV of Colorado, LLC:
         LAWSON & WEITZEN, LLP
19       BY:  KATHRYN E. PIECZARKA, ESQUIRE
              88 Black Falcon Avenue
20            Boston, MA  02210
              (617) 439-4990
21
22                 ALLIED COURT REPORTERS
                     115 PHENIX AVENUE
23            CRANSTON, RHODE ISLAND  02920
                     (401) 946-5500
24            www.alliedcourtreporters.com
0002
1                      I N D E X
2               DEPOSITION OF JANET HOEFS
3
                                                  PAGE
4
    Examination by Ms. Pieczarka . . . . . . . .      4
5   Examination by Mr. Lefebvre. . . . . . . . .     45
6
7
8
9
10                   E X H I B I T S
11
    NO.          DESCRIPTION                      PAGE
12
         No Exhibits offered in this deposition.
13
14
15
                       Page 1

090104 Hoefs (ASCII).txt

```
16
17
18
19
20
21
22
23
24
0003
 1                    (DEPOSITION COMMENCED AT 3:52 P.M.)
 2                         JANET HOEFS
 3        Being duly sworn, deposes and testifies as
 4        follows:
 5                    THE COURT REPORTER:  Please state your
 6        full name for the record.
 7                    THE WITNESS:  Janet Hoefs.
 8                    MS. PIECZARKA:  Hi, Janet, my name is
 9        Kathryn Pieczarka.  I'm an attorney for one of
10        the Defendants, CACV of Colorado.
11                    THE WITNESS:  Yes.
12                    MS. PIECZARKA:  Have you ever had your
13        deposition taken before?
14                    THE WITNESS:  No.
15                    MS. PIECZARKA:  Okay.  Basically what I
16        ask -- I'm just going to ask you questions which
17        you can answer, and then if there's something you
18        don't understand, feel free to ask me, and I'll
19        just clarify, as well as the stenographer can't
20        pick up nodding of the head or something.  You
21        need to give a verbal response.  So that's all I
22        ask is that you give a verbal response.
23                    THE WITNESS:  Okay.
24
0004
 1                    EXAMINATION BY MS. PIECZARKA
 2   Q.   Could you state your current address?
 3        A.   5453 Martin Drive, Cross Lanes, West
 4        Virginia, 25313.
 5   Q.   And how long have you lived there?
 6        A.   Since February of this year.
 7   Q.   Where did you live before that?
 8        A.   15 Rice Drive, Wilbraham, Massachusetts,
 9        01095.
10   Q.   And how long did you live there?
11        A.   For 4 years.
12   Q.   Four years.  Before that?
13        A.   P.O. Box 337, Bancroft, West Virginia, 25033.
14   Q.   And what year was that in?
15                    THE WITNESS:  The year we moved to
16        Massachusetts?
17                    MS. PIECZARKA:  Yes.
18        A.   That would have been in 2000.
19   Q.   So you moved to Massachusetts from what state?
20        A.   Bancroft.
21   Q.   From Bancroft.  And what state is that in?
22        A.   West Virginia.
23   Q.   West Virginia.  And how long did you live at that
24        address?
0005
 1        A.   Since 1992.
 2   Q.   Okay.  And so from '92 to 2000, you lived at that
 3        Bancroft address?
```

Page 2

090104 Hoefs (ASCII).txt

```
 4        A.  Yes.
 5   Q.   Okay.  Can you just give me a general employment
 6        history?  Where do you work right now?
 7        A.  I work for the Social Security
 8        Administration.  I have worked with them since
 9        1989.
10   Q.   And what's your position there?
11        A.  Paralegal.
12   Q.   And what have you done -- what did you do before
13        that?
14             THE WITNESS:  When I started -- you mean
15        prior to working with Social Security?
16   Q.   How long have you been with Social Security?
17        A.  Since 1989.
18   Q.   Okay.  So what was your position before being a
19        paralegal?
20        A.  I was a stenographer for the State of
21        West Virginia.
22   Q.   And before that, what did you do?
23        A.  That was it.  That's all I've ever done.
24   Q.   Did you hold a job when you lived in
0006
 1        Massachusetts?
 2        A.  Yes.
 3   Q.   And what did you do when you lived in
 4        Massachusetts?
 5        A.  I transferred with the Social Security
 6        Administration.  I continued to work for them.
 7   Q.   Were you also a paralegal?
 8        A.  Yes.
 9   Q.   So your entire time with the Social Security
10        Administration, you were a paralegal?
11        A.  No.  Actually, in 1989, I started out as a
12        clerk/typist.  I was promoted -- I believe it was
13        in '90, I was promoted to a legal assistant; in
14        '93, up to a hearing assistant; and then in 1989,
15        I was promoted to a paralegal.
16   Q.   Okay.  Now, at some point, you decided to apply
17        for a credit card with MBNA?
18        A.  Yes.
19   Q.   And do you recall what date you did that?
20        A.  I don't recall what date it was.  It was when
21        I was with my ex-husband.  I'm not exactly sure
22        of the date, maybe '96, '97.
23   Q.   Okay.  And how did you apply for an MBNA credit
24        card?
0007
 1        A.  I don't remember.
 2   Q.   Did you call using the telephone or did you
 3        physically fill out an application?
 4        A.  I don't remember that.
 5   Q.   Okay.  Do you remember how you decided to apply
 6        for an MBNA credit card?
 7        A.  I can remember my husband discussing it with
 8        me, but I don't remember how we applied.
 9   Q.   Okay.  If I represent to you that it was
10        October 22, 1997, that you applied for a credit
11        card with MBNA, does that seem about right?
12        A.  That probably is.
13   Q.   Okay.  And do you recall getting a card member
14        agreement with your credit card?
15        A.  Yes.
16   Q.   Okay.  Do you remember when you got your credit
```
Page 3

090104 Hoefs (ASCII).txt

```
17        card in the mail?
18              THE WITNESS:  You mean the actual day or
19        do I remember getting it?
20   Q.   Do you remember getting the physical card?
21   A.   Yes, I do.
22   Q.   And what did you have to do to activate your
23        card?
24   A.    I believe I had to call a phone number on the
0008
 1        card before it was activated.
 2   Q.   Okay.  And did you call that number and activate
 3        the credit card?
 4   A.   Yes.
 5   Q.   Okay.  And did you review the credit card
 6        agreement that came with the card?
 7   A.   Yes, I did.
 8   Q.   Okay.  Did you bring some documents with you?
 9   A.   Yes, I did.
10   Q.   If you turn to -- I believe the bottom numbers,
11        they begin with MBNA; do you see that?
12   A.   Yes.
13   Q.   If you go to MBNA 14?
14   A.   Okay.
15   Q.   It says Credit Card Agreement on it; is that
16        right?
17   A.   Yes.
18   Q.   Does this look like the credit card agreement
19        that you would have received in the mail with
20        your credit card?
21   A.   Yes, it does.
22   Q.   And it goes all the way to Page MBNA 21 which
23        would be Page 8 of the actual agreement?
24   A.   Yes.
0009
 1   Q.   Is that right?
 2   A.   Yes.
 3   Q.   And you just stated that you remember reviewing
 4        this credit card agreement?
 5   A.   Yes, I do.
 6   Q.   Okay.  If you turn to MBNA Page 19, which is
 7        Page 6 of the actual agreement?
 8   A.   Okay.
 9   Q.   And there is a section entitled Amendments; do
10        you see that?
11   A.   Yes.
12   Q.   Can you read that first sentence for me?
13   A.   "We may amend this agreement by complying
14        with the" -- you want me to continue?
15              MS. PIECZARKA:  You can just finish the
16        sentence.
17   A.   "With the applicable notification
18        requirements of federal law and the laws of the
19        State of Delaware."
20   Q.   Do you remember reading this paragraph
21        specifically when you got your agreement?
22   A.    I remember reading the entire thing.
23   Q.   Okay.  So it's fair to say you probably read this
24        section on amendments when you read it when you
0010
 1        got the agreement?
 2   A.   Yes.
 3   Q.   Okay.  Now, after you received your credit card,
 4        did you start making purchases with it?
                        Page 4
```

090104 Hoefs (ASCII).txt

```
 5         A.  Yes.
 6    Q.   Okay.  And do you know when you started doing
 7         that?
 8         A.  Actually, the credit card wasn't -- we didn't
 9         apply for the credit card for any specific
10         reason, so I never really -- there was just small
11         purchases that I made with it, and my husband
12         took care of the bills, so I'm not really sure
13         how much that I charged, but I'm sure it wasn't
14         much.
15    Q.   Okay.  I guess my question is more when you
16         applied for the credit card, you said you called
17         the number and activated the credit card?
18         A.  Yes.
19    Q.   And my question is did you start using it right
20         away or did you just keep it in your wallet for a
21         time when it could possibly be an emergency?
22         A.  Like I said, it wasn't kept for an emergency,
23         but there wasn't nothing but minor things, maybe
24         a grocery store, or something such as that.
0011
 1         There wasn't any major purchases that I used it
 2         for.
 3    Q.   And now, when you applied for the card, you're
 4         referencing "we," is that referring to you and
 5         your husband -- or your ex-husband?
 6         A.  Yes.
 7    Q.   And what is his name?
 8         A.  Clinton King.
 9    Q.   Clinton King.  Now, when you applied for this
10         MBNA credit card, did you apply with him as a
11         joint account?
12         A.  I believe so.
13    Q.   Or was it just your name on the account when you
14         applied?
15         A.  I believe it was both of our names because he
16         was the one who suggested getting the card.
17    Q.   But that doesn't necessarily mean that his name
18         was on the card also?  In other words, you could
19         have just put your name on the card and applied
20         for it yourself?
21         A.  I know that he had a credit card he kept with
22         him.  I'm not sure if his name was actually on
23         the account or if he was an authorized user, but
24         I do know that he had a credit card.
0012
 1    Q.   He had a credit card, but would that be an MBNA
 2         credit card?
 3         A.  Yes.
 4    Q.   Okay.  So you didn't carry it around in your
 5         wallet, this MBNA credit card?
 6         A.  No.
 7    Q.   But it's fair to say your name was on the
 8         application when you applied for it?
 9         A.  Yes.
10    Q.   And you're uncertain as to whether his name was
11         on there as well as yours?
12         A.  Correct.
13    Q.   Okay.  But it's possible that it was an
14         individual account that you opened that he had
15         payment -- or purchase ability on the account?
16         A.  Correct.  He did have the ability to use the
17         credit card.
```

Page 5

```
                         090104 Hoefs (ASCII).txt
18   Q.   But you're unsure as to whose name it was
19        actually in, but it was definitely in your name?
20        A.  Yes.
21   Q.   Okay.  If you turn to Page 1 of the credit card
22        agreement which is MBNA 14?
23        A.  Okay.
24   Q.   It says, "How To Use Your Card"; do you see that
0013
1         title?
2         A.  Yes.
3    Q.   And if you go down to the third paragraph?
4         A.  Yes.
5    Q.   Can you read that paragraph for me?
6         A.  "If you permit any person to have access to
7         your card or account number with the
8         authorization to make a charge, you may be liable
9         for all charges made by that person including
10        charges for which you may not have intended to be
11        liable."
12   Q.   Okay.  Do you understand what that means?
13        A.  Yes.
14   Q.   What is your understanding of that paragraph?
15        A.   If I authorized someone to -- if I allowed
16        someone to use the credit card, then I may be
17        liable for any charges that they charge on the
18        credit card regardless of if I realized what they
19        were going to be using it for.
20   Q.   Okay.  So if Clinton King's -- that was your
21        ex-husband's name; correct?
22        A.  Yes.
23   Q.   Name was also on the account, you would be liable
24        for his activity on there?
0014
1         A.  Yes.
2    Q.   Right?
3         A.  Yes.
4    Q.   Okay.  Now, did you retain a copy of your
5         application when you applied for the credit card
6         with MBNA?
7         A.  No, I didn't, no.
8    Q.   Did you keep all of your billing statements?
9         A.  No, I didn't.
10   Q.   Okay.  Do you have any billing statements?
11        A.   The only thing I have is what Mr. Lefebvre
12        had forwarded to me in this packet.
13   Q.   So if you turn to MBNA Page 24?
14        A.  Okay.
15   Q.   It looks like this is a billing statement; is
16        that correct?
17        A.  Yes.
18   Q.   Now, have you ever seen this before or something
19        that looks like this, not this particular
20        document?
21        A.  Yes.
22   Q.   So this is familiar to you as a statement that
23        would come from MBNA?
24        A.  Yes.
0015
1    Q.   And this is your name, Janet S. King; is that
2         correct?
3         A.  Yes.
4    Q.   And you had taken Clinton King's name when you
5         were married to him?
                                    Page 6
```

090104 Hoefs (ASCII).txt

```
 6        A.  Yes.
 7    Q.  Okay.  And that P.O. Box 337, Bancroft, West
 8        Virginia, was that your address at the time?
 9        A.  Yes, it was.
10    Q.  And you had stated that earlier as one of the
11        addresses that you had before you moved to
12        Massachusetts?
13        A.  Yes.
14    Q.  Okay.  And you received these statements at that
15        P.O. box; is that correct?
16        A.  Yes.
17    Q.  And each month would a statement come, and you
18        would go pick it up at the P.O. box?
19        A.  Actually, during the time that my ex-husband
20        and I separated and eventually divorced, we had
21        agreed to pay off all of our credit cards prior
22        to the divorce, and in our divorce agreement, we
23        had no credit cards with a balance.  That wasn't
24        even discussed in our divorce because everything
0016
 1        was paid, at least I assumed it was.  I wasn't
 2        receiving any statements from MBNA, and I assumed
 3        since he told me this was paid off that it was,
 4        but he had access to the post office box, and I
 5        was told later by the post master -- it was a
 6        small town -- that he was continuing to pick up
 7        some mail at that post office box.
 8    Q.  So when did you get -- when did you and
 9        Clinton King get divorced?
10        A.  Our divorce was final in '98.  We separated
11        in '97.
12    Q.  Okay.  Do you know around in '97 when you
13        separated?
14        A.  Around July of -- no, wait a minute.  It was
15        around the end of '97.  He had left a couple
16        times prior to that, but had returned, and it was
17        I would say about the first part of December that
18        he left and didn't return to the house.
19    Q.  Okay.  So if this account was opened in October
20        of '97, that was only a few months before you
21        separated?
22        A.  Right.
23    Q.  Okay.  And then you got divorced in '98?
24        A.  Yes.
0017
 1    Q.  And do you know about what month that occurred?
 2        A.  In July of '98.
 3    Q.  Okay.  So in October of '97, when you applied for
 4        this card, this P.O. Box 337 was the correct
 5        address --
 6        A.  Yes.
 7    Q.  -- for you, and you had access to this P.O. box;
 8        is that correct?
 9        A.  Yes.
10    Q.  And how long did you live in Bancroft,
11        West Virginia?
12        A.  Since '92.
13    Q.  And when did you leave Bancroft, West Virginia?
14        A.  In 2000.
15    Q.  2000, okay.  Now, did you have this P.O. box the
16        entire time you were in Bancroft, West Virginia?
17        A.  Yes.
18    Q.  And you had access to it?  You had a key?
```

Page 7

090104 Hoefs (ASCII).txt
```
19        A.  Yes.
20   Q.   Okay.  I just want to go through a few of these
21        statements.  So if in '98 you became divorced --
22        and what did you say, it was about July?
23        A.  Yes.
24   Q.   When did you actually change your name?  Did you
0018
 1        keep your name until you -- are you remarried or
 2        is this --
 3        A.  Yes.
 4   Q.   Did you keep your name until you remarried?
 5        A.  Yes.
 6   Q.   And when did you remarry?
 7        A.  In February of '99.
 8   Q.   Okay.  And then you took your current husband's
 9        last name which is Hoefs?
10        A.  Yes.
11   Q.   And when did you actually legally change your
12        name?
13        A.  It actually wasn't legally changed until
14        about a year ago.
15   Q.   Okay.  Well, if we look at these statements --
16        and you said February of '99, you got married?
17        A.  Yes.
18   Q.   And what's your husband's current name?
19        A.  Steve Hoefs.
20   Q.   Steve Hoefs.  If you look at MBNA Page 36, that
21        says the closing date for the statement; do you
22        see where that is?
23             THE WITNESS:  The closing date?
24             MS. PIECZARKA:  Yes, it says 1/4/99.
0019
 1        It's in a little box.
 2        A.  I see it.
 3   Q.   It says your name is Janet S. King?
 4        A.  Yes.
 5   Q.   And if you turn the page, you're also Janet S.
 6        King.  If you go to MBNA 39, now MBNA 39 has you
 7        on record as Janet S. Hoefs, and that closing
 8        date is April 2, 1999; is that correct?
 9        A.  Yes.
10   Q.   Does that seem about the time that you legally
11        changed your name?
12        A.  No, as I said, it was just changed legally
13        about a year ago, 2003.
14   Q.   So you called MBNA and changed the account name
15        because you were now married?
16             THE WITNESS:  Who did?
17   Q.   Did you call MBNA and change your account name?
18        A.  No, at this time, I thought MBNA was closed.
19   Q.   Your MBNA account?
20        A.  Yes.
21   Q.   Even though this statement says you've made a
22        payment for $44, if you look at this MBNA 39?
23        A.  I was not making payments at that time.  I
24        thought the account was closed.
0020
 1   Q.   Okay.  And when did you think the account closed?
 2        A.  At the time of our divorce, everything was
 3        supposed to be closed out.  No credit card
 4        accounts were even listed in our divorce
 5        agreement.  The only thing I had was my house
 6        payment and car payment.  I had no credit cards.
                                              Page 8
```

090104 Hoefs (ASCII).txt

```
 7          My ex-husband and I had no credit cards with a
 8          balance at the time, I thought.
 9    Q.    Okay.  And how did you know that?  Did you
10          have -- do you have a written document that says
11          you have no credit cards that are open?
12    A.    Nothing but my divorce degree that stated
13          there was no outstanding credit card debt.
14    Q.    Okay.  And you still had access to this
15          P.O. Box 337 in Bancroft, West Virginia?
16    A.    Yes, but as I said, he did also.  I didn't
17          realize it at the time, but he had -- his name
18          was also on the box because that's the way we
19          opened the post office box, and he got another
20          key.
21    Q.    But you could still go and get mail there;
22          correct?
23    A.    Yes.
24    Q.    And as you read just a few minutes ago, on Page 1
0021
 1          of your credit card agreement, it says any person
 2          that has access to your account to make charges,
 3          that you would be liable for them?
 4    A.    Yes.
 5    Q.    Do you still remember that as being part of your
 6          credit card agreement?
 7    A.    I do, but I didn't realize that he had the
 8          credit card at the time.  Like I said, I thought
 9          it was closed out.
10    Q.    Okay.  Now --
11                MR. LEFEBVRE:  Can we go off the record
12          just for one second?
13                     (OFF THE RECORD)
14    Q.    Now, you stated previously that in your divorce
15          degree, which occurred in February of '99 -- I
16          think that's right?
17    A.    No, that's when I was remarried.
18    Q.    Oh, right.  So when was the divorce, '98?
19    A.    Yes.
20    Q.    And the month was?
21    A.    July, I believe, July '98.
22    Q.    Okay.  So at that point, you didn't think you had
23          any outstanding or open credit on a credit card?
24    A.    Correct.
0022
 1    Q.    Okay.  And did you have physical custody over the
 2          card at any point in time when this account was
 3          open?
 4    A.    It was kept in our house.  I didn't keep it
 5          in my purse, but yes, I did have access to it --
 6                MS. PIECZARKA:  Okay.
 7    A.    -- until that time, and then I cut up the
 8          card after that.
 9    Q.    Until what time?
10    A.    Until -- it was probably -- it was prior to
11          the divorce when everything was supposed to have
12          been paid off, and I cut up all the credit cards.
13          I didn't want any of the old credit cards.
14    Q.    Okay.  Now, did you ever see any document from
15          MBNA that stated you have closed your account?
16    A.    No.
17    Q.    So if that occurred in '98 -- do you ever
18          remember seeing literature from MBNA in your P.O.
19          box in West Virginia?
```

                                    Page 9

090104 Hoefs (ASCII).txt
```
20        A.  No.
21    Q.  Did you ever receive a statement from MBNA, the
22        ones we had just looked at?
23        A.  No.
24    Q.  You never looked at any?
0023
 1        A.  No.
 2    Q.  So it's fair to say that you don't know whether
 3        statements came to P.O. Box 337 in Bancroft,
 4        West Virginia?
 5        A.  Exactly.  I never saw them.
 6    Q.  Okay.  So it's fair to say that you don't know if
 7        any other literature from MBNA came in that P.O.
 8        box?
 9        A.  Nothing that I'm aware of.
10    Q.  Did you ever get mail in that P.O. box?
11        A.  I got mail in the P.O. box, but apparently,
12        he had gone through the mail and pulled out
13        different items.  This wasn't the only credit
14        card he did this with.
15              MS. PIECZARKA:  Okay.
16              (OFF THE RECORD)
17    Q.  So you never received any statement from MBNA?
18        You never saw one --
19        A.  No.
20    Q.  -- physically, but it's still possible that the
21        statements were sent to your P.O. box?
22        A.  It's possible.
23    Q.  And it's just possible that you never actually
24        got them out of your P.O. box?
0024
 1        A.  I got all the mail that was there for me to
 2        pick up, but apparently, I found out later from
 3        the postmaster that he would come and go through
 4        the mail.
 5    Q.  And that's Clinton King?
 6        A.  Yes.
 7    Q.  Was he legally authorized to use the P.O. box as
 8        well?
 9        A.  Yes, he was.  The postmaster told me that
10        when we opened up the box, it had both of our
11        names on it, and I hadn't changed that, and I
12        didn't think to change that, so --
13    Q.  Did he have a key?
14        A.  He had given me his key, but then he
15        requested another key, I found out later.
16    Q.  Did you have your own key as well?
17        A.  Yes, I had my key.
18    Q.  Okay.  Do you know whether your credit card
19        agreement was amended at all?
20        A.  Not that I'm aware of.
21    Q.  If I represent to you that in December of '99,
22        MBNA sent an amendment to your credit card
23        agreement along with one of your statements,
24        would you know whether or not that was sent to
0025
 1        your P.O. box?
 2        A.  I know that I did not receive that.
 3    Q.  Okay.  But it's possible that it was sent to your
 4        P.O. box?
 5        A.  It's possible.
 6    Q.  Okay.  And it's possible that Clinton King
 7        removed it from the P.O. box?
```
                                        Page 10

090104 Hoefs (ASCII).txt

```
 8        A.  Correct.
 9   Q.   And it's possible that you just never saw it, but
10        it did go to the P.O. box?
11        A.  That's possible.
12   Q.   If you look at MBNA document 22?
13        A.  Okay.
14   Q.   It's entitled Important Amendments To Your Credit
15        Card Agreement; do you see that?
16        A.  Yes.
17   Q.   Do you see how there is a boldfaced word that
18        says "Arbitration" towards the last large
19        paragraph?
20        A.  Yes.
21   Q.   Can you read the first sentence for me?
22        A.  "Any claim or dispute ('Claim') by either you
23        or us against the other or against the employees,
24        agents or assigns of the other, arising from or
0026
 1        relating in any way to this Agreement or any
 2        prior Agreement" -- I believe that's "Or your
 3        account (whether under a statute, in contract,
 4        tort, or otherwise and whether for money damages,
 5        penalties" -- I'm sorry, I can't read that part.
 6   Q.   I think it says "Or" --
 7        A.  "Or" -- it's blurred.  I can't see it.
 8             MS. PIECZARKA:  Okay.
 9        A.  "Or equitable relief) including Claims
10        regarding the applicability of this Arbitration
11        Section or the validity of the entire Agreement
12        or any prior agreement shall be resolved by
13        binding arbitration."
14   Q.   Now, do you understand what that means?
15        A.  It means that rather than go to court, it
16        will go to -- that I would agree it would go to
17        arbitration.
18   Q.   And do you recall seeing this in your P.O. box
19        that came with the statement?
20        A.  No.
21   Q.   Okay.  But it's fair to say that MBNA was still
22        sending these statements to your P.O. box with
23        your name on them, and that MBNA was considering
24        this account open?
0027
 1        A.  Apparently -- from looking at these
 2        documents, apparently, they were, but I didn't
 3        know that.
 4   Q.   Okay.  Now, if you turn to MBNA 23, it's just the
 5        second page to that amendment?
 6        A.  Okay.
 7   Q.   If you look at the last paragraph, it's in
 8        italics?
 9        A.  Yes.
10   Q.   It says, "If you do not wish your account to be
11        subject to this Arbitration Section, you must
12        write to us at MBNA," et cetera.  Do you recall
13        seeing this in your P.O. Box?
14        A.  No.
15   Q.   But you agree that your account was open at this
16        time, and you might not have known it was open,
17        but it was open?
18        A.  It appears that it was, but like I said, I
19        did not know that, and I know I did not receive
20        this in the mail.
```

Page 11

090104 Hoefs (ASCII).txt
```
21  Q.  But it's possible that it was sent to your P.O.
22      box, and Clinton King removed it?
23      A.  Yes, that's possible.
24  Q.  And you didn't write to MBNA and wish to not be
0028
 1      subject to the arbitration section; is that
 2      correct?
 3      A.  That's correct, because I was not aware of
 4      this.
 5  Q.  Okay.  Now, if you turn to MBNA Page 50?
 6      A.  Okay.
 7  Q.  I'm going to represent to you that this was the
 8      statement that contained that amendment we just
 9      read about, the arbitration provision?
10              MR. LEFEBVRE:  Or alleged statement.  We
11      still --
12              MS. PIECZARKA:  Alleged statement.
13              MR. LEFEBVRE:  For purposes of the
14      record.
15              MS. PIECZARKA:  Fair enough.
16  Q.  And this says it was sent to Janet S. Hoefs at
17      20 Thorn Hill Estates in Poca, West Virginia; is
18      that what that says?
19      A.  Yes.
20  Q.  Did you live at that address?
21      A.  That was my physical address, but I did not
22      use that.  Anything that came into that box was
23      junk mail, and I used the post office box.
24  Q.  Okay.  But you lived -- this was where you
0029
 1      physically resided, at 20 Thorn Hill Estates?
 2      A.  Yes.
 3  Q.  And you got mail there?
 4      A.  Like I said, I got fliers and stuff.  I
 5      didn't ever use this as a mailing address.
 6  Q.  Okay.  Did you ever open the mail?
 7              THE WITNESS:  The mail that came into
 8      this box?
 9              MS. PIECZARKA:  To 20 Thorn Hill Estates.
10      A.  Yes, like I said, it was junk mail.  I opened
11      up fliers and stuff like that, but there was
12      never any bills that were sent to this address.
13      What happened was there was no mail service to
14      the area, and when they began mail service, I
15      automatically got this address.  So I got just
16      fliers and stuff, but I never used it.
17  Q.  What do you mean there was no mail service to the
18      area?
19      A.  There was no mail service.  We could not get
20      mail.  We had to use a post office box, and
21      eventually they came around, and said we could
22      get mail delivery to our homes, and that's when
23      this address came about.
24  Q.  Okay.  So when they said you could get mail at
0030
 1      your house, you got this address, 20 Thorn Hill
 2      Estates?
 3      A.  Yes.
 4  Q.  And then you started getting fliers?
 5      A.  Yes.
 6  Q.  Okay.  And at some point, this address was
 7      changed with MBNA to be 20 Thorn Hill Estates?
 8      A.  Yes.
```

090104 Hoefs (ASCII).txt

```
 9   Q.   Did you call MBNA and change that address?
10   A.   No.
11   Q.   Do you know how MBNA was contacted to change that
12        address?
13   A.   I have no idea.
14   Q.   But it's fair to say that MBNA was contacted, and
15        the address was changed on their system as that
16        being your address?
17   A.   I'm assuming so since this is on the
18        statement, but I never received anything at that
19        address from them.
20   Q.   Okay.  And if this was your address on the
21        statement, it's fair to say it would have been
22        mailed to that address; is that correct?
23   A.   Yes.
24   Q.   But you stated that you never received any of
0031
 1        these statements at this address?
 2   A.   That's correct.  I never used this box
 3        because I knew -- at this time, I knew there was
 4        problems with my ex-husband trying to get my
 5        mail, and I had taken his name off the post
 6        office box, so that couldn't happen, and
 7        apparently, it was coming to the box at my home,
 8        and I didn't realize it.
 9   Q.   So it's possible that you did receive these
10        statements in the mail and thought they were
11        junk, and maybe threw them away?
12   A.   No, absolutely not.
13   Q.   Did you open all of the junk mail?
14   A.   Yes, I did.
15   Q.   Okay.  But it's fair to say that these statements
16        did get mailed to your house at 20 Thorn Hill
17        Estates?
18   A.   Yes, and not until after I moved to
19        Massachusetts did a neighbor tell me that she had
20        saw my ex-husband getting the mail out of my
21        mailbox in front of my home.
22   Q.   Okay.  So that's Clinton King?
23   A.   Yes.
24   Q.   And so it's your testimony that he was going into
0032
 1        your mailbox at 20 Thorn Hill Estates?
 2   A.   Yes.
 3   Q.   And removing your mail?
 4   A.   Yes.
 5   Q.   Okay.  Now, it says here on the same page,
 6        MBNA 50, it says that there's an over credit line
 7        fee and a late charge for payment due; is that
 8        correct?
 9   A.   Yes.
10   Q.   Now, if you go back to MBNA Page 48?
11   A.   Yes.
12   Q.   It still says Janet S. Hoefs, 20 Thorn Hill
13        Estates, Poca, West Virginia; is that correct?
14   A.   Yes.
15   Q.   And it looks like there's a series of charges on
16        there?
17   A.   Yes.
18   Q.   It says, for instance, Adirondack Technologies
19        $19.95; do you see that?  It's the fourth line
20        down.
21   A.   Yes.
```

Page 13

090104 Hoefs (ASCII).txt

22  Q.  Do you recall making that charge to the account?
23  A.  No, I have no idea what that is.
24  Q.  So it's possible that Clinton King made that
0033
1       charge to the account?
2   A.  It's very likely.
3   Q.  And so the next one, Drug Emporium #2 for $39.11,
4       you don't recognize that?
5   A.  No.
6   Q.  So it's possible Clinton King made that charge?
7   A.  Yes, that's also very likely.
8   Q.  Okay.  So if we turn to MBNA 52?
9   A.  Yes.
10  Q.  And this was a statement with a closing date of
11      February 2, 2000; do you see that in that box?
12  A.  Yes.
13  Q.  It says there was an express payment made of
14      $325?
15  A.  It looks like $125.
16          MR. LEFEBVRE:  It looks likes $125 to me.
17          MS. PIECZARKA:  Okay.  $125.
18  A.  Yes.
19  Q.  Did you make that payment?
20  A.  No.
21  Q.  Do you know who did make that payment?
22  A.  No, I don't know.
23  Q.  But it's fair to say that MBNA assumes that you
24      made this payment?
0034
1           MR. LEFEBVRE:  I'm going to object.  I
2       don't know how she could have any foundation to
3       know what MBNA would assume.  You can answer if
4       you want to.  Do you understand what she's asking
5       you, Janet?
6           THE WITNESS:  I guess she's asking me
7       would I assume what MBNA would think when they
8       received the payment?
9           MS. PIECZARKA:  All right.  I withdraw
10      the question.
11  Q.  Did you ever fail to make a payment on your
12      credit card?
13  A.  No.
14  Q.  Okay.  And as far as you're concerned, you always
15      made payments on the card when they were supposed
16      to be made; is that correct?
17  A.  Yes.
18  Q.  And that at some point, the account was closed?
19  A.  Yes.
20  Q.  Okay.  When is the first time that you learned
21      that this account was open after you had thought
22      that it had been closed?
23  A.  After I moved to Massachusetts.
24  Q.  And what year was that?
0035
1   A.  In 2000.
2   Q.  Okay.  In 2000.  And how did you come to that
3       realization?
4   A.  I got a phone call from MBNA concerning the
5       account.
6   Q.  And the phone call -- you received the phone call
7       in Massachusetts?
8   A.  Yes.
9   Q.  Did you receive a statement in Massachusetts?
                    Page 14

090104 Hoefs (ASCII).txt
```
10    A.  I did after I received the phone call.  I had
11        asked for a statement showing what this was
12        about.  I was clueless, and I never received
13        anything such as what I'm looking at now showing
14        what charges were on the account.
15  Q.  If you turn to the Page MBNA 60?
16    A.  Yes.
17  Q.  It says Janet S. Hoefs, 15 Rice Drive, Wilbraham,
18        Mass.  Was that your address in Massachusetts?
19    A.  Yes, it was.
20  Q.  Did you receive this statement there at that
21        address?
22    A.  I believe so.
23  Q.  Was this the statement you requested after you
24        spoke with someone at MBNA?
0036
1     A.  This is not what I had requested.  I had
2        requested a statement showing what the charges
3        were, you know, how this happened.  Like I said,
4        I thought it was closed out, and then they're
5        telling me that I'm past due, and I have a big
6        balance on the account, and I really didn't know
7        what was going on.
8   Q.  Have you ever seen a document that looks like
9        this page, MBNA 60?
10            THE WITNESS:  Like a statement like this?
11            MS. PIECZARKA:  Correct, sent to 15 Rice
12        Drive in Wilbraham, Massachusetts.
13    A.  Yes, I did get a statement.
14  Q.  Okay.  Did you get regular statements or just
15        one?
16    A.  I got a couple, and every time I got one, I
17        would call them and tell them -- retell them the
18        situation, that I had no idea what this was
19        about.  I didn't know what these charges stemmed
20        from.  I hadn't received anything from them since
21        the account was closed, and every time I just got
22        a runaround.  I never got any answers to what
23        these charges stem from.  They just told me that
24        I was going to collections, and that I needed to
0037
1        make a substantial payment, and at one point, I
2        even tried to set up a payment plan with them,
3        and I just was unable to do so because I wasn't
4        in a situation to pay this bill at that time.
5   Q.  Did you call MBNA and change your address to
6        15 Rice Drive on this account?
7     A.  No, I didn't.
8   Q.  Did you ever contact Clinton King when you
9        suspected that he was intercepting your
10        statements or using a credit card in your name
11        without your authorization?
12    A.  Not until I received this phone call from
13        MBNA in 2000.
14  Q.  And then --
15    A.  I had no clue until that time that anything
16        was going on.
17  Q.  Did you contact Clinton King after you received
18        this phone call?
19    A.  Yes, I did.
20  Q.  And what did you say to him?
21    A.  I asked him if he was responsible for charges
22        on a credit card that he was supposed to have
```
Page 15

090104 Hoefs (ASCII).txt
```
23        closed out, that I thought that we had closed out
24        all credit card accounts, and I'm getting a phone
0038
 1        call stating there's a large balance on one of
 2        the owed accounts that I wasn't aware of, and he
 3        refused to discuss it with me.
 4   Q.   Did he deny that he had been using the credit
 5        card?
 6        A.  No.
 7   Q.   Did he say he had been using the credit card?
 8        A.  He didn't say that either.
 9             MS. PIECZARKA:  All right.
10        A.  He just actually stated -- I remember the
11        comment, "You got what you deserve," and he hung
12        up on me.
13             MS. PIECZARKA:  That's nice.
14             THE WITNESS:  Yes.
15   Q.   What happened after you were receiving these
16        statements from MBNA, did -- they wanted to set
17        up a payment plan with you?
18        A.  Yes.
19   Q.   Or did you want to set up a payment plan with
20        them?
21        A.  I asked them what I could do about this.  I
22        explained the situation, told them I was very
23        concerned about this, what could I do.  This
24        shouldn't be my responsibility.  I didn't make
0039
 1        these charges, and I just really got the
 2        runaround telling me I had to pay it.  It was in
 3        my name.  It was my responsibility, and that I
 4        needed to actually make the payment in full, and
 5        after continuous phone calls from them telling me
 6        this was in collections, and I had to do
 7        something about it, I told them I would try to
 8        make monthly payments, but it was impossible at
 9        the time for me to do so.
10   Q.   Did you ever make a monthly payment on the
11        account?
12        A.  I believe I made a couple of payments on it.
13   Q.   And what year or date was that?
14        A.  That would have been in 2000, after they
15        contacted me.
16   Q.   In 2000.  Now, these statements beginning MBNA 60
17        are during 2000.  That one looks likes it's from
18        November 2000.  Could you identify on these
19        statements that are from 2000 where there is a
20        payment that you actually made?  It looks like
21        MBNA Page 60 is the first statement directed at
22        15 Rice Drive, Wilbraham, Mass., the first time
23        it was mailed there.
24        A.  Okay.  It looks likes the November payment --
0040
 1        actually, it's --
 2   Q.   On MBNA 61?
 3        A.  On 60.
 4             MS. PIECZARKA: Okay.
 5        A.  The $145 payment.
 6             MS. PIECZARKA:  Yes.
 7        A.  I believe that's when I started trying to
 8        make the payments.  They told me if I would send
 9        $145, and then $85 dollars a month, and I made
10        those two $85 payments, and I was unable to
                          Page 16
```

090104 Hoefs (ASCII).txt

```
11       continue.
12   Q.  So you made the $145 payment on Page MBNA 60?
13       A.  Yes.
14   Q.  And you made the $85 payment on MBNA Page 61?
15       A.  Yes.
16   Q.  Okay.  Did you make the payment on MBNA Page 62,
17       the $85 payment?
18       A.  Yes.
19   Q.  And then you stopped making payments?
20       A.  Yes, I was unable to continue.  At that time,
21       I was diagnosed with rheumatoid arthritis and had
22       a lot of medical bills coming in, and I had to
23       set my priorities as to what was being paid, and
24       this was not something that I had charged.  I
0041
1        didn't feel I was responsible for it.
2    Q.  But you stated that you had made payments to the
3        account?
4        A.  I did because I valued my credit, and they
5        kept telling me this was going to reflect poorly
6        on my credit.
7    Q.  And you were taking responsibility for the
8        account?
9        A.  No, I was not taking responsibility.  I was
10       trying to protect my credit.
11   Q.  By making a payment, you weren't taking
12       responsibility for the account?
13       A.  I was misled over the telephone when they
14       called me.  They kept telling me this was my
15       total responsibility; that even though I didn't
16       make the charges, that it was still my
17       responsibility.  This was going against my
18       credit.  This would prevent me from ever buying
19       another house.  They scared me.
20   Q.  And this is your name on the account, Janet S.
21       Hoefs?
22       A.  Yes.
23   Q.  And you do remember at some point opening an MBNA
24       credit card with your ex-husband, Clinton King?
0042
1        A.  Yes.
2    Q.  So you knew at that point that the account had
3        never been closed, and there had been -- and
4        Clinton King had been using the credit card?
5        A.  I assumed that's what had happened.
6    Q.  And you knew that the credit card was also your
7        responsibility?
8        A.  No, I didn't feel it was my responsibility at
9        that point.  I thought the card was closed.
10                    (OFF THE RECORD)
11       A.  I did not make these charges.
12   Q.  But you had just stated that in MBNA Page 60, you
13       had made that $145 payment.  At that point, you
14       knew that this account was still open and had
15       been used?
16       A.  That's what they told me.
17   Q.  What happened after you made the second $85
18       payment?
19       A.  I was unable to continue making these
20       payments.  As I said, I had a lot of medical
21       bills.  I informed them of this because I
22       continued to receive phone calls almost on a
23       daily basis, and I told them I was not
```

Page 17

090104 Hoefs (ASCII).txt

24      responsible for this, that I gave them my
0043
1       ex-husband's name, phone number, address, and
2       told them they need to direct all correspondence
3       to him.
4    Q. Did they acknowledge that he was an authorized
5       user on the account?
6    A.  They really wouldn't give me any information.
7       They just told me that this is my responsibility.
8       They were very -- they harassed me very much on
9       the telephone.
10   Q. Did they continue sending you statements to
11      15 Rice Drive in Wilbraham?
12   A.  Yes.
13   Q. Did you make any other payments after that second
14      $85 payment?
15   A.  No.
16   Q. So how many statements did you receive after that
17      second $85 payment?
18   A.  I don't know, maybe 5 or 6.
19   Q. If you turn to the final page in that packet,
20      MBNA 71.
21   A.  Okay.
22   Q. And you notice the first line of the body of the
23      document states, "Charge-off Adjustment"?
24   A.  Yes.
0044
1    Q. Do you remember receiving this document?
2    A.  No, I don't.
3    Q. Do you see how it says Janet S. Hoefs?
4    A.  Yes.
5    Q. And underneath that, it says P.O. Box -- what is
6       that 18026?
7    A.  That's what it looks like.
8    Q. And then in Wilmington, Delaware; is that
9       correct?
10   A.  That's what it says.
11   Q. And did you ever open that P.O. Box?
12   A.  No, I have never lived there.
13          MR. LEFEBVRE:  I think that's an MBNA
14      address.
15          MS. PIECZARKA:  I think you might be
16      right.
17   Q. So do you recall seeing the MBNA Page 70
18      document?
19   A.  I remember seeing one similar to it, but I
20      can't be positive it was this one.
21   Q. So after you received this, did you receive any
22      other statements?
23   A.  No.
24   Q. What is the next contact you received from MBNA?
0045
1    A.  I didn't receive any contact from MBNA.  The
2       next contact I received was from -- I thought at
3       the time it was an attorney's office stating they
4       were handling the collection of this account.
5    Q. Okay.  And did you know what they were trying to
6       collect?
7    A.  I assumed it had -- well, they had put --
8       referenced this MBNA account, and the total
9       amount due, so yes.
10   Q. And you were familiar with that because you had
11      been getting these statements?
                              Page 18

090104 Hoefs (ASCII).txt
```
12        A.  Yes.
13              MS. PIECZARKA:  Okay.
14        A.  At the time I had received that, I thought
15        that -- when I quit receiving statements, I
16        assumed that somehow they had straightened this
17        out with my ex-husband or whatever because I quit
18        receiving statements.
19              MS. PIECZARKA:  Okay.  I don't have any
20        other further questions.
21              MR. LEFEBVRE:  I have a couple.
22              EXAMINATION BY MR. LEFEBVRE
23   Q.   Janet, I just want to get some time frames clear
24        so we have a nice record.  You mentioned
0046
1         repeatedly during the deposition that as part of
2         the divorce, you believed that there were no
3         credit cards; correct?  That they had all been
4         paid off?
5    A.   Yes.
6    Q.   Now, just educate me.  I assume you and your
7         ex-husband had had some discussions about credit
8         card debt and paying them off which formed the
9         basis for your belief that they were going to be
10        paid; correct?
11   A.   Yes.
12   Q.   When you went to court -- was it West Virginia
13        you got divorced in?
14   A.   Yes.
15   Q.   Did your husband show up in court?
16   A.   Yes.
17   Q.   Okay.  Now, you talked about the divorce.  There
18        was a -- educate me a little bit.  You went into
19        the court date -- when did you actually go before
20        the judge to get the divorce, what month
21        approximately, give or take?
22   A.   Maybe March or April of '98.
23   Q.   And then did you have to wait a few months before
24        you got a final decree of divorce?
0047
1    A.   Yes.
2    Q.   Okay.  Now, prior to March of '98, when you went
3         before the judge for your divorce, were you and
4         your husband living together at that time?
5              THE WITNESS:  When we went before the
6         judge?
7              MR. LEFEBVRE:  Yes.
8    A.   No.
9    Q.   In fact, you had been separated; is that correct?
10   A.   Yes.
11   Q.   When did you separate from your husband?  When
12        were you living in separate places?
13   A.   We lived in separate places several different
14        times, but the last time was toward the end of
15        '97.
16   Q.   And that was the last separation before the
17        divorce?
18   A.   Yes.
19   Q.   So is it fair to say that sometime in '97 up
20        until March of 1998, when you went before the
21        judge to get your divorce, you were living in one
22        household, and your husband was living in
23        another?
24   A.   Yes.
```
Page 19

090104 Hoefs (ASCII).txt

```
0048
 1   Q.   And at that time, you still had that P.O. box,
 2        the one in Bancroft?
 3   A.   Yes.
 4   Q.   Okay.  Now, from the time you separated in '97 up
 5        until the day you went to see the divorce judge
 6        in March of '98, who was getting the MBNA
 7        statement at that time, if you remember?
 8   A.   Actually, I believed this was paid off prior
 9        to us seeing the judge.
10   Q.   And what had you -- go ahead.  I'm sorry.
11   A.   We had discussed this at the time we were
12        separating.  There was no way that either of us
13        could handle having credit card debt and living
14        separately, so we agreed to take money that we
15        had in the bank at the time and pay off all
16        credit card debt, and that left me with the house
17        payment and my car payment, and left him with no
18        debt at the time.
19   Q.   Okay.  So is it fair to say that after you went
20        before the judge in March of '98 that you never
21        made a single charge or purchase to this MBNA
22        account?
23   A.   That's correct.
24   Q.   And is it fair to say that after March of '98,
0049
 1        until you received that phone call from MBNA
 2        sometime in 2000, that you were unaware of this
 3        account?  You had thought that it was history?
 4   A.   That's correct.
 5   Q.   So if looking at statement -- let's go through
 6        the statements.  Look at Number 26.
 7   A.   Okay.
 8   Q.   There's a charge -- I'm looking at the -- there's
 9        a charge it looks like from North Carolina,
10        Adam Hayl, and then a charge at Big Lots.  You
11        didn't make those charges?
12   A.   No.
13   Q.   Let's go to the next one, 27.  Look at all the
14        charges on this statement and the payment.  Did
15        you make the payment or any of these charges?
16   A.   No, I didn't.
17   Q.   How about 28 -- let's forget 28.  There's no
18        charges there.  Did you make the $1,000 payment
19        referenced on MBNA 29?
20   A.   No.
21   Q.   How about 30, the Truckee River Lodge, there was
22        a purchase for $384; do you know what the Truckee
23        River Lodge is in Reno?
24   A.   I have no idea.
0050
 1   Q.   Ever been to Reno?
 2   A.   No.
 3   Q.   Okay.  How about 31, Myrtle Beach, did you go
 4        down to the beach in October of '98 and spend
 5        $736?
 6   A.   No, I didn't.
 7   Q.   Did you make any of these charges referenced on
 8        MBNA 31?
 9   A.   No.
10   Q.   So I just want to back up, just flipping through
11        34, 35 -- I'm looking at MBNA 34, 35, 36, 37,
12        MBNA 38, MBNA 39, up until the time you were in
                            Page 20
```

090104 Hoefs (ASCII).txt

```
13          Massachusetts in 2000, you didn't make any of
14          these charges as referenced on these exhibits?
15     A.   No, I didn't.
16     Q.   Now, I want to just go back.  We took the
17          deposition of the MBNA rep., and you heard
18          counsel mention that this account was opened I
19          think -- what was it, October of --
20               MS. PIECZARKA:  '97.
21     Q.   '97.  That kind of coincides -- you don't dispute
22          that it was October of '97 if MBNA's records say
23          so?
24     A.   No, I don't.
0051
 1     Q.   At the time in '97, you don't remember how you
 2          got the card, if it was via the phone, some
 3          telephone solicitation, or you filled out an
 4          application?  You don't remember how you did it?
 5     A.   I really don't.
 6     Q.   Do you know if your husband was involved?  Did
 7          you talk to him, and did he want to be --
 8     A.   I remember it was his suggestion.
 9               MR. LEFEBVRE:  Okay.
10     A.   At the time, we were trying to patch things
11          up, and I was very cooperative.
12     Q.   Okay.  And ultimately you got the card?
13     A.   Yes.
14     Q.   Now, when you got the card, was it your
15          understanding in October of '97 that your husband
16          was permitted to use the card at that time?
17     A.   Yes.
18     Q.   So did you ever call MBNA at any time and have a
19          discussion with them asking them to put your
20          husband's name on as an authorized user?
21     A.   Not that I recall.
22     Q.   So if MBNA -- take a look with me at -- just bear
23          with me one second.
24                         (PAUSE)
0052
 1     Q.   Take a look at MBNA 02.
 2     A.   Okay.
 3     Q.   Now, you see here the dates, I'm looking at --
 4          halfway through, it looks like a 7/26/99 at 1514,
 5          there is some operator, BTASLS, it says, "Add
 6          CH's Husband" -- I assume card holder's
 7          husband -- "as authorized user."  Do you recall
 8          having a conversation in July of '99?
 9     A.   No, and I can assure you that my current
10          husband has never had a card on this account.
11     Q.   Because I must confess, and I'm a bit
12          embarrassed, during the prior deposition, I kept
13          using Steven Hoefs, assuming that Steven was your
14          ex-husband until I just learned that he was not.
15          Steven Hoefs is your present husband?
16     A.   Yes, he is.
17     Q.   Does Steven Hoefs have an MBNA credit card?
18     A.   No, he never has.
19     Q.   You're sure of that?
20     A.   I'm quite positive of that.
21     Q.   And in fact, in this marriage with Steven, you
22          take care of all of the finances; is that
23          correct?
24     A.   Yes, I do.
0053
```

090104 Hoefs (ASCII).txt
```
 1   Q.   You open all of the bills, and you pay them; is
 2        that right?
 3        A.   Yes.
 4   Q.   Okay.  So to the best of your knowledge, Steven
 5        doesn't have an MBNA account?
 6        A.   No.
 7   Q.   Do you know why Steven would be referenced on
 8        your account back in July of '99?  Were you two
 9        dating at that time?  Were you married by them?
10        A.   We were married at that time.
11   Q.   Okay.  How about during your prior marriage,
12        whose responsibility was it to pay the bills?
13        A.   My ex-husband handled all the bills.
14   Q.   So you learned, and in this marriage, you're
15        paying the bills?
16        A.   I learned.
17   Q.   Okay.  And you understand that you're under oath,
18        and you understand the importance of testifying
19        truthfully; you understand that?
20        A.   Yes, I do.
21   Q.   Is there any doubt in your mind -- relative to
22        receiving the arbitration rider which has been
23        talked about at length, and it's referenced in
24        MBNA 22 and 23, did you ever see that document,
0054
 1        open an envelope that contained that document?
 2        That's my question.  Have you ever --
 3        A.   No.
 4   Q.   So is it fair to say other than just yesterday,
 5        when I scanned this document to you or as part of
 6        this lawsuit, it was the first time that you ever
 7        had seen this -- we'll call it arbitration
 8        addendum, Exhibit Numbered 22 and 23?
 9        A.   Yes, that's correct.
10   Q.   And you said that when you first found out that
11        there was a problem sometime in June of 2000, you
12        were living in Massachusetts?
13        A.   Yes.
14             MR. LEFEBVRE:  Okay.  That's all I have.
15             MS. PIECZARKA:  Nothing further.
16             MR. LEFEBVRE:  We would like to read and
17        sign, so we don't want to waive that privilege.
18             THE REPORTER:  Would you like a copy?
19             MR. LEFEBVRE:  Yes.
20             (DEPOSITION CLOSED AT 4:51 P.M.)
21
22
23
24
0055
 1                    C E R T I F I C A T E
 2
 3        I, Jeannette A. Lemoine, a Notary Public in and
     for the State of Rhode Island, duly commissioned and
     qualified to administer oaths, do hereby certify that
 4   the foregoing deposition of Janet Hoefs, Plaintiff in
     the above-entitled cause, was taken by me at the
 5   offices of Allied Court Reporters, 115 Phenix Avenue,
     Cranston, Rhode Island, commencing at 3:30 p.m. on
 6   September 1, 2004; that previous to the testimony of
     said witness, who was of lawful age, the witness was
 7   sworn by me; whereupon the witness was first duly
     cautioned and sworn to testify the truth, the whole
                         Page 22
```

090104 Hoefs (ASCII).txt
```
 8  truth, and nothing but the truth, and that the witness
    thereupon testified as in the foregoing-annexed
 9  transcript.
10      I further certify that the foregoing deposition
    was taken down by me in stenotype and was later
11  reduced to typewriting and that the foregoing is a
    true and accurate record of the testimony of said
12  witness.
13      Pursuant to Rule 30 (e), the witness, with
    agreement of the parties, hereby requests to read and
14  sign the transcript.
15      Pursuant to Rule 5 (d) and 30 (f) (1) of the
    Federal Rules of Civil Procedure, original transcripts
16  shall not be filed in court.  Therefore, original is
    delivered and retained by Defendant's attorney.
17

        IN WITNESS WHEREOF, I have hereupon set my hand
18  this        day of September, 2004.
19
20
21          JEANNETTE A. LEMOINE, CSR, NOTARY PUBLIC
              My Commission Expires July 17, 2005
22
23  In Re:  Janet Hoefs v. CACV of Colorado, LLC, et al
    Deposition:  Janet Hoefs
24  Date:  September 1, 2004
```

Page 23

# Exhibit D

AUG-31-2004 TUE 04:58 PM MBNA LAW          FAX NO. 3024320754          P. 15/36

| | | ACCOUNT NUMBER | |
|---|---|---|---|
| Ringling Bros. Barnum & | | 5329 0119 5917 2909 | |
| Bailey Combined Shows Inc | | | |

| PAYMENT DUE DATE | NEW BALANCE TOTAL |
|---|---|
| 01/02/00 | $7,072.52 |

| TOTAL MINIMUM PAYMENT DUE | AMOUNT ENCLOSED |
|---|---|
| $636.00 | |

Make check
payable to:
MBNA AMERICA          04
P.O. BOX 15137
WILMINGTON, DE 19886-5137

CARDHOLDER SINCE 1997

JANET S HOEFS
20 THORN HILL ESTS
POCA          WV 25159-040720

*1983654050*

$ 0000000000000000000004131150000592900000702252000536000053290119591729 09
$ 0002 5161 000  5329400000 20000000000000070 2820 00536000 05329 0119 5917 2909

| ACCOUNT NUMBER | | CREDIT LINE | CASH OR CREDIT AVAILABLE | BILLING CYCLE | CLOSING DATE | TOTAL MINIMUM PAYMENT DUE | PAYMENT DUE DATE |
|---|---|---|---|---|---|---|---|
| 5329 0119 591 2909 | | $6,500 | | 30 | 12-02-99 | $636.00 | 01/02/00 |

| POSTING DATE | TRANSACTION DATE | REFERENCE NUMBER | | TRANSACTIONS | DECEMBER 1999 STATEMENT | CHARGES | CREDITS (CR) |
|---|---|---|---|---|---|---|---|
| | | | | PURCHASES AND ADJUSTMENTS | | | |
| 1202 | 1100 | 00048820005B02 | NC C | OVER CREDIT LINE FEE | | 29.00 | |
| 1202 | 1202 | 000000000000000 | NC C | LATE CHARGE FOR PMT DUE 12/01 | | 29.00 | |
| | | | | TOTAL FOR BILLING CYCLE FROM 11/03/1999 THROUGH 12/02/1999 | | $58.00 | $.00 |

OUR RECORDS SHOW YOUR ACCOUNT IS PAST DUE AND YOUR BALANCE EXCEEDS APPROVED CREDIT LIMITS

**IMPORTANT**
**NEWS**

| SUMMARY OF TRANSACTIONS | | | | | | | | TOTAL MINIMUM PAYMENT DUE | |
|---|---|---|---|---|---|---|---|---|---|
| Previous Balance | **Payments and Credits** | + Cash Advances | + Purchases &Adjustments | = Periodic Rate FINANCE CHARGES | + Transaction Fee FINANCE CHARGES | = New Balance Total | | Past Due Amount | $395.00 |
| $6,882.76 | $0.00 | $0.00 | $58.00 | $131.76 | $0.00 | $7,072.52 | | Current Payment | $141.00 |
| | | | | | | | | Total Min Payment Due | $636.00 |

| FINANCE CHARGE SCHEDULE | | | | | |
|---|---|---|---|---|---|
| Category | | Periodic Rate | Corresponding Annual Percentage Rate | Balance Subject to Finance Charges | |
| A. BALANCE TRANSFER CHECKS | | .0629565% DLY | 22.98% | $0.00 | |
| B. ATM, BANK | | .0629565% DLY | 22.98% | $4,169.08 | |
| C. PURCHASES | | .0629565% DLY | 22.98% | $2,807.10 | |
| D. OTHER BALANCES | | .000000% DLY | 00.00% | $0.00 | |

FOR THIS BILLING PERIOD
ANNUAL PERCENTAGE RATE          22.98%
(Includes Periodic Rate and Transaction Fee Finance Charges)

THIS DOCUMENT IS A COPY OF THIS STATEMENT. IT IS FOR YOUR RECORDS
ONLY AND IS NOT AN OFFICIAL LIVE DOCUMENT. THIS COPY IS NOT AN
EXACT DUPLICATE AND MAY IT NOT INCLUDE MESSAGES WHICH APPEAR IN
THE IMPORTANT NEWS SECTION OF YOUR ORIGINAL PERIODIC STATEMENT.

PAGE 1 OF 1

FOR YOUR SATISFACTION, EVERY HOUR, EVERY DAY
• For our automated Direct Connect service, call
  1-800-526-6550
• To speak to one of our Customer Satisfaction representatives, call
  1-800-421-2110
• For TDD (Telecommunications Device for the Deaf) assistance, call
  1-800-346-3178
• Billing rights are preserved only by written inquiry. Mail billing inquiries and other account information to:
  MBNA AMERICA P.O. BOX 15026
  WILMINGTON, DE 19850-5026

MBNA000050

# Exhibit E

**IMPORTANT AMENDMENTS**
**TO YOUR CREDIT CARD AGREEMENT**

These Amendments change the terms of your Credit Card Agreement. Please read this document carefully and keep it with your Credit Card Agreement. Except for these Amendments, the terms of your Credit Card Agreement continue in full force and effect.

- Effective with transactions that post to your account on or after January 15, 2000, if you obtain a Check Cash Advance, a Balance Transfer, or an Other Cash Advance, we will assess a transaction fee (FINANCE CHARGE) equal to 3.00% of the U.S. Dollar amount of each such Cash Advance (Minimum Fee: $5.00; Maximum Fee $30.00).

- Effective with transactions that post to your account on or after January 15, 2000, if you obtain a Bank Cash Advance, an ATM Cash Advance, or a Cash Equivalent, we will assess a transaction fee (FINANCE CHARGE) equal to 3.00% of the U.S. Dollar amount of each such Cash Advance (Minimum Fee: $5.00).

- Effective April 8, 2000, your Minimum Payment will be calculated as follows: The Total Minimum Payment Due each billing cycle will be the sum of the Current Payment plus all past due amounts. The Current Payment each billing cycle will be the lesser of: 1) the sum of all Periodic Rate Finance Charges, Transaction Fees, and Account Fees (excluding Returned Cash Advance Check Fees, Copy Fees, and Abandoned Property Charges) plus $15; or 2) 2.25% of the New Balance Total. The Current Payment will never be less than $15 unless your New Balance Total is less than $15 in which case the Total Minimum Payment Due will equal the New Balance Total. If a payment is credited to your account but is returned unpaid in a later billing cycle, we will recalculate the Current Payment for the billing cycle in which the payment was originally credited.

- You consent to and authorize MBNA America, any of its affiliates, or its marketing associates to monitor and/or record any of your telephone conversations with our representatives or the representatives of any of those companies.

- As provided in your Credit Card Agreement and under Delaware law, we are amending the Credit Card Agreement to include an Arbitration Section. Please read it carefully because it will affect your right to go to court, including any right you may have to have a jury trial. Instead, you (and we) will have to arbitrate claims. You may choose not to be subject to this Arbitration Section by following the instructions at the end of this notice. This Arbitration Section will become effective on February 1, 2000. The Arbitration Section reads:

Arbitration: Any claim or dispute ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or any prior Agreement or your account (whether under a statute, in contract, tort, or otherwise and whether for money damages, penalties or declaratory or equitable relief), including Claims regarding the applicability of this Arbitration Section or the validity of the entire Agreement or any prior Agreement, shall be resolved by binding arbitration. "
The arbitration shall be conducted by the National Arbitration Forum ("NAF"), under the Code of Procedure in effect at the time the claim is filed. Rules and forms of the National Arbitration Forum may be obtained and Claims may be filed at any National Arbitration Forum office, www.arb-forum.com, or P.O. Box 50191, Minneapolis, Minnesota 55405, telephone 1-800-474-2371. If the NAF is unable or unwilling to act as arbitrator, we may substitute another nationally recognized, independent arbitration organization that uses a similar code of procedure. At your written request, we will advance any arbitration filing fee, administrative and hearing fees which you are required to pay to pursue a Claim in arbitration. The arbitrator will decide who will be ultimately responsible for paying those fees. In no event will you be required to reimburse us for any arbitration filing, administrative or hearing fees in an amount greater than what your court costs would have been if the claim had been resolved in a state court with jurisdiction. Any arbitration hearing at which you appear will take place within the federal judicial district that includes your billing address at the time the Claim is filed. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"). Judgment upon any arbitration award may be entered in any court having jurisdiction. The arbitrator shall follow existing substantive law to the extent

consistent with the FAA and applicable statutes of limitations and shall honor any claims or privilege recognized by law. If any party requests, the arbitrator shall write an opinion containing the reasons for the award.

No Claim submitted to arbitration is heard by a jury and no Claim may be brought as a class action or as a private attorney general. You will not have the right to act as a class representative or participate as a member of a class of claimants with respect to any Claim. This Arbitration Section does not apply to Claims between you and us previously asserted in any lawsuits filed before the date this Arbitration Section becomes effective. However, this Arbitration Section applies to all Claims now in existence or that may arise in the future.

This Arbitration Section shall survive the termination of your account with us as well as any voluntary payment of the debt in full by you, any bankruptcy by you or sale of the debt by us.

For the purposes of this Arbitration Section, "we" and "us" means MBNA America Bank, N.A., its parent, subsidiaries, affiliates, licensees, predecessors, successors, assigns, and any purchaser of your account, and all of the officers, directors, employees, agents and assigns or any and all of them. Additionally, "we" or "us" shall mean any third party providing benefits, services, or products in connection with the account (including but not limited to credit bureaus, merchants that accept any credit device issued under the account, rewards or enrollment services, credit insurance companies, debt collectors and all of their officers, directors, employees and agents) if, and only if, such a third party is named by you as a co-defendant in any Claim you assert against us. Also, for the purposes of this Arbitration Section, "you" or "yours" shall mean any person or entity approved by us to use the account, including but not limited to all persons or entities contractually obligated on the Account and all authorized users of the account.

If any part of this Arbitration Section is found to be invalid or unenforceable under any law or statute consistent with the FAA, the remainder of this Arbitration Section shall be enforceable without regard to such invalidity or unenforceability.

THE RESULT OF THIS ARBITRATION SECTION IS THAT, EXCEPT AS PROVIDED ABOVE, CLAIMS CANNOT BE LITIGATED IN COURT, INCLUDING SOME CLAIMS THAT COULD HAVE BEEN TRIED BEFORE A JURY, AS CLASS ACTIONS OR AS PRIVATE ATTORNEY GENERAL ACTIONS.

*If you do not wish your account to be subject to this Arbitration Section, you must write to us at MBNA America, P.O. Box 15565, Wilmington, DE 19850. Clearly print or type your name and credit card account number and state that you reject this Arbitration Section. You must give notice in writing; it is not sufficient to telephone us. Send this notice only to the address in this paragraph; do not send it with a payment. We must receive your letter at the above address by January 25, 2000 or your rejection of the Arbitration Section will not be effective.*

© 1999 MBNA America Bank, N.A.